```
                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA


   UNITED STATES OF AMERICA,        .
                                    .
            Plaintiff,              .   CR No. 21-0699-01 (JDB)
                                    .
       v.                           .
                                    .
                                    .   Washington, D.C.
   JOLY GERMINE,                    .   Wednesday, January 24, 2024
                                    .   9:41 a.m.
            Defendant.              .
   . . . . . . . . . . . . . . .    .   Pages 745 through 870


                          A.M. SESSION
                   TRANSCRIPT OF BENCH TRIAL
            BEFORE THE HONORABLE JOHN D. BATES
                 UNITED STATES DISTRICT JUDGE
```

<u>APPEARANCES</u>:

For the Government:          KAREN P. SEIFERT, AUSA
                            KIMBERLY L. PASCHALL, AUSA
                            U.S. Attorney's Office
                            601 D Street NW
                            Washington, DC 20530

                            BEAUDRE D. BARNES, ESQ.
                            U.S. Department of Justice
                            950 Pennsylvania Avenue NW
                            Washington, DC 20530

For Defendant:              ALLEN H. ORENBERG, ESQ.
                            The Orenberg Law Firm, PC
                            12505 Park Potomac Avenue
                            6th Floor
                            Potomac, MD 20854

                            ELITA AMATO, ESQ.
                            2111 Wilson Boulevard
                            Suite 8th Floor
                            Arlington, VA 22201

Court Reporter:             BRYAN A. WAYNE, RPR, CRR
                            U.S. Courthouse, Room 4704-A
                            333 Constitution Avenue NW
                            Washington, DC 20001

C O N T E N T S


TESTIMONY


KATIANA JOSEPH:     Direct Examination...................... 748
                    Cross-Examination...................... 759
                    Redirect Examination................... 765

JEAN RODNEY:        Direct Examination...................... 767
                    Cross-Examination...................... 781
                    Redirect Examination................... 794
                    Recross-Examination.................... 803
                    Further Redirect ...................... 814

JOSE LOUREIRO:      Direct Examination...................... 818

JAMES KAELIN:       Direct Examination...................... 835


*   *   *


EXHIBITS RECEIVED

Government Exhibit No. 903 .............................. 753
Government Exhibit No. 800.C2 .......................... 775
Government Exhibit Nos. 800.T- 809.T (conditionally)..... 801
Government Exhibit Nos. 800.T - 809.T................... 815
Government Exhibit No. 800.C1 .......................... 817
Government Exhibit Nos. 800 - 809 ...................... 817
Government Exhibit No. 410.02 .......................... 821
Government Exhibit No. 1001 ............................ 822
Government Exhibit Nos. 1070.01-.05 .................... 824
Government Exhibit No. 1070.07 ......................... 826
Government Exhibit No. 1070.08 ......................... 828
Government Exhibit No. 410.10 .......................... 829
Government Exhibit No. 410.11 .......................... 830
Government Exhibit No. 410.12 .......................... 831
Government Exhibit No. 410.13 .......................... 832
Government Exhibit No. 450 ............................. 844
Government Exhibit No. 912 ............................. 847


*   *   *

P R O C E E D I N G S

THE DEPUTY CLERK:  Good morning, Your Honor.  We're on the record in criminal case 21-699, United States of America versus Joly Germine.  We have Ms. Regine Duroska-Murray and Ms. Vophsie Cantave as interpreters who have been sworn in for the record.

Starting with government counsel, may you please approach the podium and state your appearance for the record.

MS. SEIFERT:  Good morning, Your Honor.  Karen Seifert for the United States.  With me at counsel table are AUSAs Paschall and Barnes.

THE COURT:  Good morning, good morning, and good morning.

MR. ORENBERG:  Good morning, Your Honor.  Allen Orenberg on behalf of Mr. Germine, who is present.

THE COURT:  Good morning, Mr. Orenberg, and to Mr. Germine as well.

MS. AMATO:  Good morning, Your Honor.  Elita Amato on behalf of Mr. Germine as well.

THE COURT:  Good morning, Ms. Amato.  Is there anything preliminarily before we resume the evidence in the case?

MS. SEIFERT:  Not from the government, Your Honor.

MR. ORENBERG:  No thank you, Your Honor.

THE COURT:  All right.  Next witness, please.

MS. PASCHALL:  Thank you, Your Honor, the government

1    calls Katiana Joseph.

2         THE COURT:  And by the way, I thank the government for

3    the -- we'll call it the updated exhibit list.  At some point

4    I will compare my list in terms of what's been admitted with

5    your list and then we can have any necessary discussion.

6         MS. PASCHALL:  Thank you.

7         MS. SEIFERT:  Just for the Court's awareness, I already

8    spoke to the clerk about doing that this morning and we're

9    going to work on that as well over the passing of today.

10   Thank you.

11        KATIANA JOSEPH, WITNESS FOR THE GOVERNMENT, SWORN

12                      DIRECT EXAMINATION

13   BY MS. PASCHALL:

14   Q.   In a loud and clear voice, could you please state your

15   name for the court?

16   A.   My name is Katiana Joseph.

17   Q.   Ms. Joseph, what state do you live in?

18   A.   Florida.

19   Q.   Are you a United States citizen?

20   A.   Yes, I am.

21   Q.   In August of 2021, were you in Haiti?

22   A.   Yes, I was.

23   Q.   And during that summer, were you operating a business

24   in Haiti?

25   A.   Yes, ma'am.

1    Q.    What happened to you in August of 2021 while you were

2    in Haiti?

3    A.    I was driving, and then I saw a motorcycle coming with

4    two people with a gun, and they stopped me with the gun and

5    they told me to open the door.

6    Q.    Okay.

7          MR. ORENBERG:  Your Honor, we're having a little

8    difficulty hearing her.  Can she pull the microphone closer?

9          THE WITNESS:  What about now?

10         MS. PASCHALL:  Or if you actually move your seat.

11         THE COURT:  Move your chair closer, and we'll get that

12    microphone closer.

13         THE DEPUTY CLERK:  Is that a little better?

14         MR. ORENBERG:  Yes.

15         THE WITNESS:  Sorry.

16         MS. PASCHALL:  That's okay.  I'll remind you too.

17         THE WITNESS:  Thank you.

18    BY MS. PASCHALL:

19    Q.    So I believe you said there were men on motorcycles who

20    stopped you while you were driving.

21    A.    Yes, ma'am.

22    Q.    What did those men do?

23    A.    The two men?

24    Q.    Yes.

25    A.    Okay.  They drove about one hour, and then after one

1    hour, approximately one hour, and then they drove me to some

2    place and then there was a guy who came, and then they said

3    they kidnap me.

4    Q.   Okay.  Let's stop and go back so that we can break it

5    down just piece by piece for the Court.  The two men who

6    stopped you, I believe you just said that they had guns.

7    Is that correct?

8    A.   Excuse me?

9    Q.   They had guns?

10   A.   Two gun.

11   Q.   What did the guns look like?

12   A.   They were short, but I don't know really about gun, but

13   what I saw, it was like two short gun.

14   Q.   And so for the record, you're holding your hands apart

15   maybe about a foot, like I am right now.  Does that sound

16   right?

17   A.   Right.

18   Q.   What did they do with those guns when they approached

19   you?

20   A.   They opened the door and then they push me in the back.

21   Q.   Were they using the guns at the time?

22   A.   What?

23   Q.   Were they using those guns at the time that they pushed

24   you in the back of the gun?

25   A.   Yeah.  Yes, ma'am.

1    Q.   Can you describe for us how they were using them?  You

2    can use your hands.

3    A.   Like to the door.  And then one of them put it to my head

4    when they were driving.

5    Q.   And I believe you said that you drove for about an hour.

6    Is that right?

7    A.   About an hour.

8    Q.   When you stopped driving, what happened next?

9    A.   When they stopped, and then there was a guy who came to

10   the car.

11   Q.   What did that guy say to you?

12   A.   He told me his name is Lanmo Sanjou, that he kidnap me.

13   Q.   What did he ask you to do?

14   A.   He asked me -- he -- he took the phone and make a phone

15   call, and called.

16   Q.   What did they take from you?  What are all of the items

17   they took from you?

18   A.   I had some money in the bank, and they took everything

19   that was in the bank.  They took my jewelry, my watch,

20   everything.

21   Q.   And you mentioned the phone.  Did the man who identified

22   himself as Lanmo Sanjou take that phone too?

23   A.   Yes, he took the phone.  Yes, ma'am.

24   Q.   What did he do with the phone?

25   A.   He called the -- he called the last number that was on

1    the phone, and he asked the man for ransom.

2    Q.    Could you hear him talking on the phone after he made

3    that call?

4    A.    Yes.  I heard him talking to the person on the phone.

5    Q.    How far away from you was he when he was making that

6    phone call?  Was he close to you?  Far away from you?  In the

7    car with you?

8    A.    Close, ma'am.

9    Q.    Close?

10    A.    Close to me.

11    Q.    Were you still in the car at the time?

12    A.    Yes, ma'am.

13    Q.    And what did he say to that person who picked up on the

14    other end of the phone?

15    A.    He said I have Katiana with me.  You have to prepare.

16    $1 million.

17    Q.    Was that $1 million U.S. or $1 million Haitian?

18    A.    U.S.

19    Q.    After this experience, when you spoke to the FBI, did

20    they show you a photograph that they asked you to identify of

21    the man that you knew as Lanmo Sanjou?

22    A.    Yes, ma'am.

23    Q.    Could we please pull up just for the witness Government's

24    Exhibit 903.

25          Ms. Joseph, can you see Government's Exhibit 903 on the

1    screen in front of you?

2    A.    That's him.

3    Q.    And when you say "that's him," who do you mean?

4    A.    That's Lanmo Sanjou.

5    Q.    Is this the photograph that you identified for the FBI?

6    A.    Yes, ma'am.

7    Q.    I'm also going to ask that we pull up what is --

8    actually, at this time, Your Honor, we would move the

9    admission of Government's Exhibit 903.

10            THE COURT:  On my exhibit list, it says "photo array."

11            MS. PASCHALL:  It's just --

12            THE COURT:  Is this being called a photo array?

13            MS. PASCHALL:  It is, Your Honor.  It's just the one

14    page.

15            THE COURT:  All right.  903 has been moved.

16            MR. ORENBERG:  No objection.

17            THE COURT:  Without objection, 903 is admitted.

18                        (Government Exhibit No. 903

19                          received into evidence.)

20    BY MS. PASCHALL:

21    Q.    Could we please pull up what's already in evidence as

22    Government's Exhibit 3.

23        Ms. Joseph, can you see Government's Exhibit 3 on the

24    screen in front of you?

25    A.    That's him.  Yeah.

1    Q.    And when you say "that's him" --

2    A.    That's Lanmo Sanjou.

3    Q.    That's Lanmo Sanjou?

4    A.    Yes, ma'am.  That's Lanmo Sanjou.

5    Q.    After Lanmo Sanjou made that phone call, what happened next?

6    A.    They put me in a room.

7    Q.    What kind of room was it?

8          Take your time.  Take your time.

9    A.    That's a room who -- where they hold people when they

10   kidnap them.  And I found people in that room.

11   Q.    Were there other people in the room when you arrived?

12   A.    Yes, ma'am.

13   Q.    Were they Haitian individuals?

14   A.    Excuse me?

15   Q.    Haitians?  Were they Haitian individuals?

16   A.    Yes, ma'am.

17   Q.    How long did you stay in the room?

18   A.    Nine days, ma'am.

19   Q.    What happened on the ninth day?

20   A.    On the ninth?

21   Q.    On the ninth day, what happened?

22   A.    They did liberate me, and then they call you by the name

23   of the car and that's how I knew that they called me.

24   Q.    Okay.  Let's break that down.  The individuals who were

25   watching over you in the room, are those the people who

1   announced the vehicle?

2   A.   Yes, ma'am.   Yes, ma'am.

3   Q.   Did they announce the vehicle that you were kidnapped in?

4   A.   Yes, ma'am.

5   Q.   And when they did that, what did that mean to you?

6   A.   That's when they call you that -- they release you.

7   Q.   So what happened after they called the name of the

8   vehicle that you were in?

9   A.   And then there was a guy waiting on a motorcycle to take

10  you out and then to drive you another place that they're going

11  to release you.

12  Q.   Did you go on the motorcycle with that gentleman?

13  A.   Yes, ma'am.

14  Q.   Did that gentleman have a firearm or a gun?

15  A.   It wasn't short, it was a long one, but I don't know

16  the name.   It was a long one.

17  Q.   Longer than the one you previously described?

18  A.   Yes.   Yes.

19  Q.   Could you show us with your hands?

20       So for the record Ms. Joseph is holding up what I'll

21  estimate to be about three feet.   Would that be maybe one and

22  a half meters?   Or shorter?

23  A.   The truth is, this look like, you know, when I look at

24  the movie, it's when you go -- when you go -- it's when you go

25  like -- when you are killing animals?   It's approximately that

1    size.

2    Q.   So the size of a firearm that you've seen in the movies

3    when people are hunting animals.

4    A.   Exactly.  That's the name I missed.  Thank you, ma'am.

5    I appreciate it.  Hunting, yes.

6    Q.   So after that man with the long gun drove you on the

7    motorcycle, what happened next?

8    A.   He was sitting in the back and then one is driving and

9    then they took me to another place, and then that's where

10   they liberated me --

11   Q.   I'm sorry.  Are you saying is that where they liberated

12   you?  Is that the word you're saying?

13   A.   I can tell that that's the end, because I saw Lanmo

14   Sanjou, and then he gave me -- he gave each of us a paper

15   with a phone number.

16   Q.   And what did he say to you about that piece of paper

17   with the phone number on it?

18   A.   He said, whenever you want to negotiate the car, you

19   can call that number.

20   Q.   Did you ever call that phone number?

21   A.   No, ma'am.

22   Q.   Why not?

23   A.   The person who came to pick me up, he took it and threw

24   it away.  And even if he didn't do that, I wouldn't -- like

25   I'm talking to you now?  That's a sad story.  I don't even

```
 1         want to see the car anymore.
 2         Q.   Is it too difficult?
 3         A.   Excuse me?
 4         Q.   Is it too difficult?
 5         A.   It's what?
 6         Q.   Too difficult to negotiate for the car?
 7         A.   It's hard.
 8         Q.   And how are you feeling now, sitting in court recounting
 9         these events for the Court?
10         A.   How do I feel?
11         Q.   How do you feel?
12         A.   It's a big sacrifice, ma'am, talking to you about it.
13         It's hard.  It's my whole life.
14         Q.   After you were released, what have you done for the
15         people who paid your ransom?
16         A.   I went to see them --
17              THE COURT:  Excuse me.  I don't know that there's a
18         foundation for that question, that a ransom was paid.
19         BY MS. PASCHALL:
20         Q.   Do you know if a ransom was paid for you?
21         A.   Do I know what?
22         Q.   Do you know if a ransom was paid for you to be released?
23         A.   Yes.  They paid the ransom for me to be released.
24         Q.   And earlier when you described your captors calling
25         people's vehicles out by name, did that mean that that
```

1    person's ransom had been paid and they would be released?

2    A.   Yes.

3    Q.   So when your vehicle name was called out, did that mean

4    that your ransom had been paid?

5    A.   Yes, ma'am.

6    Q.   So after you were released, what did you do for the

7    people who paid your ransom?

8    A.   I spoke to them.  Some of them doesn't want to take any

9    money from me.  Some of them, yes, but some of them they don't

10   want to take any money.

11   Q.   Do you know how much money was collected on your behalf?

12   A.   Each time I asked that, they tell me a different story.

13   But most of the -- I mean, it was about around 50 equivalent.

14   It's not in U.S., but it was the equivalent in Haitian money.

15   Q.   So when you say 50, do you mean 50,000 U.S. dollars

16   approximately?

17   A.   Yes, ma'am.

18   Q.   But I think you said that was paid in Haitian money?

19   A.   Haitian money, yes.

20   Q.   Is that because the people who paid your ransom were

21   in Haiti and collected cash?

22   A.   Yes.  They pay in cash.  Yes, ma'am.

23   Q.   $50,000 in U.S. in cash, is that a lot of money in Haiti?

24   A.   Yes.  Yes, ma'am.

25   Q.   How much of the money would you say that you have paid

```
1     back for the people who paid that ransom money --

2     A.   Around 20,000.  Equivalent of $20,000.

3     Q.   20,000 in U.S. dollars?

4     A.   In U.S. dollars.

5     Q.   But you've paid them --

6     A.   In Haitian money.

7          MS. PASCHALL:  Thank you for your time, Ms. Joseph.

8     I'll pass the witness.

9          MR. ORENBERG:  Court's indulgence.

10         THE COURT:  Certainly.

11      (Defense conferring.)

12         THE COURT:  Ms. Amato.

13                      CROSS-EXAMINATION

14    BY MS. AMATO:

15    Q.   Good morning.

16    A.   Good morning.

17    Q.   Now, you informed us that you are a U.S. citizen.

18    A.   Excuse me?

19    Q.   You testified that you are a U.S. citizen.

20    A.   Yes, I am.

21    Q.   Okay.  Now, are you originally from Haiti?

22    A.   Yes, ma'am.

23    Q.   Okay.  So when you talked about -- when you told us about

24    the conversations that you heard, were those conversations

25    that you heard in what language?
```

1    A.    In Creole.

2    Q.    Okay.  And you speak Creole.

3    A.    Yes, ma'am.

4    Q.    Now, when you were initially approached by the two

5    individuals, they spoke to you in Creole?

6    A.    In Creole, ma'am.

7    Q.    And you spoke to them in Creole.

8    A.    In Creole.

9    Q.    And when you were housed -- I believe you said it was

10   nine days -- during that time, did you speak to the

11   individuals in Creole?

12   A.    Yes.

13   Q.    When you met with Lanmo Sanjou you spoke to him in

14   Creole.  Correct?

15   A.    In Creole.

16   Q.    And they took your phone, you said, and they called the

17   last number that was on the phone.

18   A.    Excuse me?

19   Q.    You said they took your phone.  Correct?

20   A.    Correct.

21   Q.    All right.  And when they took your phone they looked at

22   your phone?

23   A.    Yes.

24   Q.    And did you give them a password so they could --

25   A.    Exactly.

```
1    Q.   And then they opened up the phone and then they saw the
2    very last number that either your phone called or called your
3    phone.  Correct?
4    A.   Correct.
5    Q.   Was that a number in Haiti?
6    A.   It was a number in Haiti, ma'am.
7    Q.   So that is the number that then was called to speak with
8    someone for a ransom.  Correct?
9    A.   I don't understand the question, ma'am.
10   Q.   Okay.  So they called that number -- there was a purpose
11   for them calling that number.  Correct?
12   A.   Yes, ma'am.
13   Q.   And the purpose for them calling that number is they were
14   trying to tell someone they wanted money.  Is that what you're
15   saying?
16   A.   Exactly.
17   Q.   So that number they called was a number that was in
18   Haiti.  Correct?
19   A.   Correct, ma'am.
20   Q.   And you heard them speak to the person?
21   A.   Yes, ma'am.
22   Q.   And you heard --
23   A.   Because --
24   Q.   Excuse me.  You heard them speak in Creole.  Correct?
25   A.   It was on speaker.  That's why I heard it.
```

1   Q.   Okay.  Right.  And it was in Creole.

2   A.   In Creole, ma'am.

3   Q.   And was that the only person that they dealt with to seek

4   money for your release?

5   A.   No, ma'am.  Because the person that they called was the

6   last person, and that person call other people.

7   Q.   Okay.  So that person called other people.  But did Lanmo

8   Sanjou, did he call other people for the money, or did he just

9   deal with one person?

10  A.   They call it negotiator, you know, the person who

11  negotiate for you.  That's the number that he has that he's

12  been calling.

13  Q.   Okay.  So he called the negotiator.

14  A.   Yes, ma'am.

15  Q.   And then the negotiator called other people.

16  A.   The negotiator -- yes, ma'am.

17  Q.   Okay.  But Lanmo Sanjou always dealt with the negotiator.

18  A.   Exactly.

19  Q.   Okay.  And you said that the money was paid in Haitian

20  money.  Correct?

21  A.   Correct.

22  Q.   And you said that when you asked people afterwards what

23  was paid, they kept saying different numbers.  Correct?

24  A.   No.  They didn't say different number.  They said

25  approximately in Haitian 50,000.  The thing is, they don't

1    want me to worry that every time -- in the beginning when they

2    released me, they didn't even want to talk to me.  They said

3    it's your health, for your safety, it's your health first.

4    Don't even think about money.  Okay?  Because you imagine I'm

5    on high blood pressure, and then I stayed without -- I have my

6    medicine now I was taking.  I stayed without medicine.  So my

7    health was first.

8    Q.   I understand.  And so my question to you was that the

9    people that paid, afterwards they were telling you different

10   numbers of what they paid.  Correct?

11   A.   Not different, it's approximately, because when you

12   change the money, when you change American to Haitian,

13   different day, different time, different people, you know.

14   Everybody has their different rate to be paid.

15   Q.   Okay.  Okay.  So because of that, you heard different

16   numbers.

17   A.   They said it's approximately $50,000.  That's the

18   approximation.

19   Q.   Okay.  But when you said that it's approximately -- as

20   you testified on direct examination, you said that every time

21   you asked them, they said a different number.

22   A.   Approximately that number, 50,000 equivalent in Haitian.

23   Q.   Now, when you were held those nine days, at no time did

24   you tell the individuals that were holding you that you were a

25   U.S. citizen.  Correct?

1    A.    No.  I don't want to tell them that.  I don't want to
2    know that.  It might be worse, ma'am.
3    Q.    So they thought that you were only Haitian?
4         MS. PASCHALL:  Objection.  Foundation for this witness
5    to know what they thought.
6         THE COURT:  Sustained.
7    BY MS. AMATO:
8    Q.    All right.  So as you said, you wanted to hide the fact
9    that you were also an American citizen.
10        MS. PASCHALL:  Objection.  That mischaracterizes the
11   testimony.
12        THE COURT:  You may answer that question.  Ask it
13   again.
14        MS. AMATO:  Certainly.
15   BY MS. AMATO:
16   Q.    So you wanted to hide that you were an American citizen.
17   A.    They didn't ask me, ma'am.  They didn't ask me if I am
18   Haitian or not.  They didn't ask me that.
19   Q.    Okay.  All right.  And you did not tell them that you
20   were anything but Haitian.
21   A.    It's not a matter of telling them that you're Haitian or
22   not.  It's a matter of money that they want.  It's not a
23   matter of your nationality.
24   Q.    Well, I understand what you're saying, but my question to
25   you is that you did not tell them that you were anything but

```
 1        Haitian.  You did not tell them that you were also a U.S.

 2        citizen, did you?

 3               MS. PASCHALL:  Asked and answered, Your Honor.

 4               THE COURT:  You may answer the second part of that

 5        question.  Did you tell them that you were a U.S. citizen?

 6        Did you tell them that?

 7               THE WITNESS:  No.  I didn't tell them nothing.

 8               MS. AMATO:  Okay.  All right.

 9          Thank you, Your Honor.  That's all I have.

10               THE COURT:  Ms. Paschall.

11                         REDIRECT EXAMINATION

12        BY MS. PASCHALL:

13        Q.   Ms. Joseph, defense counsel asked you several questions

14        about the different amounts of money you heard were paid for

15        you.  Do you remember those questions she just asked you?

16        A.   Yes.

17        Q.   So how much money have you personally paid back to the

18        people who have paid your ransom?

19        A.   20,000 --

20               MS. AMATO:  Your Honor, beyond the scope.  I didn't ask

21        about what she actually paid.

22               THE COURT:  Overruled.  Actually, this has been asked

23        and answered.  Ask the question again.  The objection is

24        overruled.

25
```

```
 1      BY MS. PASCHALL:
 2      Q.   How much money have you paid back to those people?
 3      A.   20,000 equivalent.
 4      Q.   And the defense counsel just asked you some questions
 5      about whether you told your captors if you were an American
 6      citizen or not.  Do you remember those questions?
 7      A.   Yes, ma'am.
 8      Q.   And you weren't -- you never lied to them about your
 9      citizenship, did you?
10           MS. AMATO:  Your Honor, leading.
11           THE COURT:  That's a leading question.  You can ask
12      a different question.
13      BY MS. PASCHALL:
14      Q.   Did they ever ask you what your citizenship was?
15      A.   No, ma'am.  No, ma'am.
16           MS. PASCHALL:  Thank you, Your Honor.  No further
17      questions.
18           THE COURT:  Ms. Joseph, thank you very much for coming.
19      We appreciate it, you may step down and you're excused.
20           THE WITNESS:  Thank you so much, Judge.
21           THE COURT:  Have a good day.
22           THE WITNESS:  You too.
23        (Witness steps down.)
24           THE COURT:  Next witness.
25           MS. SEIFERT:  The government calls Jean Rodney to
```

 1    the stand.

 2              JEAN RODNEY, WITNESS FOR THE GOVERNMENT, SWORN

 3                         DIRECT EXAMINATION

 4    BY MS. SEIFERT:

 5    Q.    Good morning.  Could you please introduce yourself and

 6    spell your name for the record?

 7    A.    Very well.  My name is Jean Riccardo Rodney.  J-E-A-N;

 8    Riccardo, R-I-C-C-A-R-D-O; Rodney, R-O-D-N-E-Y.

 9    Q.    Mr. Rodney, where were you born?

10    A.    I was born in Haiti.

11    Q.    Where do you live now?

12    A.    I live in Chandler, Arizona.

13    Q.    How long have you lived in the United States?

14    A.    I've been living in the United States for about 22 years,

15    23 years.

16    Q.    What languages do you speak?

17    A.    I speak English, Creole, and French.

18    Q.    What did you speak growing up?

19    A.    I spoke Haitian Creole and French.

20    Q.    And when did you learn English?

21    A.    I learn English in Haiti throughout my studies and also

22    when I came here I continued to learn English in the first

23    couple years I came to the United States, in 2000, 1999.

24    Q.    How far in school did you go in Haiti?

25    A.    In Haiti I completed high school.

1    Q.   What about any schooling in the United States?

2    A.   In the United States I did my master's degree.

3    Q.   And what's your master's in?

4    A.   Adult education and training.

5    Q.   And you did that schooling in the United States?

6    A.   That's correct.

7    Q.   And was that schooling primarily in English?

8    A.   Yes, it was.

9    Q.   Before you took your current position, did you serve

10   in any military branches?

11   A.   Yes, I did.  I was in the Army.

12   Q.   How long were you in the Army?

13   A.   I was in the Army for seven years.

14   Q.   Now, what is your current job?

15   A.   Right now I'm an interpreter/translator.

16   Q.   And how long in terms of years for all of the time have

17   you worked in that field of interpreting or translating?

18   A.   I've been working in that field for over 11 years.

19   Q.   Let's start with your current full-time job.  What's your

20   current full-time job?

21   A.   It is a video remote interpreter with Stratus Video.

22   Q.   How long have you worked for Stratus Video?

23   A.   I've been working for Stratus since 2016, so about seven

24   years.

25   Q.   What do you do for them?

1    A.   I interpret legal, medical, translate interpretation

2    sessions.

3    Q.   And you said Stratus Video.  So are these video, like,

4    visits?  Or what kind of video are you using?

5    A.   It is via computer, so remotely by video the client join,

6    and then I do the interpretation session.

7    Q.   And could you move the microphone a little closer?

8    A.   Yes.

9    Q.   You're quite tall.

10   So for instance, if a patient is seeing a doctor and the

11   patient speaks Haitian Creole and the doctor speaks English,

12   would you be providing services?

13   A.   That is correct.  I'll be doing that via an iPad that

14   they have at the hospital or in that session.

15   Q.   What type of testing process did you have to go through

16   with Stratus Video in order to affirm to them that you had a

17   sufficient level of translation skill?  Excuse me.

18   Interpretation skill.

19   A.   Interpretation.  I had to take a test by phone with a

20   third party, where they test me in different areas with

21   medical and legal terminology.  And that's what I had to do.

22   Q.   And I used "translation" and "interpretation."  Could you

23   define for us the difference between those two terms?

24   A.   Interpretation, it's spoken.  It's being able to render

25   from one source to another what is being said.  And when it

1   comes to translation, it's strictly written documents.  It's

2   documents.  So whenever you are changing renditions, meaning

3   from one source target to another.  So that's translation.

4   Q.   Do you work in both of those -- sorry.  Do you do both of

5   those things in your jobs?

6   A.   In my -- with the Stratus, I do interpretation, not

7   translation.

8   Q.   Okay.  We're going to talk about your other jobs in a

9   minute.  Do you also do some translation in addition as a side

10  job?

11  A.   Yes, I do.

12  Q.   Okay.  We'll get to the translation in a minute.  Let me

13  ask you about another part-time job.  Have you had a part-time

14  job working as a court interpreter?

15  A.   Yes, I do.

16  Q.   Could you tell me a little bit about how long you've done

17  that for?

18  A.   I've been doing this since 2011.  Yes.  2011.

19  Q.   And what do you do as a court interpreter?

20  A.   With SOS International, so I go to EOIR court, Department

21  of Justice, so I interpret in the immigration court to various

22  cities in the country.  Wherever they need me, they send me

23  there.

24  Q.   And you said EOIR.  I think -- then you clarified.

25  You're talking about immigration court.

1    A.    Immigration court.  Yes.

2    Q.    What languages do you interpret -- I should have asked

3    this about Stratus Video as well, but with both of these jobs,

4    what languages are you interpreting to and from?

5    A.    Creole and English.

6    Q.    Thank you.  What is the testing process that you had to

7    go through to become a court interpreter?

8    A.    We had a proctored test where there was someone

9    supervising the test and they are at different sections in

10   the test.  And they do that every year.  So they call me and

11   then, from English and Creole, the same scenario that I would

12   have in a real courtroom, then they provide different

13   scenarios for me to interpret.

14   Q.    Okay.  And how often do you take that test?

15   A.    Every year.

16   Q.    Now, have you ever, in your time either with Stratus

17   Video or with the court interpretation, not passed a test

18   that has been administered to you in terms of translating

19   from Creole to English?

20   A.    Never.

21   Q.    How many times have you provided court interpretation,

22   and how many different proceedings?

23   A.    I really cannot count, but over a hundred times.

24   Q.    Do you also have a part-time job where you provide

25   translation?

```
1     A.    Yes, with -- yes, with Manpower.

2     Q.    And Manpower, is that the name of the company that you

3     work with?

4     A.    Yes.

5     Q.    How long have you worked for Manpower?

6     A.    I cannot remember exactly.  Probably for six, seven

7     years.

8     Q.    And the work that you do for Manpower, is that regular?

9     Is it once in a while?

10    A.    Not frequent.  Whenever they have a project they call me.

11    Q.    Are you an employee or a contractor?

12    A.    Contractor.

13    Q.    Now, does Manpower administer a test before they bring

14    you on as a translator?

15    A.    Yes, they did.

16    Q.    How did you do on that test?

17    A.    I did pretty well.  Yes.

18    Q.    And have you ever not passed a test that was administered

19    to you with respect to translating?

20    A.    Never.

21    Q.    Okay.  Now, tell me a little bit about your involvement

22    in this case, which relates to your work for Manpower.  Did

23    you receive a project from Manpower with respect to this case?

24    A.    Yes, I did.

25    Q.    Can you explain to the Court how Manpower assigned the
```

1    project?

2    A.   They emailed me and asked me if I was available for the

3    project, and if I do, I email back and say yes, I'm available.

4    And then from there they give me access, whenever the court

5    gives them authorization to start on the project.  And then

6    from there, from a secure site, I do have access to it, and

7    I receive the documents and what I needed to work on.

8    Q.   Now, for Manpower, were you the first -- for this

9    project, in this case, were you the first line of translation?

10   A.   No, I was not.

11   Q.   Okay.  What was your role?

12   A.   I was a reviewer.

13   Q.   So explain for the Court how Manpower works in terms

14   of the first line of translation and the reviewer, please.

15   A.   First when we receive the translation project, they have

16   a translator working on it, and once that translator is done,

17   they send it to a reviewer, another translator, to review it.

18   And also they have staff also to check the project whenever

19   it's done to make sure everything is correct as well.  So

20   that's how they work.

21   Q.   Okay.  And have you worked as both a reviewer and a

22   first-line translator?

23   A.   For this project, or?

24   Q.   In general.

25   A.   In general?  Sometimes.  Sometimes I'm a translator,

1    sometimes I'm a reviewer.

2    Q.   If you know, why is it that the company is having someone

3    review?

4    A.   I'm assuming it's to make sure of accuracy of the

5    project.

6    Q.   And on this particular project, following your review of

7    the materials that you were asked, did you sign a

8    certification about your review and about the accuracy of the

9    translation?

10   A.   Yes, I did.

11   Q.   Okay.  And I'm showing you what's been marked as

12   Government's 800.C2.  Are you familiar with this document?

13   A.   Yes, I am.

14   Q.   And 800.C2 is a two-page document with the Manpower Group

15   logo on the first page and on the second page a signature.

16   Do you know whose signature this is?

17   A.   Yes, I do.  That's mine.

18   Q.   Have you seen this document before?

19   A.   Yes, I did.

20   Q.   Is this the certification of translation that you

21   produced with respect to your work that you did in this case?

22   A.   Yes, that is.

23        MS. SEIFERT:  And, Your Honor, move to introduce the

24   certification.

25        THE COURT:  What's the exhibit number again?

```
 1              MS. SEIFERT:  800.C2.
 2              THE COURT:  Eight zero zero dot three two.
 3              MS. SEIFERT:  C, like Charlie for certification.
 4              THE COURT:  Oh.
 5              MR. ORENBERG:  No objection.
 6              THE COURT:  800C -- the way it's listed on the exhibit
 7         list is 800C.2.  Is that the same document?
 8              MS. SEIFERT:  Yes, Your Honor.
 9              THE COURT:  Okay.  Is admitted.
10                             (Government Exhibit No. 800.C2
11                              received into evidence.)
12         BY MS. SEIFERT:
13         Q.   Now, this document first has a series of file names; and
14         they have some very long strings of numbers and underscores,
15         and it looks like there are one, two, three, four, five, six,
16         seven, eight, nine -- ten files.  Are you familiar with the
17         files in this first part of the document under "Haitian Creole
18         title"?
19         A.   Yes, I am.
20         Q.   Do these correspond to files that you reviewed?
21         A.   Yes.
22         Q.   Okay.  We met before today.  Correct?
23         A.   Correct.
24         Q.   And did we look at these files together?
25         A.   Yes, we did.
```

776

1    Q.    Okay.  And I'm going to open for you a file folder that

2    has some exhibit numbers, Exhibit 800, 801, 802, 803, 804,

3    805, 806, 807, 808, 809.  Do you see those displayed on the

4    screen?

5    A.    Yes, I do.

6    Q.    And 800 through 809 all have the file extension ".mp3."

7    Is that right?

8    A.    Yes, they do.

9    Q.    Are these all audio files?

10   A.    Yes, they are.

11   Q.    And are these the audio files that you reviewed in

12   preparation for your work in this case?

13   A.    Yes.

14   Q.    When we were in my office together did you go through

15   your list that is in 800.C2 of the Creole files and match them

16   up to the list that you see on the screen now of these names

17   of these various exhibits, 800 through 809?

18   A.    Yes, we did.

19   Q.    Did they all match up?

20   A.    Yes, they did.

21   Q.    Okay.  Now, tell me about what you did with those audio

22   files.

23   A.    When I received the audio files, I listened to them and

24   looked at the English translation, transcribing --

25   transcription, rather.  And then also I looked at the Creole

1    translation of it to make sure are they accurate.

2    Q.   Okay.  Let's take a step back.  800 through 809, what

3    type of audio are they, do you know?  Sorry.  Let me first

4    ask, are they in Creole or English?

5    A.   Oh.  They are in Creole.

6    Q.   Could you tell just in general what the people on the

7    audio files were talking about?

8    A.   If I can have a vague recollection, it was a conversation

9    between some people, I think people were in jail, that's about

10    it, but I don't know much about this case at all.

11    Q.   That's plenty.  So these are conversations between two

12    people speaking both in Creole?

13    A.   Both in Creole.  Yes.

14    Q.   So you said in addition to the audio files, what else

15    did Manpower send you?

16    A.   The Word documents of the transcriptions.

17    Q.   Okay.  And the transcriptions are you said Word

18    documents.  And what is on the Word document?

19    A.   English and Creole translations side by side.

20    Q.   Okay.  So before you got that Word document, just to

21    clarify, someone had listened to the call and transcribed

22    it into Creole?

23    A.   Correct.

24    Q.   And then there was also English on the document?

25    A.   Yes.

1   Q.   And was that the translation from Creole to English?

2   A.   Yes.

3   Q.   Okay.  What was your job?

4   A.   My job was to review what was done, to check for

5   accuracy.

6   Q.   Okay.  So with respect to Government's 800 through

7   809, did you first listen to the calls and ensure that the

8   transcription was accurate?

9   A.   That is correct.

10  Q.   Did you make any changes if you thought it wasn't

11  accurate?

12  A.   Yes.

13  Q.   Okay.  And then with respect to the translation, so

14  where the Creole was on English on the Word document, did

15  you review that?

16  A.   Yes, I did.

17  Q.   Did you make any changes if you thought it was not

18  accurate?

19  A.   Yes.

20  Q.   And tell me a little bit about what types of changes you

21  need to make in your job as a translator when you're

22  reviewing.

23  A.   As a reviewer, I will look at if the grammar and syntax

24  are not correct, or sometimes Haitian terms that may have

25  different meanings, and based on the context in some, I don't

1    really know much about what's going on, then to the best of

2    my ability, then I provide the closest possible translation or

3    correction for the document.  And also if there was something

4    that's not correct, then I corrected it.

5    Q.    Now, do you know anything about the facts of this case?

6    A.    Absolutely not.

7    Q.    Okay.  So when you said context, are you looking for

8    context within the call or are you trying to apply some sort

9    of outside the call context?

10   A.    Just literally, just based on the meaning of the words

11   and what I hear just on the regular flow of the conversations.

12   Q.    You said these calls, you thought someone was in jail.

13   Were there any words that were difficult to ascertain what the

14   callers were discussing?

15   A.    Can you rephrase the question?

16   Q.    Were there any words used on the call, like, that you

17   felt were either code words or slang or things that were maybe

18   not obvious what the meaning was?

19   A.    Yes.  There were plenty, I believe.  Yes, there were.

20   Q.    And with respect to those instances, did you translate it

21   as literally as you could to the best of your ability?

22   A.    Yes, I did.

23   Q.    Now I'm showing you on the screen -- actually, let's

24   first go back to 800.C2, which is your certification.

25         On page 1, the second list says "English title" and it

1    looks like there are the same file names as in the Haitian

2    Creole title but now each of the names has a "-ENGL" addition

3    to that name.  Is that right?

4    A.    Yes.

5    Q.    What are these documents that are listed under the

6    English title.

7    A.    Those are the English documents of the call.

8    Q.    Okay.  And is that what you produced as a representative

9    of Manpower Group in response to the assignment which was to

10   translate the calls that are in the first list, the Haitian

11   Creole MP3s?

12   A.    Yes.

13   Q.    And when we were in my office, did you review the

14   following exhibits which are listed on the screen --

15   A.    Yes.

16   Q.    And I'll go through them just for the record.  800.T,

17   801.T, 802.T, 803.T, 804.T, 805.T, 806.T, 807.T, 808.T, 809.T.

18   Did you review each of those documents with me?

19   A.    Yes, I did.

20   Q.    Did we open them together and look at them?

21   A.    Yes, we did.

22   Q.    Do 800.T through 809.T, are they fair and accurate

23   records of what you produced to my office in respect to the

24   assignment in this case?

25   A.    Yes.

1    Q.   And are those the same files that are referenced in your

2    certification?

3    A.   Yes.

4    Q.   Okay.

5         MS. SEIFERT:  I have no further questions for this

6    witness.  Actually, no.  One more question.  Two.

7    BY MS. SEIFERT:

8    Q.   Did you fairly and accurately transcribe the Creole calls

9    from audio into Creole on the paper?

10   A.   The original interpreter did that.  I review, yes.

11   I reviewed.  Yeah.

12   Q.   And was that transcription fair and accurate?

13   A.   Yes.

14   Q.   Based on your knowledge.

15   A.   Yeah, to the best of my knowledge.

16   Q.   And is the translation from Creole into English fair and

17   accurate based on your knowledge?

18   A.   Yes.

19        MS. SEIFERT:  Okay.  No other questions for this

20   witness.

21        THE COURT:  Ms. Amato.

22        MS. AMATO:  Thank you, Your Honor.

23                    CROSS-EXAMINATION

24   BY MS. AMATO:

25   Q.   Good morning, Mr. Rodney.

```
 1    A.    Good morning, ma'am.
 2    Q.    So let me just go through a little bit.  I have a few
 3    questions again about your background in translating and
 4    interpreting.
 5    A.    Yes.
 6    Q.    Now, would you say that most of the work that you do
 7    is interpreting rather than translating?
 8    A.    Yes.  Most of the work I do is interpreting.
 9    Q.    And you said that you testified -- or you not testified
10    but you provide interpreting in front of the immigration
11    courts?
12    A.    Yes, I do.
13    Q.    Now, you are not federally court certified to interpret.
14    Correct?
15    A.    No.  For my language, no, we don't do that.
16    Q.    So in other words, you could not come to this courtroom
17    and interpret for us because you are not federally court
18    certified.
19    A.    No.
20    Q.    Okay.  All right.  And did you take the exam?
21    A.    Which exam?
22    Q.    The exam to become a federally court certified
23    interpreter?
24    A.    No.  I never had to.
25    Q.    And you understand that that exam is a very difficult
```

```
 1    and demanding exam.

 2         MS. SEIFERT:  Objection.  Calls for speculation.

 3    He stated he never took the test.

 4         THE COURT:  You can lay a foundation as to how he might

 5    know.

 6    BY MS. AMATO:

 7    Q.   So let me ask you this.  You're aware that to work in

 8    federal court you have to be federally court certified.

 9    Correct?

10    A.   Yes.  Yes.

11    Q.   Okay.  And have you looked into what is required to

12    become federally court certified?

13    A.   No.

14    Q.   Have you spoken with anyone who is federally court

15    certified in Creole?

16    A.   No.

17    Q.   Or in any language?

18    A.   No.  No.

19    Q.   Now, you said that every year you receive a test for

20    interpreting.  Is that correct?

21    A.   That is correct.

22    Q.   Now, you said that you passed.  Correct?

23    A.   Yes.

24    Q.   All right.  But is it a pass and fail, or is it graded

25    on a grade?
```

1    A.    It's graded.

2    Q.    Okay.  And so let me ask you this, then:  How close

3    to failing were you on any of these tests?

4    A.    Four -- it's out of five, so usually I score 5 and

5    sometimes 4.5.

6    Q.    So it's out of five.  Five what?

7    A.    Five points.

8    Q.    Five points.  Okay.  And you said what do you usually

9    get?

10   A.    Five points or 4.5.

11   Q.    Now, in terms of translating, you said you have taken a

12   translation test.

13   A.    It's all part of it.

14   Q.    It's the same test.

15   A.    Same test, yeah, for the Manpower, so that's who I

16   translate for.  Yes.  They give it to me.

17   Q.    So it's one test for interpreting and translating?

18   A.    One test for translating.  For Manpower they give me --

19   okay.  For interpreting, the company that I interpret for, I

20   don't do translation work for.  So, therefore, the grade --

21   the 4.5, 5 point, it's for the interpreting.  But for Manpower

22   when I tested for them I tested the highest as well.  I do

23   translation work for them as well.

24   Q.    Okay.  I think you lost me there for a minute.

25   For Manpower, you do translation?

1    A.    Yes.

2    Q.    Okay.  You do not do interpreting.

3    A.    No.

4    Q.    And again, interpreting is when you are dealing with the

5    oral word.  Correct?

6    A.    Correct.

7    Q.    And translating is the written word.

8    A.    Correct.

9    Q.    And there's obviously a difference in both.

10    A.    Yes.

11    Q.    And you said to us that Manpower has a test for you each

12    year or --

13    A.    No.  No.  Not Manpower.  It's the SOI International for

14    interpreting.  The translation, not every year, no.

15    Q.    Okay.  So SOS is the one that -- is the one that's

16    providing the examinations.

17    A.    SOS.  Yes.

18    Q.    For interpreting, yes?

19    A.    Yes.

20    Q.    And for translating?

21    A.    No.

22    Q.    No.  Okay.  So SOS is just interpreting?

23    A.    Correct.

24    Q.    And that one you do every year.

25    A.    Yes.

1    Q.   How often do you do the test for translation?

2    A.   Just one time when I started with the company.

3    Q.   Just one time, okay.  And that was through the Manpower

4    test?

5    A.   Yes.

6    Q.   It was their test.

7    A.   Yes.

8    Q.   And when was that that you took the test?

9    A.   I cannot recall.  Probably six, seven years ago when I

10   started with them.

11   Q.   Okay.  And was that also on a point scale?

12   A.   It was so long I cannot remember, but usually they are.

13   But I cannot remember.

14   Q.   You cannot recall?

15   A.   Yes.

16   Q.   All right.  And you can't recall where --

17   A.   No.  I just know I passed at the highest.

18   Q.   And so since then you have not -- since about six or

19   seven years ago, you have not taken any further translating

20   tests.

21   A.   No.

22   Q.   Besides Manpower, have you worked with any other company

23   to do translation?

24   A.   Yes.  Other companies call me, yes.

25   Q.   And none of those companies have a test that they provide

1    to you?

2    A.   No, because usually they asked me for my resume with my

3    experience, and they don't need that from me.

4    Q.   Do you have a copy of your resume here?

5    A.   No, I do not.

6    Q.   Okay.  Now, in this case you were asked to listen to

7    phone -- well, you were asked to listen to jail calls.

8    Correct?

9    A.   Yes.

10   Q.   All right.  And you said that you were not the initial

11   translator.

12   A.   No.

13   Q.   Okay.  So you were the review person.

14   A.   Yes.

15   Q.   Now, to do an initial translation, that usually takes a

16   long time, doesn't it?

17   A.   Yes.

18   Q.   It takes, what, about six hours per minute, or is there a

19   time frame usual for every minute of content, of audio?

20   A.   Usually 15 minutes will take you about probably a couple

21   hours.

22   Q.   So for 15 minutes of audio would take a couple of hours.

23   A.   Yes.

24   Q.   Okay.  And that's for the initial translator.

25   A.   Yes.

1    Q.   But you as a reviewer, you don't take that much time.

2    A.   Usually not.  Depends on the quality of the translation.

3    Q.   The quality of the translation.  The quality of the

4    person that did the initial translation.

5    A.   Yes.

6    Q.   Okay.  Now, what about the quality of the recording, of

7    what you're listening to?

8    A.   Also that affects the time that it takes, yes.

9    Q.   Now, in this case, the 800 through 809 that you were

10   asked to review, do you recall the quality of the recordings?

11   A.   Yes.  They were -- yeah.  It was hard to hear on a lot of

12   the calls, yes.

13   Q.   And when you say it was hard to hear then a lot of the

14   calls, did you use any type of equipment to assist?

15   A.   Just a regular headset.

16   Q.   Regular headset, okay.  And so, in other words, when you

17   say regular headsets, that's what you were using to listen to?

18   A.   To listen to.

19   Q.   Okay.  But in terms of the actual -- was it on a video,

20   was it on a computer, where were these things --

21   A.   It was not on video, it was audio files, and on the

22   computer I listened to it with the computer Windows Media

23   Player.

24   Q.   Can you speak a little slower?

25   A.   Sure.  With the computer's Windows Media Player.

1    Q.   Windows Media Player.

2    A.   Yes.

3    Q.   Now, does Windows Media Player have anything you can use

4    to adjust the speed, for example?

5    A.   Yes, it does.

6    Q.   Okay.  Does it have anything to take out certain sounds?

7    A.   No, I don't.

8    Q.   Do you recall if you used the -- what would you call it?

9    I guess the change of speed.  Did you use that at all?

10   A.   Yes.  I tried that.  Yes.

11   Q.   You tried it?

12   A.   I did use it, yes.

13   Q.   Do you recall if you did that for every single one?

14   A.   I'm sure.  I'm sure.

15   Q.   You're sure.  Okay.

16   A.   Yes.

17   Q.   Now, did you -- but you didn't have anything then to take

18   out if there was any other noises in the calls.

19   A.   No, I did not.

20   Q.   And so it was really the speed, that was the only thing

21   you could change in terms of --

22   A.   Yes.

23   Q.   And after you did your review -- well, let me ask you

24   this:  Do you recall how many changes you made for each of

25   these transcripts you reviewed?

1    A.    No, I do not.

2    Q.    And so as you sit here, if I were to show you let's say

3    800.T, for example -- well, in other words, if I showed you

4    the translations that you reviewed, at this point as you sit

5    here you would not be able to recall what you changed in any

6    of these?

7    A.    Absolutely not.

8    Q.    So if I went through 801, 802, 803, all the way up to

9    809, same thing, you wouldn't recall what changes you made.

10   A.    Absolutely not.

11   Q.    So after you made those changes, did you show them to

12   the initial person who did the translations?

13   A.    I do not have any contact with that person.  I do not

14   know.

15   Q.    You do not?

16   A.    No.

17   Q.    Okay.  So there was never any discussion with anybody as

18   to your changes vis-à-vis what was initially on the

19   translation.

20   A.    No.  When I make the changes and I'm done with a

21   document, I send it back to Manpower and they have somebody

22   who check them as well, and they can make changes too or adopt

23   the changes or ask me to change.

24   Q.    Okay.  So there's someone above you, in other words

25   another person --

1    A.    Another person, yes.

2    Q.    -- reviewing what you've done.  But again, you yourself

3    are basically isolated in your own space.  Correct?

4    A.    Yes.

5    Q.    Doing your work.

6    A.    Correct.

7    Q.    And there's no interaction between the person that

8    initially did the translations.  Correct?

9    A.    Correct.

10   Q.    And there's no interaction with the person who then may

11   have reviewed your work.

12   A.    There's interaction between the person who reviewed it

13   after me because sometimes the person ask me, hey, what was

14   that or can I change this, and -- yes.  But not the initial

15   translator.  I do not.

16   Q.    Do you recall in this case whether the person, I'm

17   calling it for lack of a better word, above you, the reviewer

18   after you, what it was that they came back to you on?

19   A.    Absolutely not.  No.

20   Q.    Do you recall if the changes you made -- if the final

21   version has the changes that they made or the ones that you

22   had made?

23   A.    I do not know.  I would say that it has both.

24   Q.    Well, you're saying that you're guessing.  Correct?

25   A.    Yeah.  I would say because once I send it, I'm assuming

1    they sent what I sent.  If they made any change after that,

2    I would not know.

3    Q.   You would not know.

4    A.   Yes.  If they make any change after that.  Yes.

5    Q.   So once it's out of your hands, in other words, then you

6    don't see the documents again.

7    A.   No.  I do not.

8    Q.   And you don't know the final results.

9    A.   No.  Yeah, I do not.  I do not.

10        MS. AMATO:  Thank you.  Oh, one more thing.

11        (Defense conferring.)

12   BY MS. AMATO:

13   Q.   All right.  I'm going to show you -- well, let me ask

14   you this:  Were you asked to do any identifications of voices?

15   A.   I was not asked, but if I'm able to identify them, let's

16   say somebody say their name, then I can put that on the side.

17   But usually you put a generic name, MV1 if it's a male voice,

18   or if -- if it's a male voice, MV1.

19   Q.   MV1, okay.

20   A.   For the first person.  If it's a female voice, FM, and

21   so on.  But usually the person above me, as we mentioned here,

22   can do that as well.

23   Q.   Okay.  So -- all right.  So it is -- because, again,

24   as you said you don't really know anything about the case.

25   Correct?

```
 1    A.   I do not.
 2    Q.   Right.  And so for you to input a name would be if
 3    someone gave you a name to input.  Correct?
 4    A.   Usually they don't give me a name.  If I hear it on the
 5    call and then it's identified on the call, then from there I
 6    put it on there.
 7    Q.   Okay.  But now, if a translation -- so let me say this.
 8    Well, is it you that would indicate "voice attributions herein
 9    were provided by someone other than the translator"?  Would
10    that be something you would put down on the transcript or the
11    individual who did the initial translation?
12    A.   The person who did the initial translation, most likely,
13    if the person is able to identify the names of the person on
14    the call, then that person will put that on there.
15    Q.   Right.  But if a transcript indicates that voice
16    attributions were provided by someone else other than the
17    translator, then that would mean it was not the translator
18    that was making those decisions.  Correct?
19    A.   If it says that, then based on literally what you just
20    said, then probably not the translator.
21    Q.   Okay.
22              MS. AMATO:  Okay.  Thank you, Your Honor.
23              THE WITNESS:  You're welcome.
24              THE COURT:  Ms. Seifert.
25
```

REDIRECT EXAMINATION

BY MS. SEIFERT:

Q.   Mr. Rodney, you were asked a series of questions about
whether the calls were hard to hear.  When you had difficulty
hearing the calls and you did what you described, were you
able to rectify your issues hearing what was being said?

A.   Yes.  Whenever I had difficulty hearing, I tried to slow
down and get the best rendition as possible.  And also
sometimes you just put on there, you can't hear.  There's like
a symbol, I can't remember, you put on there that you were not
able to hear that part, that section.

Q.   I'll get back to that in a second, but do you ever listen
to parts that are difficult to hear more than once?

A.   Yes.

     MS. AMATO:  Your Honor, I'm going to object to leading
questions, leading the witness.  The witness can be asked what
they did, but not lead the witness.

     THE COURT:  The objection is sustained.

BY MS. SEIFERT:

Q.   What do you do to listen to the call when you can't hear?

A.   I slow down the audio, and then I listen to it more than
once as needed.

Q.   And you mentioned just a minute ago that if you can't
hear, that you mark something in the document?  What do you
mark?

1    A.   I cannot remember the symbol, but on top of the documents

2    there's different symbols where if you can't hear or it's not

3    intelligible, then you can put that on there, that it's not

4    intelligible, what's being said.

5    Q.   Okay.  I'm going to show you on the screen what has not

6    yet been admitted but what you have authenticated as 800.T

7    just as an example.

8        So I see there's a list of abbreviations at the top.

9    Is that what you're referring to?

10   A.   Yes.  That's what I'm referring to, yes.

11   Q.   Okay.  I'm going to circle this one right here.  Terrible

12   circle, I'm sorry.  There's one that says "UI."  What does

13   that mean?

14   A.   Unintelligible.

15   Q.   So is that what you marked?

16   A.   That's what I meant.

17   Q.   Okay.  Let's just take a look at 800.T.  So for instance

18   we're on page 2, line 4.  What mark did you make with respect

19   to what the voice designated as MV1 stated?

20   A.   It's unintelligible.

21   Q.   So is it a fair characterization that if there is

22   wording, you were able to hear what was being said, and if

23   there isn't -- if it says UI, it's unintelligible?

24   A.   Yeah.  If I'm not able to hear what they say, then it's

25   UI.  Yes.

1    Q.   And there are a few other things I just wanted to call to

2    your attention.  So for instance, on line 13, there's this --

3    I'm circling, on the English side, it says "laughing."

4    Why would you mark something like that?

5    A.   If somebody's laughing out loud and you hear it, then

6    you note that on there since it takes a little bit of time

7    in the call.

8    Q.   Okay.  And that's on page 2, line 13.  And let's just

9    again for reference go to page 3, line 37 and 38.  There's a

10   couple other things you noted in those lines.  We can look at

11   the English together.  Let's start with line 37.  What did you

12   note was happening on the call?

13   A.   It says there are people speaking in the background.

14   So while the main person was speaking and we could hear things

15   in the background which you're not able to tell; it's not

16   intelligible.  And also the second, the line 38, says background

17   sound.  So some kind of sound that you can hear in the call.

18   Q.   And why did you write down, like, background noise if

19   that's not what the -- or like people speaking in the

20   background, why do you mark that in the document?

21   A.   It's to depict what's going on in the call as close as

22   possible for somebody who's reading it to have a sense of the

23   reality of what's going on.

24   Q.   On this call -- we're on page 1 of 800.T -- in the

25   participants, there is an individual named Chichi LNU.

1    Do you know what LNU stands for?

2    A.    No, I do not.

3    Q.    And that name Chichi, is that a name that the translator

4    assigned?

5    A.    Yes.

6    Q.    Now we're on page 6 of 800.T.  If you could just read for

7    the Court lines 100 and 101.

8    A.    It says, "Who, Chichi?"

9          So basically they're asking who is that, if it's Chichi.

10   Q.    And then the response?

11   A.    101 says, "It's Chichi, how are you?"

12   Q.    So is this an example of how you as the translator

13   figures out who's talking?

14   A.    One more time.

15   Q.    Is this an example of how you as the translator --

16         MS. AMATO:  Objection.  Objection.

17         THE COURT:  The objection is overruled.  You're calling

18   him the translator.  He's actually the reviewer, so make sure

19   you use whatever term is accurate here.

20         MS. SEIFERT:  I think he's both, Your Honor.

21         THE COURT:  Well, he may be both, but that's why you

22   need to use term when you say as the translator.  As the

23   initial translator or as the reviewing translator?

24         MS. SEIFERT:  Well, both of those folks are

25   translators, that's what he explained.

1          THE COURT:  But you're asking if he assigned this name,

2     and that's a difference between which person.  So you need to

3     be clear in the question.

4          MS. SEIFERT:  Okay.

5     BY MS. SEIFERT:

6     Q.   Do you recall who picked the name "Chichi"?  I mean on

7     page 1.

8     A.   I do not --

9     Q.   Do you recall who put that in, if it was you or the

10    initial translator?

11    A.   It wasn't me.  It was probably the initial translator.

12    Q.   Did you agree that Chichi was the appropriate name?

13    A.   Based on what I --

14          MS. AMATO:  Objection.

15          THE COURT:  What's the objection?

16          MS. AMATO:  Your Honor, without the recording, I would

17    say it's -- he's just making a guess, an assumption at this

18    point.

19          THE COURT:  I'm allowing some limited substance

20    examination of an exhibit that is not in evidence.  And there

21    will be a point at which I'll cut that off and not allow it to

22    go any further.  But as far as it's gone, I don't think

23    there's a problem.  So the objection is overruled.

24        But be mindful that this document is not in evidence, and

25    if you go in too far in terms of the substance of the

1   document, then we're going to stop.

2          MS. SEIFERT:  I'm happy to move them all into evidence

3   right now, Your Honor.  800.T through 809.T.  I think the

4   government has laid a foundation for all of the translations

5   through this witness.  I was going to wait until we actually

6   played them for the Court, but there's no problem with moving

7   them in now.

8          MS. AMATO:  Objection, Your Honor.  This witness said

9   that after he did his translation someone else reviewed them

10  and he does not know what the ultimate final translations look

11  like.

12         MS. SEIFERT:  Let me ask a few more questions.

13  BY MS. SEIFERT:

14  Q.   Mr. Rodney?

15  A.   Yes.

16  Q.   You certified these translations?

17  A.   Yes.

18  Q.   That's 800.C2.  I'll put that back on the screen.

19  Before you signed this document which states, "I certify under

20  penalty of perjury that the attached translations are true and

21  correct," did you in fact review these documents that are the

22  English versions in your certification and confirm that in your

23  opinion they were in fact true and correct translations?

24  A.   Yes.

25  Q.   And so the documents that are 800.T through 809.T that

1    we looked at together in my office, are you certifying again

2    today that you think they are true and accurate translations?

3    A.    Yes.

4              MS. SEIFERT:  Move to admit 800.T to 809.T.

5              MS. AMATO:  Your Honor, subject to a little bit of

6    cross, please.

7              THE COURT:  I'm sorry?

8              MS. AMATO:  Subject to cross.  I didn't cross on this

9    because she didn't at that point seek to admit them.

10             THE COURT:  I think the cross-examination that you --

11   I might allow you to do some cross-examination if I feel that

12   this has gone beyond the scope of the direct and the

13   cross-examination, and maybe it has.  But with respect to

14   admitting the documents that have now been moved for

15   admission, questions you might have about the accuracy you can

16   explore, but they don't go to whether the documents should be

17   admitted based on the certification of the witness.

18        So do you have any objection to the admission of -- I guess

19   it's 800.T through 809.T.

20             MS. AMATO:  Well, I do, Your Honor, because I don't

21   know how much time this witness had to actually review each

22   one of these translations before he made the certification.

23             THE COURT:  All right.  I'm going to conditionally

24   allow the admission subject to allowing Ms. Amato a small bit

25   of cross-examination since this didn't come up in the direct

1    examination.  You didn't try to admit the exhibits.  But I'll

2    conditionally allow them so you may continue with your

3    examination.  But I'm then going to give Ms. Amato a chance

4    for whatever she wants to explore further on cross-examination

5    before I either remove the condition or decide that they

6    actually can't be admitted.

7                              (Government Exhibit Nos.

8                              800.T - 809.T (conditionally)

9                              received into evidence.)

10   BY MS. SEIFERT:

11   Q.   Prior to certifying this record, do you recall exactly

12   how much time you spent on each of these translations?

13   A.   I do not recall exactly how much time.

14   Q.   Do you have an estimate?

15   A.   On average, I'll say probably three hours.  For this

16   particular project -- yeah.  Probably like three hours on

17   average.

18   Q.   Per file?

19   A.   Per file.

20   Q.   And so on cross-examination, when Ms. Amato said you

21   don't know the final results, here, however, in your

22   certification you did certify the final results.  Correct?

23   A.   Yes.

24   Q.   So if any differences were made when it was sent to the

25   company, you reviewed those differences before you did the

1    certification?

2    A.   Yes.  They send it to me and then I certify.  Once I

3    certify it's gone and I don't have access to it.

4    Q.   Okay.  So this certification is off the final product?

5    A.   Correct.

6    Q.   So 800.T to 809.T, that's the final product of the

7    company?

8    A.   Yes, it is.

9    Q.   And that's your final product as well.

10   A.   Yes.

11   Q.   Let's go back to the Chichi question.  That's my last

12   question for you.  I believe we were on page 6.  So we're on

13   page 6 of 800.T, which has now been admitted, and I'd like you

14   to read for the Court the English version of 100 and 101.

15   A.   "Who, Chichi?"  Then 101: "It's Chichi, how are you?"

16   Q.   So in this part of the call we've switched from, on line

17   99 it was FV1, right?

18   A.   Mm-hmm.

19   Q.   FV1 had been talking with MV1.

20   A.   Yes.

21   Q.   And then it appears that in 101 there's a different -- is

22   that a different person that gets on the phone, or how do we

23   know it's a different person?

24        THE COURT:  Ms. Amato, are you standing up because you

25   want to say something?

 1          MS. AMATO:  No, excuse me, Your Honor.  I'm just
 2     standing up.  I apologize.
 3          THE COURT:  Okay.  Please.  Sorry for the interruption.
 4          THE WITNESS:  The way I know is because the person
 5     identifies herself.  So yeah, once the person identifies
 6     themself, then yes.
 7     BY MS. SEIFERT:
 8     Q.   So once they say their name on the call, is that how you
 9     identify --
10     A.   Yes.  Yes.  If somebody says -- yes.
11     Q.   As a translator, when someone says their name on a call,
12     is that one of the things you take into consideration when
13     you're trying to decide who's on the call?
14     A.   Yes.
15          MS. SEIFERT:  No other questions.
16          THE COURT:  All right.  Ms. Amato, I will give you a
17     chance at brief further cross-examination.  I suppose I will
18     have to give Ms. Seifert a chance if necessary to follow you.
19          MS. AMATO:  Thank you.  Okay.  I understand.
20                         RECROSS-EXAMINATION
21     BY MS. AMATO:
22     Q.   So, Mr. Rodney, you informed us that you signed the
23     certification of translation after reviewing all of the jail
24     calls in the U.S. Attorney's Office?
25     A.   Yes.  I reviewed them, and then once I'm done, I signed

804

1     the certification and send it.

2     Q.   Now, were you by yourself when you reviewed these calls

3     or was there someone else with you?

4     A.   By myself.

5     Q.   Okay.  So the U.S. Attorney's Office here basically

6     brought you down to their office.  Correct?

7     A.   No, no, no, no, no.  I'm from Phoenix, Arizona.  So they

8     sent them to me.

9     Q.   They sent them to you?

10    A.   Yes.  Through a secure file, I accessed them.  No, I

11    did not go to the U.S. Attorney's Office.

12    Q.   All right.  So they sent them to you, and they said

13    please review these.  They sent then the recordings to you.

14    Correct?

15    A.   Yes.

16    Q.   They sent the translations -- well, they sent the

17    document with the transcript in Creole side by side with the

18    translation in English.

19    A.   Yes.

20    Q.   All right.  And --

21         THE COURT:  Just for my sake, when you use the term

22    "they sent," let's be specific.

23         MS. AMATO:  Yes, Your Honor.

24    BY MS. AMATO:

25    Q.   Who sent it to you?

```
1    A.   Manpower.

2    Q.   Manpower.

3    A.   Yes.

4    Q.   Okay.  So it wasn't from the U.S. Attorney's Office?

5    A.   No.  I do not have any access with the U.S. Attorney's

6    Office.

7    Q.   Okay.  So Manpower said -- did they inform you that these

8    were transcripts that you had already reviewed?

9    A.   No.

10   Q.   They did not.

11   A.   When they send it to me, it's not reviewed yet.  They

12   send it to me so I can review them.

13        THE COURT:  He's talking about the initial receipt for

14   the assignment.

15        MS. AMATO:  I see.  Okay.

16   BY MS. AMATO:

17   Q.   So then maybe I'm missing something.  You were not the

18   last person to review these.  Correct?

19   A.   I don't know the process, but yes, I am, because I

20   certified that they were true and accurate.  So I don't

21   believe they have -- because each person who works on the file

22   must certify.  So I don't know if they have any other person

23   that review it, not that -- I don't know their process, but I

24   know from my end, I certify them, and whenever I see, like,

25   the signature it shows for this document, then I'm the one who
```

1    certified it.

2    Q.   So prior to that we had talked all about how after you

3    provided your review, as the reviewer, that then the documents

4    would go up to someone else.

5    A.   Yes, because I don't have access to wherever it's going.

6    So they're the one who receive them.  Because whenever I make

7    those changes, then they apply those changes, they send them

8    to wherever it's going to, or the U.S. Attorney's Office --

9    Q.   No.  What we talked about was you said after you review,

10   there's someone who reviews it after you do.

11   A.   Yeah, because they looked at the changes that I made and

12   then they applied, because on the Word document, so I made the

13   changes, and then they check them.  And then if there's

14   something, like I said, they'll send back to me and say hey,

15   what is this, I did not understand correctly.

16        Then once everything is good, they feel like everything

17   is good, then they apply those changes that I made, because on

18   the Word document, you can put both -- you have the original

19   and then you have the changes, and then they just apply them

20   once that makes sense and then they send it.

21   Q.   Let's break this down because this is sounding a little

22   different than what you had said before.

23             MS. SEIFERT:  Objection.

24             THE COURT:  Sustained.

25             MS. AMATO:  All right.

1    BY MS. AMATO:

2    Q.   So there's an individual who does the initial

3    translation.  Correct?

4    A.   Yes.

5    Q.   And that individual does two things.  They provide the

6    transcript in the language that's being translated -- that

7    is being heard.  Correct?

8    A.   Yes.

9    Q.   So in this case it was Creole.

10   A.   Creole.  Yes.

11   Q.   The recordings were in Creole.

12   A.   Yes.

13   Q.   So the initial translator provided the Creole, and then

14   after they provided the Creole, they also did the initial

15   translation.

16   A.   Yes.

17   Q.   Then that document comes up to you.  Is that correct?

18   A.   Yes.

19   Q.   The company has sent it to you informing you that you

20   are going to review what someone else has already translated.

21   A.   Yes.

22   Q.   Okay.  After you have completed -- and again, you told us

23   that you don't speak to that individual.  Correct?

24   A.   No.  I do not.

25   Q.   You make whatever changes you believe is appropriate.

1    Then it's sent to a third person in the company to do a final

2    review.  Correct?

3    A.    In the context that we are talking about, I won't say

4    final review, so that it doesn't mean that that person does

5    the same thing I did as far as, like, working on it.  But when

6    I say that person review it, just review what I've done to

7    make sure that if there's anything that doesn't make sense,

8    then they send it back to me.  So in that context, that's what

9    I mean by that.  So they don't send it to another translator

10   like me who speak Haitian Creole.  It's somebody from Manpower

11   who does that.

12   Q.    So it's someone from Manpower who is not a translator.

13   A.    I do not know, really.  I do not know.

14   Q.    So you don't really know what's going on at that --

15   A.    Exactly.  So once I certify it, what I certified, if

16   there's anything that they do not understand or they have

17   question, they send it back to me.  Then I accept whatever

18   they say, hey, is this the right thing or is there a

19   difference, or I accept it or not, or I reject it or I keep it

20   the way it is.  But whatever is sent to them, I certify them,

21   then I send it to them, they applied the changes that I made.

22   Q.    So before you send your work, your work product, you sign

23   the certification.

24   A.    For what I've done, yes.

25   Q.    And so that's what we have here.  Correct?

1    A.   Yes.

2    Q.   So these --

3         THE COURT:  What do you mean by that's what we have

4    here?

5         MS. AMATO:  Well, I'm just looking for it now,

6    Your Honor.

7    BY MS. AMATO:

8    Q.   So, for example, 800.C2, which I believe the government

9    introduced into evidence, if I can just put this --

10        THE COURT:  800.C2 is in evidence.

11        MS. AMATO:  Thank you.

12   BY MS. AMATO:

13   Q.   Okay.  So I'm showing you 800.C2.  Is this your

14   signature?

15   A.   Yes, it is.

16   Q.   And so this we see you certified on the 15th of December,

17   2023?

18   A.   Yes.

19   Q.   So that's when you completed your work of reviewing the

20   phone calls and comparing them to the transcript and the

21   translation.

22   A.   Yes.

23   Q.   And whatever changes you made.

24   A.   Yes.

25   Q.   Okay.  And you're certifying as to these specific files

1    here.  Correct?

2    A.    Yes.

3    Q.    All right.  And beyond this, do you recall if there

4    were any other files that you reviewed?

5    A.    No.  Just those files.

6    Q.    Okay.  And then so once you reviewed these files and

7    signed your certification, then it went up to some other

8    employee -- an employee of Manpower.  Correct?

9    A.    Yes.

10   Q.    Okay.  And then they reviewed the changes you made.

11   Correct?

12   A.    Yes.

13   Q.    And as you said, they make the final decision as to

14   whether to accept or reject your changes.  Correct?

15   A.    Correct.

16   Q.    Okay.  And then after that, after they've made the

17   decision as to whether to accept or reject your changes,

18   they don't send it back to you.  Correct?

19   A.    Depends on which one of them.  If they reject it they

20   send it back so that I can correct it based on their

21   suggestion, and then if I agree, then I agree.  If I disagree,

22   I maintain my translation.

23   Q.    Okay.

24   A.    And then from there, it goes out.

25   Q.    And so in this situation, how many were rejected?

1    A.    Oh, I do not know.  But it could be just like one word

2    in a document.  So it could be a few.  In some documents they

3    were fine.  But it wasn't -- probably like a couple, a few

4    documents, I don't remember.  I really don't remember.

5    Q.    Okay.  And so you don't recertify at that point.

6    Correct?

7    A.    No.  It's after -- the certification is done after

8    everything's been accepted.  Yeah.  Not -- yeah.  Not when I

9    send it.

10    Q.    Okay.  Now, you were asked on 800.T, you were shown some

11    translations regarding the name Chichi.

12         MS. SEIFERT:  Your Honor, outside the scope of the

13    permitted re-cross.

14    BY MS. AMATO:

15    Q.    Well, let me ask you this:  When you complete --

16         THE COURT:  No.  Just a second.  I need to rule on

17    the objection.  The objection's overruled.  You may go ahead,

18    Ms. Amato.

19    BY MS. AMATO:

20    Q.    You were asked, and I believe it was this page, which was

21    page 6, in this -- using this --

22         THE DEPUTY CLERK:  There's also a screen right there

23    where if you press "ELMO" right there in the front.

24         MS. AMATO:  Oh, this screen.

25         THE DEPUTY CLERK:  Yeah.

```
1              MS. AMATO:  Thank you.
2       BY MS. AMATO:
3       Q.   All right.  So you were asked about this section here.
4       Do you see that on lines 100 and 101?
5       A.   Yes.
6       Q.   Where it says -- well, it says "Who's Chichi" in English.
7       Correct?
8       A.   Yes.
9       Q.   And then it says, "It's Chichi, how are you?"
10      A.   Yes.
11      Q.   And you would agree with me that you do need the
12      recording to listen to to understand whether or not Chichi
13      or another individual is speaking at that point.  Correct?
14      Because just those words may not indicate that there's yet
15      another person that's speaking at that point whose name is
16      Chichi.
17      A.   Yeah, you need the recording, but also the translation
18      says Chichi.  And so, therefore, it's saying that that's the
19      person speaking, I think.
20      Q.   Right.  But without hearing the recording, you don't know
21      if it's the same voice or a different voice.  Correct?  And
22      sometimes inflection in the voice will provide further
23      information.  Correct?
24      A.   The recording can definitely help, but from what I'm
25      reading right now, it's pretty affirmative that's the person
```

 1    based on how they respond.

 2    Q.   So, sir, let me ask you this:  On the very first page

 3    of 800.T which this is a part of --

 4             THE COURT:  Why don't you clear your circle.

 5             MS. AMATO:  Oh, sorry.

 6    BY MS. AMATO:

 7    Q.   On the very first page of 800.T which you've been asked

 8    about previously, where it talks about UI, unintelligible, can

 9    you read for us the very last line?

10             THE COURT:  The last line meaning at the bottom of the

11    page?

12             MS. AMATO:  Yes, Your Honor.

13             THE WITNESS:  "Voice attributions herein were provided

14    by someone other than the translator."

15    BY MS. AMATO:

16    Q.   So, sir, does that mean that in fact the determination of

17    the voices in this was not made by the translator?

18             Would you like to read it again?

19    A.   Yes.

20    Q.   Sure.

21             (Witness reviewing document.)

22    A.   So.  It could be.  It could be, it could be not, because,

23    again, I don't know what the translator does.  I do not have

24    any contact with the initial translator.  But I do know

25    sometimes translator can do that.  So even though it says

814

1    that, but sometimes translator can provide a name attribution

2    as well.

3    Q.   When you certified these, was this first page provided

4    to you?

5    A.   Yes.

6    Q.   Okay.

7              MS. AMATO:  Thank you.  No further questions.

8              THE COURT:  Ms. Seifert, something briefly?

9                    FURTHER REDIRECT EXAMINATION

10    BY MS. SEIFERT:

11    Q.   Mr. Rodney, you were asked several questions about the

12    process, and I just want to clarify when in the process is

13    the certification where you sign under penalty of perjury?

14    When is that done?

15    A.   After the person from Manpower review the documents and

16    then I accept them, the changes, and I say everything's good,

17    then I show it.  So when everything is done completely.

18    Q.   Okay.  Government's 800.T to 809.T, are those the final

19    versions?

20    A.   Yes, they are.

21    Q.   Are those the same versions that you certified in your

22    certification?

23    A.   Yes.

24    Q.   And on Government's 800.T -- brief indulgence, Your

25    Honor.

 1          THE COURT:  Certainly.

 2    BY MS. SEIFERT:

 3    Q.   On Government's 800.T, line 100 and 101 -- let's just

 4    stick with 101 -- why did you translate "it's Chichi, how are

 5    you?"  Why did you know that was the translation?

 6    A.   Because that's what it says in the Creole and the audio.

 7    Q.   And so is that because you listened to the audio then?

 8    A.   Yes.

 9          MS. SEIFERT:  No other questions.

10          THE COURT:  All right.  Mr. Rodney, thank you for

11    coming.

12          THE WITNESS:  You are welcome.

13          THE COURT:  You may step down, and you're excused.

14          THE WITNESS:  My pleasure.  Thank you.

15          THE COURT:  And we will have our morning break.  A

16    little late, but we'll resume at 11:30.  And I had indicated

17    that I was attaching a condition to the admission of 800.T

18    through 809.T.  I'm going to remove that condition.  They are

19    admitted.

20                          (Government Exhibit Nos. 800.T - 809.T

21                            received into evidence.)

22          MS. SEIFERT:  Thank you, Your Honor.

23          THE COURT:  See you at 11:30.

24       (Recess from 11:15 a.m. to 11:33 a.m.)

25          THE COURT:  All right.  I think we're ready for the

1    next witness.

2            MS. SEIFERT:  Your Honor, before the witness comes,

3    the government moves the admission of 800 through 809, which

4    are the jail calls, and the government presents to the Court

5    800.C1, C like certification, 1.

6            THE COURT:  Wait, wait, wait.  You're going too fast

7    for me here with the numbers.  You're moving the admission now

8    of 800 through 809 without anything, Ts or anything else on

9    the end.

10           MS. SEIFERT:  That's correct.

11           THE COURT:  And they are what?

12           MS. SEIFERT:  800 through 809 are MP3 files.

13           THE COURT:  Those are the audios.

14           MS. SEIFERT:  The audio files.

15           THE COURT:  That have been discussed in Mr. Rodney's

16   testimony.

17           MS. SEIFERT:  That's right.  And I present to the Court

18   the certification from the jail, which is 800.C1, the

19   declaration of the jail custodian of records.

20           THE COURT:  800.C1?

21           MS. SEIFERT:  Yes.

22           THE COURT:  It has a dot in different places.  That's

23   the certification of all of those, 800 through 809.

24           MS. SEIFERT:  Correct.

25           THE COURT:  All right.  So the government has moved the

1    admission of, I take it, 800.C1 as well as 800 through 809.

2         MS. SEIFERT:  There's a little bit of an inconsistency

3    in case law as to whether the certification is itself

4    evidence.  I don't know what the Court's practice is.  I'm

5    happy to have it admitted.  I know that I have had other

6    judges who don't actually want it admitted.  But however the

7    Court wants to --

8         THE COURT:  That's when they have a jury, though.

9         MS. SEIFERT:  Definitely when they have a jury they

10   don't want it to go back.  But in a bench trial, I see no

11   issue.

12        THE COURT:  I don't think there's any issue with a

13   bench trial.

14        MS. SEIFERT:  Great.  Then we would also move the

15   admission of 800.C1.

16        THE COURT:  All right.  So 800.C1 and 800 through 809

17   have been moved for admission.

18        MR. ORENBERG:  No objection.

19        THE COURT:  All right.  They are admitted.

20        MS. SEIFERT:  Thank you, Your Honor.

21                              (Government Exhibit No. 800.C1

22                               received into evidence.)

23                              (Government Exhibit Nos. 800 - 809

24                               received into evidence.)

25        MR. BARNES:  Your Honor, the government calls Special

818

1    Agent Jose Loureiro.

2            THE COURT:  Those exhibits have been admitted.

3        JOSE LOUREIRO, WITNESS FOR THE GOVERNMENT, SWORN

4                    DIRECT EXAMINATION

5    BY MR. BARNES:

6    Q.   Good morning, sir.  Could you please state and spell your

7    name for the record.

8    A.   Yes.  Jose J-O-S-E, middle initial A., last name

9    Loureiro, L-O-U-R-E-I-R-O.

10   Q.   Where do you work?

11   A.   Federal Bureau of Investigation.

12   Q.   What is your position, Mr. Loureiro, at the FBI?

13   A.   Special agent.

14   Q.   Special Agent Loureiro, how long have you been at the

15   FBI?

16   A.   An agent since May 2004.

17   Q.   What training have you received at the FBI?

18   A.   Received training as a special agent in investigations,

19   everything from narcotics trafficking to public corruption,

20   terrorism, fraud, evidence collection and crime scene

21   processing, so forth.

22   Q.   What is your current assignment at the FBI?

23   A.   I am currently assigned to healthcare fraud squad, and

24   as a collateral, what we call collateral duty, I'm one of the

25   team leaders for the evidence response team at the Miami Field

1    Office.

2    Q.   What are your responsibilities in connection with your

3    participation on the evidence response team?

4    A.   I basically manage crime scenes when we are processing

5    them.  I manage personnel, I manage resources, the equipment

6    that's necessary to process any one crime scene, just ensure

7    that we do it efficiently and correctly.

8    Q.   Switching gears a bit, in the fall of 2021 did you take

9    part in an investigation into hostage taking of 17

10   missionaries in Haiti?

11   A.   Yes, I did.

12   Q.   What was your role in that investigation?

13   A.   My role that day was as -- in my role as a special agent

14   I was asked to assist in the investigation, and that day in

15   particular, on October 31, I processed the vehicle that was

16   registered to Walder St. Louis.

17   Q.   And what did you do for processing for that search?

18   A.   Basically we treated it like a scene, if you will, the

19   vehicle itself.  I processed it as -- basically by protocol,

20   what we would do with any scene.  I basically took photos of

21   it and photos of our entry into it once we acquired control of

22   the vehicle for that purpose.  Collected evidence, and then

23   any photographs of the way we'd left the vehicle or the scene,

24   if you will.

25   Q.   You were mentioning photographs.  And just to be clear

1    for the record, who took the photographs at the scene?

2    A.   I did.

3    Q.   Agent Loureiro, who was the vehicle you searched

4    registered to?

5    A.   Walder St. Louis.

6    Q.   Generally speaking, when you did the search of this

7    vehicle, what did you find?

8    A.   I found ammunition, I found a firearm, I found various

9    receipts, paperwork, and a couple of cell phones, from my

10   recollection immediately.  And boxes of empty -- or empty

11   boxes of ammunition as well.

12   Q.   I'd like to ask Mr. Casillas to show the witness

13   Government's Exhibit 410.02.

14       Agent Loureiro, do you recognize this picture?

15   A.   Yes, I do.

16   Q.   What do you recognize it to be?

17   A.   It was Walder St. Louis's vehicle, the Honda Accord gray

18   that I processed on October 31, 2021.

19   Q.   And is this a fair and accurate depiction of that vehicle

20   that you searched on October 31?

21   A.   Yes, it is.

22       MR. BARNES:  Your Honor, the government would move to

23   admit into evidence Exhibit 410.02.

24       MR. ORENBERG:  No objection.

25       THE COURT:  410.02 is admitted.

1            (Government Exhibit No. 410.02

2                  received into evidence.)

3    BY MR. BARNES:

4    Q.    Agent Loureiro, before we go on briefly, could you just

5    read the license plate number in this picture for the record?

6    A.    GGNU78, or Golf Golf November Uniform 78.

7    Q.    I'd like to -- if I may approach and hand the witness

8    Government's Exhibit 1001.

9          Agent Loureiro, prior to your testimony today, did you

10   review this exhibit, which is Government's Exhibit 1001?

11   A.    Yes.

12   Q.    And what is Government's Exhibit 1001?

13   A.    It is an iPhone, apparently pink and white.

14   Q.    And is this the same phone -- did you find a phone during

15   your search of Mr. St. Louis's car?

16   A.    Yes.  This was one of two phones that were found in the

17   vehicle.

18   Q.    Apologies for overspeaking you.  Just to be clear, the

19   phone you're holding now, Government's Exhibit 1001, is that

20   one of the phones you found in the car?

21   A.    Yes.

22   Q.    And how do you know it's the same phone?

23   A.    Because I collected it and I photographed it at the time

24   that I actually took it out of the vehicle.

25   Q.    Agent Loureiro, what did you do with that phone after you

1      recovered it from the vehicle?

2      A.    This phone, I actually handed it to -- I can't remember

3      specifically if it was SA Ryan Bonura or SSA Donald Morin at

4      the time, but it was basically them.  They acquired consent

5      from St. Louis to retrieve the phones from -- this one included,

6      from the vehicle.

7      Q.    Thank you.

8            MR. BARNES:  Your Honor, at this time the government

9      would move to admit Exhibit 1001.

10           MR. ORENBERG:  I thought it was already in, but no

11     objection.

12           THE COURT:  It hadn't been admitted.  It had been

13     referenced but not admitted.

14           MR. ORENBERG:  Okay.  Then no objection.

15           THE COURT:  Without objection, 1001 is admitted.

16                           (Government Exhibit No. 1001

17                              received into evidence.)

18     BY MR. BARNES:

19     Q.    I'd like to ask, Agent Loureiro, if I could hand you

20     the bag that's marked as Government's Exhibit 1070.01.

21           Agent Loureiro, prior to your testimony today, did you

22     review this bag, this evidence?

23     A.    Yes, I did.

24     Q.    And is that your name -- is your name written on this

25     bag?

1    A.    Yes, it is.

2    Q.    Why is your name written on that bag?

3    A.    My name's written on there because I put it on there as

4    the person who found it.  And I also initialed it so it bears

5    my initials telling me that I'm the one who's collected this.

6    Q.    Agent Loureiro, what is in this bag?

7    A.    This is -- do you want the whole description or --

8    Q.    At a general level, what's in this bag?

9    A.    General level, it's basically various boxes of

10   ammunition, of live ammunition.

11   Q.    And is this ammunition that you recovered from the search

12   of the vehicle in question that was registered to Walder

13   St. Louis?

14   A.    Yes.

15         MR. BARNES:  At this time, Your Honor, the government

16   would move to admit Exhibit 1070.01.  And just for clarity's

17   sake, on the government's exhibit list the items in that bag

18   I'll represent to the Court are actually Exhibits 1070.01

19   through 05.  Those are all in the same bag, so for clarity's

20   sake, we would just admit them as a single exhibit, 1070.01.

21         THE COURT:  All right.  By admitting 1070.01, I am in

22   effect admitting also .02, .03, .04, and .05, since they're in

23   the bag that I'm admitting.  Any objection?

24         MR. ORENBERG:  No objection.

25         THE COURT:  All five of those exhibits, 1070.01, 02,

1    03, 04, and 05 are admitted.

2                        (Government Exhibit Nos. 1070.01-.05

3                        received into evidence.)

4         MR. BARNES:  Court's brief indulgence.

5         THE COURT:  Did I go too far by including 05?

6         MR. BARNES:  No, Your Honor.

7         THE COURT:  Okay.

8       (Government conferring.)

9    BY MR. BARNES:

10   Q.   Agent Loureiro, if you would please open the bag and

11   describe its contents for the Court and for the record.

12   A.   Yes.  Do you want me to empty the entire bag or...

13   Q.   Yes, please.

14       (Witness complies.)

15   A.   Okay.

16   Q.   Agent Loureiro, you've removed quite a few things from

17   that bag.  If you wouldn't mind going through, maybe category

18   of item by category of item, and describing what they are for

19   the record.

20   A.   Well, some of it's mixed up.  Do you prefer I just go

21   through each box?

22   Q.   I think box by box is sufficient.

23   A.   Okay.  Well, it's five boxes of Wolf 7.62 by 39mm,

24   20-count cartridges.  Nomenclature we usually give is CCLA

25   with evidence response team, which is basically cartridge

1    casing, live ammunition, is what it stands for.

2         I'm holding one of those boxes now.  And this box

3    contains -- it's full and it contains 20 cartridges.  Now

4    there is one, two, three, four, five -- looks like six.  I'm

5    sorry.  Six.  Seven.

6              THE COURT:  Of the same cartridges?

7              THE WITNESS:  I'm sorry, no.  It's the same, basically

8    the same ammunition, just different brands.  So there's five

9    of Wolf, five Tulammo brand.  I think I'm pronouncing that

10   correctly.  Tulammo's spelled T-U-L-A-M-M-O.  That's four,

11   five.  And then -- boxes of that.  It looks like some of the

12   ammunition actually came loose from the box.  Two empty boxes

13   of Wolf 7.62 39, which I see here as well, and three empty

14   boxes of Tulammo 7.62 times 39mm.

15        And then this bag contains a lot of them.  In fact, if I

16   recall correctly, this is a bag that we use on ERT for

17   packaging purposes, and not to break the original packaging, I

18   packaged it like this.  But this is basically loose ammunition

19   from some of these boxes.

20   BY MR. BARNES:

21   Q.   Thank you, Agent Loureiro.  If you could put that back,

22   please, I would ask Agent Bonura to remove that, and I would

23   also ask to bring up Government Exhibit 1070.07.

24        Agent Loureiro, looking at Government's Exhibit 1070.07,

25   prior to your testimony today, did you review that exhibit?

1    A.    Yes.

2    Q.    And is your name on the bag holding that evidence?

3    A.    Yes, my name.

4    Q.    And why is your name on the bag?

5    A.    Because I am the person who collected this evidence, and

6    it bears my initials too, letting me know it's my handwriting

7    too.  So.

8    Q.    What's in that bag?

9    A.    Two boxes of Norma, that's the brand, tactical .308 Win,

10    that's W-I-N, ammunition, containing 20 cartridges each, total

11    of 40 CCLA, what I described before.

12    Q.    And does this bag contain ammunition that was recovered

13    from your search of the car registered to Walder St. Louis?

14    A.    Yes.

15         MR. BARNES:  At this time we would move to admit

16    Government's Exhibit 1070.07.

17         MR. ORENBERG:  No objection.

18         THE COURT:  Without objection, 1070.07 is admitted.

19                          (Government Exhibit No. 1070.07

20                           received into evidence.)

21         MR. BARNES:  And I think this will be a slightly less

22    involved process than the prior exhibit, but I would also ask

23    the witness to open this bag and describe its contents for the

24    record.

25         THE COURT:  I think he already described the contents.

1    Not sure we need to repeat it.

2            MR. BARNES:  Okay.  Then that's fine.

3    BY MR. BARNES:

4    Q.   Then Agent Loureiro, no need to open the bag.  I think

5    we can skip that step now.

6    A.   Okay.  Well, the contents is consistent with the

7    description.

8    Q.   There we go.  And finally, I'll ask Agent Bonura if you

9    could bring up Government's Exhibit 1070.08.

10           MR. ORENBERG:  Sorry, what was the last two digits?

11           MR. BARNES:  08.

12           MR. ORENBERG:  Thank you.

13   BY MR. BARNES:

14   Q.   Agent Loureiro, prior to your testimony today, did you

15   review this evidence that's in the box marked Government's

16   Exhibit 1070.08?

17   A.   Yes.

18   Q.   And what is in that box?

19   A.   This is .50 caliber ammunition.

20   Q.   And how do you know?

21   A.   I know as I collected it.  Now, this is a box that it was

22   put in afterwards, but I know the original packaging is in it.

23   Q.   And does this box contain ammunition that you recovered

24   from the search of the vehicle registered to Walder St. Louis?

25   A.   Yes.

1          MR. BARNES:  At this time, Your Honor, the government

2     would move to admit Exhibit 1070.08 into evidence.

3          MR. ORENBERG:  No objection.

4          THE COURT:  Without objection, 1070.08 is admitted.

5                         (Government Exhibit No. 1070.08

6                         received into evidence.)

7     BY MR. BARNES:

8     Q.   And at this time I would ask if you could open it to

9     confirm that the contents are as you described.

10         (Witness complies.)

11    A.   Okay.

12    Q.   Could you describe for the record the ammunition that you

13    retrieved from the box?

14    A.   Yeah.  It's three plastic containers, black in color, of

15    .50 caliber Ball M33 661 gram, 10 cartridges each, three

16    packages, or three containers of it.  So total of 30 bullets.

17    Q.   So .50 caliber bullets.

18    A.   Yes.

19    Q.   Would you mind holding up one of those, retrieving one

20    piece of ammunition and holding it up?

21    A.   This is the container and this is the ammunition.

22    Q.   Thank you.

23    A.   And if you want to add to the record, it's Israeli

24    Military Industries, Inc. brand ammunition.

25    Q.   I ask Mr. Casillas if he could pull up Government's

1    Exhibit 410.10.  And show it to the witness, please.

2        Agent Loureiro, do you recognize this picture?

3    A.   Yes, I do.

4    Q.   Did you take this picture?

5    A.   Yes, I did.

6    Q.   What does this picture show?

7    A.   It shows a few of the exhibits that I just reviewed here

8    on the stand, including the .50 caliber cartridge casings and

9    the Tulammo and Norma tactical.

10   Q.   And does it fairly and accurately depict how you found

11   them in the vehicle you searched?

12   A.   Yes, it does.

13       MR. BARNES:  The government would move to admit Exhibit

14   410.10.

15       THE COURT:  I don't think the record actually yet

16   reflects where they were found.

17       THE WITNESS:  They were found in the trunk of the

18   vehicle that I believe on the -- I designated for paperwork

19   purposes as quadrant I, I believe.

20       THE COURT:  Any objection to 410.10?

21       MR. ORENBERG:  No, Your Honor.

22       THE COURT:  It is admitted.

23                        (Government Exhibit No. 410.10

24                         received into evidence.)

25

1    BY MR. BARNES:

2    Q.   Just briefly a few more pictures, if you would,

3    Mr. Casillas, 410.11, if you would show it to the witness.

4         Agent Loureiro, do you recognize this picture?

5    A.   Yes.  That's the last exhibit I reviewed, which I

6    designated during the search as item 9.

7    Q.   And just to back up a little bit, did you take this

8    picture?

9    A.   Yes, I did.

10   Q.   Could you describe for the record, what does it show?

11   A.   It shows the .50 caliber CCLA, live ammunition cartridge

12   casings, the three plastic containers containing the 30 rounds

13   of ammunition.

14   Q.   Does this picture fairly and accurately depict the

15   ammunition you recovered from that vehicle?

16   A.   Yes.

17        MR. BARNES:  Your Honor, we would move to admit Exhibit

18   410.11.

19        MR. ORENBERG:  No objection.

20        THE COURT:  Without objection, 410.11 is admitted.

21                        (Government Exhibit No. 410.11

22                         received into evidence.)

23        MR. BARNES:  And one more at this time, Mr. Casillas.

24   410.12, please.

25

1    BY MR. BARNES:

2    Q.   Agent Loureiro, do you recognize this picture?

3    A.   Yes, I do.

4    Q.   Did you take this picture?

5    A.   Yes, I did.

6    Q.   What does this picture show?

7    A.   It shows the -- at least two of the exhibits I previously

8    reviewed on the stand, the Norma tactical, the Tulammo, and

9    Wolf ammunition, as well as a separate, which is -- on the

10   photograph it's item 11, HSM ammunition.

11   Q.   And does this picture fairly and accurately depict

12   ammunition that you recovered from your search of the vehicle

13   registered to Walder St. Louis?

14   A.   Yes.

15        MR. BARNES:  Your Honor, the government would move to

16   admit Exhibit 410.12.

17        MR. ORENBERG:  No objection.

18        THE COURT:  410.12 is admitted.

19                        (Government Exhibit No. 410.12

20                         received into evidence.)

21        MR. BARNES:  One more picture, Mr. Casillas, please.

22   410.13.  Show it to the witness, please.

23   BY MR. BARNES:

24   Q.   Agent Loureiro, do you recognize the picture in front of

25   you?

832

```
1    A.    Yes, I do.

2    Q.    Did you take this picture?

3    A.    Yes, I did.

4    Q.    What does this picture show?

5    A.    It's a receipt from Lucky Pawn and Jewelry in Miami,

6    Florida, in the name of Walder St. Louis for three --

7    Q.    Let me stop you there.

8    A.    Yeah, for three --

9    Q.    With that description, does this picture fairly and

10   accurately depict the photograph that you took at the time

11   of the receipt you recovered from that car?

12   A.    Yes, it does.

13            MR. BARNES:  Move to admit Exhibit 410.13.

14            MR. ORENBERG:  No objection.

15            THE COURT:  Without objection, 410.13 is admitted.

16                          (Government Exhibit No. 410.13

17                           received into evidence.)

18   BY MR. BARNES:

19   Q.    Agent Loureiro, I believe you listed the store and the --

20   if you could just read for the record who the buyer was on

21   this receipt.

22   A.    Walder St. Louis.

23   Q.    And what is the date?

24   A.    The date is October 6, 2021, or 10/06/21.

25   Q.    And could you just please read the items that are listed
```

1    on this receipt.

2    A.    The description itself or the part number and all that?

3    Q.    The description with the numbers.

4    A.    I believe that's Gen or C-E-N VSKA 7.62 times 39.  I

5    believe that is an S auto rifle serial number SV7034765.

6         The next item is rifle sentry, blue 7.62 semi -- serial

7    number 19222511RO.

8         The next description is Palmtoar, P-A-L-M-T-O-A-R.

9    Handgun, palmetto blue, serial number SCD617477.  And that

10   indicates FDLE background check.  FDLE stands for Florida

11   Department of Law Enforcement I believe is the case on this

12   receipt.

13   Q.    Thank you.

14        MR. BARNES:  No further questions for the witness,

15   Your Honor.

16        THE COURT:  All right.

17        MS. AMATO:  Your Honor, may I speak to the prosecutor

18   briefly?

19        (Counsel conferring.)

20        MS. AMATO:  Okay.  Thank you.

21   Your Honor, I'm going to have to have the assistance of

22   Mr. Casillas to help me locate certain photographs.

23   So, Your Honor, excuse me.  I'm having a bit of a technical

24   issue.

25        THE COURT:  That's quite all right.  Those happen

1        in this courtroom on occasion.

2              MS. AMATO:  Right.  But the issue is that I -- I

3        usually bring two computers, and one computer has access to

4        all of my files on my desktop, and the other computer does

5        not.  So I use that computer.  And the second computer's the

6        one I'm able to plug in to your system here.  But last night

7        I --

8              THE COURT:  Where's this explanation taking us?

9              MS. AMATO:  So, anyway, the explanation is taking us

10       to the fact that the photographs I need, I don't have them

11       with me, and the government is kind enough to assist me with

12       this, but it might take a little bit of time to download them

13       because of the computer -- the internet system.

14          So if -- I guess the government is willing to call a

15       different witness out of turn and then during the lunch we

16       will deal with the photographs, the exhibits that I need.

17             THE COURT:  It's okay with me if it's okay with both

18       sides.

19             MR. BARNES:  Conditionally, Your Honor.  I want to

20       confirm with the witness he's not trying to make a flight

21       today.

22             THE WITNESS:  It's okay.  I've already rebooked my

23       flight for tomorrow.

24             MR. BARNES:  Then no objection from the government,

25       Your Honor.

```
 1            THE COURT:  All right.  So that means we're going to

 2       ask Special Agent Loureiro to step down but be available this

 3       afternoon, hopefully right after lunch.

 4            THE WITNESS:  Sure.

 5            THE COURT:  Thank you.

 6            THE WITNESS:  No problem.

 7         (Witness steps down.)

 8            THE COURT:  And government, call your next witness.

 9         JAMES KAELIN, WITNESS FOR THE GOVERNMENT, SWORN

10                       DIRECT EXAMINATION

11       BY MS. SEIFERT:

12       Q.   Good afternoon.  Or morning.  Good morning.

13       A.   It's afternoon.

14       Q.   Almost afternoon.  We're getting right there.

15            Please introduce yourself to the Court and spell your

16       name for the record.

17       A.   It's Special Agent James J. Kaelin, K-A-E-L-I-N.

18       Q.   Where do you work?

19       A.   I'm assigned to the Miami Field Office.

20       Q.   And what squad are you on?

21       A.   I'm on our public corruption civil rights squad.

22       Q.   How long have you been an FBI agent?

23       A.   February 25th of this year will be 23 years.

24       Q.   In your time with the FBI, have you ever participated

25       or been trained for search warrant executions?
```

```
 1    A.    Yes.
 2    Q.    Tell me about the training that you did in your career
 3    to be on a search warrant execution team.
 4    A.    I received training in the FBI academy.  In addition to
 5    that, I was on our evidence response team for 11 years.  Six
 6    of those years I was a team leader.
 7    Q.    Your time on the evidence response team, was that all in
 8    Miami?
 9    A.    Yes.
10    Q.    And did you do a detail at headquarters?
11    A.    Yes.
12    Q.    And was that here in Washington?
13    A.    That was from January of 2015 to July of 2016, and I was
14    in our Human Resources Division leadership selection unit.
15              THE COURT:  Of what year?
16              THE WITNESS:  January 2015 through --
17              THE COURT:  Oh, I'm sorry.
18              THE WITNESS:  Yes, it was an 18-month TDY, Your Honor.
19    BY MS. SEIFERT:
20    Q.    And then after you went to headquarters, did you return
21    to Miami?
22    A.    Yes.
23    Q.    When you returned to Miami from your headquarters detail,
24    were you still on the evidence response team in Miami?
25    A.    No longer.  I had to resign my position when I left for
```

1   headquarters.

2   Q.   Even though you're not on the evidence response team

3   now, do you still volunteer to take part in search warrants?

4   A.   Yes.

5   Q.   Why do you do that?

6   A.   Because generally we don't have a sufficient number of

7   bodies on a particular squad, so when they have big arrests

8   or search warrants, we volunteer to assist those squads, and

9   I do have a certain amount of expertise in executing search

10   warrants.

11   Q.   So let me ask you some about that expertise.  What's the

12   method or kind of system that FBI uses to execute a warrant?

13   A.   So generally we like to have at least eight to ten

14   personnel for the execution of a search warrant.  Based on

15   the number of people we have, we're going to assign

16   responsibilities to the people.

17        You're going to have a photographer, somebody that

18   keeps a photo log, somebody that keeps like an evidence log.

19   Sometimes you'll have to -- some people have to wear two hats

20   or multiple hats depending on the number of personnel you have

21   available to conduct a search.

22   Q.   And the person who's taking the photographs, is that

23   person also searching or is their job just photographer?

24   A.   Generally for the photographer it's just photography

25   because that's probably one of the busiest -- they're

1    responsible for overall photography, and then any time

2    anything of evidentiary value is found we obviously try to

3    photograph it in place when possible, but they are capturing

4    evidence where it's found and then taking multiple exposures

5    of that evidence to fully document it.

6    Q.   As the team leader, is it your job to assign roles?

7    A.   Yes.

8    Q.   And how do you assign the roles in terms of who's going

9    to collect the evidence or search for the evidence?

10   A.   With respect to who's going to be conducting the search,

11   it's just who's available.  I mean, the searching is not

12   something that requires a certain level of skill, just find

13   what we're looking for per the search warrant.

14   Q.   But in terms of you enter the premises with a bunch of

15   officers.  Who decides who goes where?

16   A.   That would be the team leader.  And you assign a room.

17   You basically -- you're going to start with the common areas

18   like the living room, the family room, the kitchen, and then

19   you're going to move to the bedrooms.  You basically tell --

20   you know, you search this room, you search this room, and then

21   once that search is complete, you move to the next room, the

22   next area.

23   Q.   What is the role of the seizing officer?

24   A.   So I acted as a seizing officer.  Generally the team

25   leader is going to act as the seizing officer.  I oversee the

1    entire execution of the search, and I'm kind of bouncing from
2    room to room.  When somebody says I found some evidence, I'll
3    go observe where that evidence was located and then, you know,
4    the two individuals that found -- we like to have two people,
5    one that finds it and one that is going to be a witness to
6    that.  And then as a seizing official I also like to see the
7    evidence in place.  And then they will collect it, we will put
8    that evidence either in a -- it depends.  If it's a firearm,
9    it's going to go into a gun box.  If it's documents, generally
10   we're going to use plastic packaging.  If it's something that
11   has biological, we'll use paper.  It depends on what's
12   available.  Large items sometimes we'll put in a large paper
13   bag.
14   Q.   Are all those processes with respect to how evidence is
15   collected and where it's stored, who comes up with that
16   process?
17   A.   That's -- I mean, it's like the Bureau policy, the way
18   we're trained.
19   Q.   And the training you're talking about, is that at
20   Quantico?
21   A.   Yeah.  All agents receive basic training in the execution
22   of searches, and then if you're on the evidence response team,
23   there's an 80-hour basic course that you undertake, and then
24   there's specialties like latent print, bullet trajectory,
25   human remains recovery.  There's a lot of specializations that

1    you can take in addition to just the basic evidence collection

2    course that they teach in Quantico.

3    Q.   You mentioned that while someone's searching they might

4    call out "I found something."  Under the FBI's protocol, what

5    are they supposed to do after they find something and say "I

6    found something"?

7    A.   We're going to have the photographer come over, we're

8    going to usually place an evidence placard with an item

9    number, you know, as close to that evidence or in proximity

10   to that evidence as we can.  We're going to photograph it in

11   place and then it's going to be collected and placed in

12   packaging.

13   Q.   Based on your experience, what movement of the evidence

14   occurs before the team leader comes over or the seizing

15   officer comes over to observe?

16   A.   Well, in some circumstances, especially if you're

17   searching like drawers, for example, can be challenging as

18   far as photographing something in place because often you're

19   removing items to get to it, and then you'll find an item, and

20   initially you might not realize it's something of evidentiary

21   value but then you'll be, oh, that's something we need to seize.

22        So then you'll call for the photographer.  They'll

23   photograph it.  Then it'll be removed, and then generally

24   we're going to try and photograph it in more optimal

25   conditions where it's not laying in a drawer where there's a

841

1    bunch of other stuff laying in there with it.  So then you're
2    going to place it in either -- like typically if I'm doing a
3    search of a bedroom, I like to use the bed because then you
4    can have the item and you can do your close-ups of the items.
5    Q.   But in your experience, when you're the team leader, do
6    you attempt to observe the item in place before it's moved?
7    A.   Yes.
8    Q.   Did you assist the FBI, and specifically the Miami C5
9    squad, in the execution of the search warrant on October 31,
10   2021, at the address 2951 Northeast Terrace in Pompano Beach,
11   Florida?
12   A.   I did.
13   Q.   What was your role that day?
14   A.   I was the team leader.  The SWAT team had initially done
15   the, what we call the -- they did a clear.  They entered the
16   residence, they did a safety clear of the residence, and then
17   it was turned over to us.  At that time I read the search
18   warrant to all the people participating in the search of the
19   residence, and then we initiated overall photography.  The
20   agent, Jennifer Gibson, that I assigned as the photographer,
21   she initiated overall photography of the exterior of the
22   residence and then worked into the interior of the residence.
23   And then we began in earnest our search of the residence.
24   Q.   You've been talking a lot about in general how the
25   searches work.  In your recollection of October 31, did your

1    team and you generally follow the plan that you've just

2    described to the Court of how it normally happens in practice?

3    A.    Yes.

4    Q.    Was there anything particularly unusual or different from

5    this search than from the other searches that you've done?

6    A.    None that I recall.

7    Q.    And how many searches have you conducted?

8    A.    It's probably well into the hundreds.

9    Q.    Do you specifically remember this search?

10    A.    Yes.

11    Q.    What was memorable about it?

12    A.    Because it was on Halloween night.

13    Q.    See any trick-or-treaters that day?

14    A.    It was a very busy neighborhood that night.

15    Q.    You mentioned that the SWAT team cleared the house.

16    Were there any individuals who appeared to live in the

17    house present?

18    A.    There were two individuals that were present.

19    Q.    Do you recall the names of those individuals?

20    A.    You would have to refresh my -- I remember one was a

21    10th grader and one was an adult that was born -- I believe

22    around 1970, close to my age.

23    Q.    And the older person, was it a man or a woman?

24    A.    A man.

25    Q.    And did that person appear to be the property owner?

1    A.    I don't recall if he was -- I think he identified himself

2    as the property owner, or at least the person that was in

3    control of the residence.

4    Q.    Okay.  Was the search warrant provided to any of those

5    individuals?

6    A.    Yes.

7    Q.    Now, you mentioned that the photographs were taken by

8    the officer you assigned to take photographs.  Is that right?

9    A.    Yes.  Agent Gibson.

10   Q.    And if I could have shown to the witness Government's 450.

11         Agent Kaelin, fair to say there are a lot of photos that

12   get taken at a warrant execution, huh?

13   A.    As we say, digital film is cheap.

14   Q.    In preparation for your testimony today, did you review

15   all the photos?

16   A.    Yes.

17   Q.    Did you cull those photos down to what is present in

18   Exhibit 450?

19   A.    Yes.

20   Q.    And Exhibit 450 is 66 photos.  Are those the photos that

21   you determined would be relevant to your explanation to the

22   Court today?

23   A.    They are.

24   Q.    Have you reviewed each and every one of the photos?

25   A.    I have.

1    Q.   And do the photos fairly and accurately depict each

2    portion of the house, interior or exterior, that you are

3    going to testify about today?

4    A.   Yes.

5    Q.   Do they fairly and accurately depict the areas in the

6    house where items of evidentiary value were recovered by your

7    team?

8    A.   Yes.

9    Q.   Do you personally recall each of the different items that

10   were searched or found during the search that are captured in

11   Exhibit 450?

12   A.   Yes.

13        MS. SEIFERT:  Your Honor, move to admit 450.

14        MR. ORENBERG:  No objection.

15        THE COURT:  Without objection, 450 is admitted.

16                              (Government Exhibit No. 450

17                                received into evidence.)

18   BY MS. SEIFERT:

19   Q.   Okay.  And let's -- let me ask you, as the team leader

20   and the seizing officer, did you take notes during the time

21   period that you were there?

22   A.   I did.

23   Q.   And did you later prepare a report?

24   A.   Yes.

25   Q.   And when you were preparing for your testimony today

1    did you have those items available to you as well as these

2    pictures?

3    A.    I have my -- what the FBI refers to as an FD-302.

4    I would have submitted my notes in what we call physical 1A.

5    I'm not sure what happened to the physical 1A because it's

6    not --

7    Q.    You didn't have your paper notes but you had your --

8    A.    My 302, which was done the following day.

9    Q.    And you reviewed your 302 along with these photos.

10   A.    Yes.

11   Q.    Okay.  Great.  Well, let's get started looking at the

12   photos.  If we could start -- one moment.

13        What do we see on page 1?

14   A.    That's what we call the photo log.  It just basically

15   has the date, the case ID, who the photographer was, and the

16   location.

17   Q.    Special Agent Kaelin, when you reviewed the pictures and

18   your notes, did you prepare a summary for the Court to

19   identify each of the items that you recovered as the seizing

20   officer?

21   A.    Yes.

22   Q.    I'm showing you what's been marked as Government's

23   Exhibit 912.  912 is a two-page document which appears to

24   be a chart that is -- goes on for about a page and a half.

25   Do you recognize the document?

1    A.    Yes.

2    Q.    Is this the summary that you prepared and reviewed in

3    preparation for your testimony today?

4    A.    Yes.

5    Q.    And based on your review of the photos and your notes,

6    does this summary fairly and accurately state for the Court

7    each of the pieces of evidence that you reviewed that you --

8    that the FBI obtained and where it was obtained?

9    A.    Yes.

10    Q.    Does it also -- let me ask you, yesterday did you also

11    review this chart with certain items of physical evidence that

12    the FBI had obtained?

13    A.    I did.

14    Q.    And did you add to the first column, where it says

15    exhibit number, the number of the physical exhibit that was

16    relevant to the item description --

17    A.    Yes.

18    Q.    Now, some say "not applicable" or "NA."  Is that because

19    there was no physical exhibit?

20    A.    Correct.

21    Q.    And does Government's Exhibit 912, is it a fair and

22    accurate summary of all of the items and their exhibit numbers

23    that you intend to talk about today?

24    A.    Yes.

25    Q.    And did you produce this for the convenience of the

 1       Court?

 2       A.    Yes.

 3             MS. SEIFERT:  Your Honor, move to admit 912.

 4             THE COURT:  912 is not on your exhibit list.

 5             MS. SEIFERT:  Oh.  I'm so sorry, Your Honor.  It should

 6       have been in the update.  I apologize.

 7             THE COURT:  It's not on the new exhibit list either,

 8       unless it's out of order and placed somewhere else that I have

 9       to leaf through 25 pages.

10             MS. SEIFERT:  I apologize.  I will add it tonight.

11             THE COURT:  Well, I've added it to my list, calling it

12       summary of the evidence for Special Agent Kaelin's testimony.

13       But has it been provided to the defense?

14             MS. SEIFERT:  It has, Your Honor.

15             THE COURT:  All right.  Any objection?

16             MR. ORENBERG:  No, Your Honor.

17             THE COURT:  All right.  912 is admitted.

18                              (Government Exhibit No. 912

19                               received into evidence.)

20             MS. SEIFERT:  May I approach the witness with 912?

21             THE COURT:  You may.

22             MS. SEIFERT:  And I believe a copy of 912 should have

23       been provided to the Court, but I have an extra copy if --

24             THE COURT:  You mean in this large book that I have to

25       turn the pages on --

1          MS. SEIFERT:  There was an extra set of exhibits that

2     should have made its way to the front this morning, but if it

3     did not get to you yet, I will bring it right now.

4          THE COURT:  Well, unless someone has put it in the

5     book, I don't have it because I don't see it up here.

6          THE DEPUTY CLERK:  I didn't place anything.

7        (Document tendered to the Court.)

8          THE COURT:  Thank you.

9          MS. SEIFERT:  I think we have the pictures back up.

10    BY MS. SEIFERT:

11    Q.   So we'll pivot between the photos that you culled and 912

12    and try to move through the locations of the search warrant.

13    So if we could go back to -- so you said -- this is 450, page

14    1.  This is Agent Gibson's photo page, and then let's go to

15    the next page, please.

16         Okay.  This is page 2.  What do we see here?

17    A.   Those are the two vehicles parked in the driveway.

18    Q.   This vehicle in the center, can you identify it for the

19    Court, please?

20    A.   It's a Jeep.

21    Q.   What color does it appear to be?

22    A.   I think it was gray.  I don't think the flash was working

23    very well on the...

24    Q.   Okay.  Next page, please.  This is 450, page 3.

25         Is this a closer-up version?

1    A.    Yes.

2    Q.    Of the same Jeep?

3    A.    It's a close-up of the tag.  Correct.

4    Q.    Great.  Next picture, please.

5          Now we're on 450, page 4.  What do we see here?

6    A.    That's the entry to the residence.

7    Q.    Okay.  Next picture.

8          This is page 5.  What do we see here?

9    A.    That is the rear door to enter the residence.

10   Q.    These doors are open.  Is that how the FBI found it?

11   A.    Yes.

12   Q.    Next picture.

13   A.    Clarify.  That's how the SWAT team left it.

14   Q.    Oh.  Fair enough.  That's how the photographer found it.

15   Is that right?

16   A.    That's the condition that we found it in, yes.

17              THE COURT:  Mr. Orenberg.

18              MR. ORENBERG:  For purposes of clarity of the record,

19   will the government please state which slide number it is, as

20   to each photo.

21              THE COURT:  I think she's been doing that, but she may

22   have missed one.

23              MS. SEIFERT:  Thank you.

24   BY MS. SEIFERT:

25   Q.    This is 450, page 6.  What do we see here?

1    A.    That's a close-up of the front door.

2    Q.    Is this how you entered the residence?

3    A.    Yes.

4    Q.    Next page, please.  We're on page 7.  What do we see

5    here?

6    A.    That is like the living room, family room area.

7    Q.    And there's an individual whose arm is in this

8    photograph.  Do you know who that is?

9    A.    That would be me.

10   Q.    Would you circle yourself for the Court?

11        (Witness complies.)

12        Okay.  You're on the -- for the record, the witness has

13   circled the only individual in the photo.

14        THE COURT:  I was about to say, it wasn't really

15   necessary.

16        (Laughter.)

17        THE WITNESS:  Generally we try not to be captured in

18   the photos, but...

19   BY MS. SEIFERT:

20   Q.    Now, there is a piece of paper on the wall with a letter

21   A.    Do you recognize that?

22   A.    That's the room labels that we affix to identify the

23   rooms for purposes of the search.

24   Q.    And is that -- why is that done?

25   A.    Just for clarity.  Sometimes you'll have, you know, much

larger residences or, you know, structures, that it's not --
like in this case I'm calling it the living room, but, you
know, in a larger residence there may be multiple rooms that
you can't really easily identify as a particular room.  So the
labels actually make it easier for purposes of documentation.

Q.   So then when you as a seizing officer are making your
report, how do you incorporate those labels?

A.   So when I do my 302 I'm going to refer to, usually I'll
say it was seized from room A and then I'll usually -- if
it's -- in this case it was -- I said room A, the living room,
or, you know, in the case of the other room, like where a lot
of the evidence was seized, I say room E, the master bedroom.

Q.   In looking down at your chart, which I believe everyone
has in front of them now, which is 912, the first line on your
chart, could you tell the Court what you found in room A?

A.   There was a black Pelican rifle case with the model
No. 1750.

Q.   Who located that item?

A.   SA Matt Abbate.

Q.   Was he one of the other officers with you that day?

A.   Yes.

Q.   Where was it located?

A.   There was like a sofa up against the wall there near the
door, with like the curtain hanging down.  That's where that
rifle case was located.

1    Q.   Could you circle it for the Court so we're clear we're

2    all talking about the same thing.

3         (Witness complies.)

4         Great.   For the record, the witness has drawn a half

5    circle around the furniture, just like half of a couch as

6    displayed in this picture on the left-hand side of the screen.

7         If I could have the next page, please, which is 450.8.

8    What do we see here?

9    A.   That is the -- the aforementioned rifle case.

10   Q.   And that's the same rifle case on 912, line 1?

11   A.   Yes.   And we have an evidence placard there indicating

12   No. 1.

13   Q.   Okay.   Is that -- when you first described earlier that

14   you bring a placard over, is that what you were describing to

15   the Court?

16   A.   Yes.

17   Q.   Okay.   And this is -- was this where it was when it was

18   found?

19   A.   Yes.

20   Q.   Next picture, please, which is page 9.

21        What's this picture show?

22   A.   That's a different view of the rifle case.

23   Q.   And the next picture, page 10.

24   A.   That's where -- like we've removed it from the location

25   we found it, and now it's being photographed, you know, where

1     it's -- for better clarity.

2     Q.   And the next picture, page 11 of 450, what do --

3     A.   That's the interior of it.  And it was empty.

4     Q.   Okay.  And just so the record is clear, on 450, page 11,

5     based on your review of the item itself, what size of a

6     weapon --

7     A.   That would have been what we would characterize as a long

8     gun.

9     Q.   Next picture --

10         THE COURT:  All right.  You should be aware of the fact

11    that we need to take a lunch break at some point.  So I'll let

12    you choose when.  It's obvious to me that we're not going to

13    get through all the pictures and all the items before lunch.

14         MS. SEIFERT:  Sure.

15      Can I have the next picture, please?

16      This is the next room, so this is a fine point to stop,

17    Your Honor, on 450, page 12.  And we can pick up in this room

18    when we return.

19         THE COURT:  All right.  We'll return to this room at

20    1:45.  That room, not this room.

21      (Lunch recess taken at 12:33 p.m.)

22

23

24

25

\*   \*   \*   \*   \*   \*

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.

_/s/ Bryan A. Wayne_
Bryan A. Wayne

## $

**$20,000** [1] - 759:2
**$50,000** [2] - 758:23, 763:17

## /

**/s** [1] - 854:9

## 0

**02** [2] - 823:22, 823:25
**03** [2] - 823:22, 824:1
**04** [2] - 823:22, 824:1
**05** [4] - 823:19, 823:22, 824:1, 824:5
**08** [1] - 827:11

## 1

**1** [11] - 752:16, 752:17, 779:25, 796:24, 798:7, 816:5, 845:13, 848:14, 852:10, 852:12
**10** [2] - 828:15, 862:23
**10/06/21** [1] - 832:24
**100** [4] - 797:7, 802:14, 812:4, 815:3
**1001** [8] - 746:17, 821:8, 821:10, 821:12, 821:19, 822:9, 822:15, 822:16
**101** [8] - 797:7, 797:11, 802:14, 802:15, 802:21, 812:4, 815:3, 815:4
**1070.01** [6] - 822:20, 823:16, 823:18, 823:20, 823:21, 823:25
**1070.01-.05** [2] - 746:18, 824:2
**1070.07** [6] - 746:18, 825:23, 825:24, 826:16, 826:18, 826:19
**1070.08** [6] - 746:19, 827:9, 827:16, 828:2, 828:4, 828:5
**10th** [1] - 842:21
**11** [5] - 768:18, 831:10, 836:5, 853:2, 853:4
**11:15** [1] - 815:24

**11:30** [2] - 815:16, 815:23
**11:33** [1] - 815:24
**12** [1] - 853:17
**12505** [1] - 745:19
**12:33** [1] - 853:21
**13** [2] - 796:2, 796:8
**15** [1] - 787:20, 787:22
**15th** [1] - 809:16
**17** [1] - 819:9
**1750** [1] - 851:17
**18-month** [1] - 836:18
**19222511RO** [1] - 833:7
**1970** [1] - 842:22
**1999** [1] - 767:23
**1:45** [1] - 853:20
**1A** [2] - 845:4, 845:5

## 2

**2** [3] - 795:18, 796:8, 848:16
**20** [2] - 825:3, 826:10
**20,000** [4] - 759:2, 759:3, 765:19, 766:3
**20-count** [1] - 824:24
**2000** [1] - 767:23
**20001** [1] - 745:25
**2004** [1] - 818:16
**2011** [2] - 770:18
**2015** [2] - 836:13, 836:16
**2016** [2] - 768:23, 836:13
**2021** [6] - 748:21, 749:1, 819:8, 820:18, 832:24, 841:10
**2023** [1] - 809:17
**2024** [1] - 745:6
**20530** [2] - 745:15, 745:17
**20854** [1] - 745:20
**21-0699-01** [1] - 745:4
**21-699** [1] - 747:3
**2111** [1] - 745:22
**22** [1] - 767:14
**22201** [1] - 745:23
**23** [2] - 767:15, 835:23
**24** [1] - 745:6
**25** [1] - 847:9
**25th** [1] - 835:23
**2951** [1] - 841:10

## 3

**3** [4] - 753:22, 753:23,

796:9, 848:24
**30** [2] - 828:16, 830:12
**302** [3] - 845:8, 845:9, 851:8
**308** [1] - 826:9
**31** [5] - 819:15, 820:18, 820:20, 841:9, 841:25
**333** [1] - 745:25
**37** [2] - 796:9, 796:11
**38** [2] - 796:9, 796:16
**39** [2] - 825:13, 833:4
**39mm** [2] - 824:23, 825:14

## 4

**4** [3] - 745:9, 795:18, 849:5
**4.5** [3] - 784:5, 784:10, 784:21
**40** [1] - 826:11
**410.02** [5] - 746:17, 820:13, 820:23, 820:25, 821:1
**410.10** [5] - 746:19, 829:1, 829:14, 829:20, 829:23
**410.11** [5] - 746:20, 830:3, 830:18, 830:20, 830:21
**410.12** [5] - 746:20, 830:24, 831:16, 831:18, 831:19
**410.13** [5] - 746:21, 831:22, 832:13, 832:15, 832:16
**450** [15] - 746:21, 843:10, 843:18, 843:20, 844:11, 844:13, 844:15, 844:16, 848:13, 848:24, 849:5, 849:25, 853:2, 853:4, 853:17
**450.8** [1] - 852:7
**4704-A** [1] - 745:24

## 5

**5** [3] - 784:4, 784:21, 849:8
**50** [7] - 758:13, 758:15, 827:19, 828:15, 828:17, 829:8, 830:11
**50,000** [3] - 758:15, 762:25, 763:22

## 6

**6** [6] - 797:6, 802:12, 802:13, 811:21, 832:24, 849:25
**601** [1] - 745:14
**66** [1] - 843:20
**661** [1] - 828:15
**6th** [1] - 745:20

## 7

**7** [1] - 850:4
**7.62** [5] - 824:23, 825:13, 825:14, 833:4, 833:6
**745** [1] - 745:7
**748** [1] - 746:4
**753** [1] - 746:14
**759** [1] - 746:4
**765** [1] - 746:5
**767** [1] - 746:6
**775** [1] - 746:14
**78** [1] - 821:6
**781** [1] - 746:6
**794** [1] - 746:7

## 8

**80-hour** [1] - 839:23
**800** [14] - 746:16, 776:2, 776:6, 776:17, 777:2, 778:6, 788:9, 816:3, 816:8, 816:12, 816:23, 817:1, 817:16, 817:23
**800.C1** [8] - 746:16, 816:5, 816:18, 816:20, 817:1, 817:15, 817:16, 817:21
**800.C2** [11] - 746:14, 774:12, 774:14, 775:1, 775:10, 776:15, 779:24, 799:18, 809:8, 809:10, 809:13
**800.T** [24] - 746:15, 746:15, 780:16, 780:22, 790:3, 795:6, 795:17, 796:24, 797:6, 799:3, 799:25, 800:4, 800:19, 801:8, 802:6, 802:13, 811:10, 813:3, 813:7,

814:18, 814:24, 815:3, 815:17, 815:20
**800C** [1] - 775:6
**800C.2** [1] - 775:7
**801** [3] - 746:15, 776:2, 790:8
**801.T** [1] - 780:17
**802** [2] - 776:2, 790:8
**802.T** [1] - 780:17
**803** [3] - 746:7, 776:2, 790:8
**803.T** [1] - 780:17
**804** [1] - 776:2
**804.T** [1] - 780:17
**805** [1] - 776:3
**805.T** [1] - 780:17
**806** [1] - 776:3
**806.T** [1] - 780:17
**807** [1] - 776:3
**807.T** [1] - 780:17
**808** [1] - 776:3
**808.T** [1] - 780:17
**809** [15] - 746:16, 776:3, 776:6, 776:17, 777:2, 778:7, 788:9, 790:9, 816:3, 816:8, 816:12, 816:23, 817:1, 817:16, 817:23
**809.T** [12] - 746:15, 780:17, 780:22, 799:3, 799:25, 800:4, 800:19, 801:8, 802:6, 814:18, 815:18, 815:20
**809.T.....................** [1] - 746:15
**814** [1] - 746:8
**815** [1] - 746:15
**817** [2] - 746:16, 746:16
**818** [1] - 746:9
**821** [1] - 746:17
**822** [1] - 746:17
**824** [1] - 746:18
**826** [1] - 746:18
**828** [1] - 746:19
**829** [1] - 746:19
**830** [1] - 746:20
**831** [1] - 746:20
**832** [1] - 746:21
**835** [1] - 746:10
**844** [1] - 746:21
**847** [1] - 746:22
**8th** [1] - 745:22

## 9

**9** [2] - 830:6, 852:20
**903** [7] - 746:14,
752:24, 752:25,
753:9, 753:15,
753:17, 753:18
**912** [13] - 746:22,
845:23, 846:21,
847:3, 847:4,
847:17, 847:18,
847:20, 847:22,
848:11, 851:14,
852:10
**950** [1] - 745:17
**99** [1] - 802:17
**9:41** [1] - 745:6

## A

**a.m** [3] - 745:6, 815:24
**Abbate** [1] - 851:19
**abbreviations** [1] -
795:8
**ability** [2] - 779:2,
779:21
**able** [10] - 769:24,
790:5, 792:15,
793:13, 794:6,
794:11, 795:22,
795:24, 796:15,
834:6
**above-entitled** [1] -
854:5
**absolutely** [4] - 779:6,
790:7, 790:10,
791:19
**academy** [1] - 836:4
**accept** [5] - 808:17,
808:19, 810:14,
810:17, 814:16
**accepted** [1] - 811:8
**access** [6] - 773:4,
773:6, 802:3, 805:5,
806:5, 834:3
**accessed** [1] - 804:10
**Accord** [1] - 820:17
**accuracy** [4] - 774:4,
774:8, 778:5, 800:15
**accurate** [12] - 777:1,
778:8, 778:11,
778:18, 780:22,
781:12, 781:17,
797:19, 800:2,
805:20, 820:19,
846:22
**accurately** [8] - 781:8,
829:10, 830:14,
831:11, 832:10,

844:1, 844:5, 846:6
**acquired** [2] - 819:21,
822:4
**act** [1] - 838:25
**acted** [1] - 838:24
**actual** [1] - 788:19
**add** [3] - 828:23,
846:14, 847:10
**added** [1] - 847:11
**addition** [5] - 770:9,
777:14, 780:2,
836:4, 840:1
**address** [1] - 841:10
**adjust** [1] - 789:4
**administer** [1] -
772:13
**administered** [2] -
771:18, 772:18
**admission** [10] -
753:9, 800:15,
800:18, 800:24,
815:17, 816:3,
816:7, 817:1,
817:15, 817:17
**admit** [15] - 800:4,
800:9, 801:1,
820:23, 822:9,
823:16, 823:20,
826:15, 828:2,
829:13, 830:17,
831:16, 832:13,
844:13, 847:3
**admitted** [25] - 748:4,
753:17, 775:9,
795:6, 800:17,
801:6, 802:13,
815:19, 817:5,
817:6, 817:19,
818:2, 820:25,
822:12, 822:13,
822:15, 824:1,
826:18, 828:4,
829:22, 830:20,
831:18, 832:15,
844:15, 847:17
**admitting** [4] - 800:14,
823:21, 823:22,
823:23
**adopt** [1] - 790:22
**adult** [2] - 768:4,
842:21
**affects** [1] - 788:8
**affirm** [1] - 769:16
**affix** [1] - 850:22
**aforementioned** [1] -
852:9
**afternoon** [4] - 835:3,
835:12, 835:13,
835:14
**afterwards** [3] -

762:22, 763:9,
827:22
**age** [1] - 842:22
**Agent** [28] - 818:1,
818:14, 820:3,
820:14, 821:4,
821:9, 821:25,
822:19, 822:21,
823:6, 824:10,
824:16, 825:21,
825:22, 825:24,
827:4, 827:8,
827:14, 829:2,
830:4, 831:2,
831:24, 832:19,
835:2, 835:17,
845:17, 847:12,
848:14
**agent** [8] - 818:13,
818:16, 818:18,
819:13, 835:22,
841:20, 843:9,
843:11
**agents** [1] - 839:21
**ago** [3] - 786:9,
786:19, 794:23
**agree** [4] - 798:12,
810:21, 812:11
**ahead** [1] - 811:17
**ALLEN** [1] - 745:18
**Allen** [1] - 747:14
**allow** [4] - 798:21,
800:11, 800:24,
801:2
**allowing** [2] - 798:19,
800:24
**almost** [1] - 835:14
**Amato** [10] - 747:18,
747:20, 759:12,
781:21, 800:24,
801:3, 801:20,
802:24, 803:16,
811:18
**AMATO** [50] - 745:21,
747:18, 759:14,
764:7, 764:14,
764:15, 765:8,
765:20, 766:10,
781:22, 781:24,
783:6, 792:10,
792:12, 793:22,
794:15, 797:16,
797:14, 798:16,
799:8, 800:5, 800:8,
800:20, 803:1,
803:19, 803:21,
804:23, 804:24,
805:15, 805:16,
806:25, 807:1,
809:5, 809:7,

809:11, 809:12,
811:14, 811:19,
811:24, 812:1,
812:2, 813:5, 813:6,
813:12, 813:15,
814:7, 833:17,
833:20, 834:2, 834:9
**AMERICA** [1] - 745:3
**America** [1] - 747:3
**American** [4] - 763:12,
764:9, 764:16, 766:5
**ammunition** [23] -
820:8, 820:11,
823:10, 823:11,
825:1, 825:8,
825:12, 825:18,
826:10, 826:12,
827:19, 827:23,
828:12, 828:20,
828:21, 828:24,
830:11, 830:13,
830:15, 831:9,
831:10, 831:12
**amount** [1] - 837:9
**amounts** [1] - 765:14
**animals** [2] - 755:25,
756:3
**announce** [1] - 755:3
**announced** [1] - 755:1
**answer** [2] - 764:12,
765:4
**answered** [2] - 765:3,
765:23
**anyway** [1] - 834:9
**apart** [1] - 750:14
**apologies** [1] - 821:18
**apologize** [3] - 803:2,
847:6, 847:10
**appear** [2] - 842:25,
848:21
**appearance** [1] -
747:8
**APPEARANCES** [1] -
745:12
**appeared** [1] - 842:16
**applicable** [1] -
846:18
**applied** [2] - 806:12,
808:21
**apply** [4] - 779:8,
806:7, 806:17,
806:19
**appreciate** [2] - 756:5,
766:19
**approach** [3] - 747:7,
821:7, 847:20
**approached** [2] -
750:18, 760:4
**appropriate** [2] -
798:12, 807:25

**approximation** [1] -
763:18
**area** [2] - 838:22,
850:6
**areas** [3] - 769:20,
838:17, 844:5
**Arizona** [2] - 767:12,
804:7
**Arlington** [1] - 745:23
**arm** [1] - 850:7
**Army** [3] - 768:11,
768:12, 768:13
**array** [2] - 753:10,
753:12
**arrests** [1] - 837:7
**arrived** [1] - 754:11
**ascertain** [1] - 779:13
**assign** [4] - 837:15,
838:6, 838:8, 838:16
**assigned** [7] - 772:25,
797:4, 798:1,
818:23, 835:19,
841:20, 843:8
**assignment** [4] -
780:9, 780:24,
805:14, 818:22
**assist** [5] - 788:14,
819:14, 834:11,
837:8, 841:8
**assistance** [1] -
833:21
**assuming** [2] - 774:4,
791:25
**assumption** [1] -
798:17
**attached** [1] - 799:20
**attaching** [1] - 815:17
**attempt** [1] - 841:6
**attention** [1] - 796:2
**Attorney's** [7] -
745:14, 803:24,
804:5, 804:11,
805:4, 805:5, 806:8
**attribution** [1] - 814:1
**attributions** [3] -
793:8, 793:16,
813:13
**audio** [15] - 776:9,
776:11, 776:21,
776:23, 777:3,
777:7, 777:14,
781:9, 787:19,
787:22, 788:21,
794:21, 815:6,
815:7, 816:14
**audios** [1] - 816:13
**August** [2] - 748:21,
749:1
**AUSA** [2] - 745:13,
745:13

**AUSAs** [1] - 747:10
**authenticated** [1] - 795:6
**authorization** [1] - 773:5
**auto** [1] - 833:5
**available** [7] - 773:2, 773:3, 835:2, 837:21, 838:11, 839:12, 845:1
**Avenue** [3] - 745:17, 745:19, 745:25
**average** [2] - 801:15, 801:17
**aware** [2] - 783:7, 853:10
**awareness** [1] - 748:7

**B**

**background** [7] - 782:3, 796:13, 796:15, 796:16, 796:18, 796:20, 833:10
**bag** [21] - 822:20, 822:22, 822:25, 823:2, 823:6, 823:8, 823:17, 823:19, 823:23, 824:10, 824:12, 824:17, 825:15, 825:16, 826:2, 826:4, 826:8, 826:12, 826:23, 827:4, 839:13
**Ball** [1] - 828:15
**bank** [2] - 751:18, 751:19
**BARNES** [33] - 745:16, 817:25, 818:5, 820:22, 821:3, 822:8, 822:18, 823:15, 824:4, 824:6, 824:9, 825:20, 826:15, 826:21, 827:2, 827:3, 827:11, 827:13, 828:1, 828:7, 829:13, 830:1, 830:17, 830:23, 831:1, 831:15, 831:21, 831:23, 832:13, 832:18, 833:14, 834:19, 834:24
**Barnes** [1] - 747:11
**based** [13] - 778:25, 779:10, 781:14, 781:17, 793:19, 798:13, 800:17,

810:20, 813:1, 837:14, 840:13, 846:5, 853:5
**basic** [3] - 839:21, 839:23, 840:1
**BATES** [1] - 745:10
**Beach** [1] - 841:10
**bears** [2] - 823:4, 826:6
**BEAUDRE** [1] - 745:16
**become** [3] - 771:7, 782:22, 783:12
**bed** [1] - 841:3
**bedroom** [2] - 841:3, 851:12
**bedrooms** [1] - 838:19
**BEFORE** [1] - 745:10
**began** [1] - 841:23
**beginning** [1] - 763:1
**behalf** [3] - 747:15, 747:19, 758:11
**BENCH** [1] - 745:9
**bench** [2] - 817:10, 817:13
**best** [4] - 779:1, 779:21, 781:15, 794:8
**better** [3] - 749:13, 791:17, 853:1
**between** [7] - 769:23, 777:9, 777:11, 791:7, 791:12, 798:2, 848:11
**beyond** [3] - 765:20, 800:12, 810:3
**big** [2] - 757:12, 837:7
**biological** [1] - 839:11
**bit** [12] - 770:16, 772:21, 778:20, 782:2, 796:6, 800:5, 800:24, 817:2, 819:8, 830:7, 833:23, 834:12
**black** [2] - 828:14, 851:16
**blood** [1] - 763:5
**blue** [2] - 833:6, 833:9
**bodies** [1] - 837:7
**Bonura** [3] - 822:3, 825:22, 827:8
**book** [2] - 847:24, 848:5
**born** [3] - 767:9, 767:10, 842:21
**bottom** [1] - 813:10
**Boulevard** [1] - 745:22
**bouncing** [1] - 839:1
**box** [11] - 824:21, 824:22, 825:2,

825:12, 827:15, 827:18, 827:21, 827:23, 828:13, 839:9
**boxes** [10] - 820:10, 820:11, 823:9, 824:23, 825:2, 825:11, 825:12, 825:14, 825:19, 826:9
**branches** [1] - 768:10
**brand** [3] - 825:9, 826:9, 828:24
**brands** [1] - 825:8
**break** [6] - 750:4, 754:24, 806:21, 815:15, 825:17, 853:11
**brief** [3] - 803:17, 814:24, 824:4
**briefly** [4] - 814:8, 821:4, 830:2, 833:18
**bring** [6] - 772:13, 825:23, 827:9, 834:3, 848:3, 852:14
**brought** [1] - 804:6
**Bryan** [2] - 854:9, 854:9
**BRYAN** [2] - 745:24, 854:3
**bullet** [1] - 839:24
**bullets** [2] - 828:16, 828:17
**bunch** [2] - 838:14, 841:1
**Bureau** [1] - 818:11
**bureau** [1] - 839:17
**busiest** [1] - 837:25
**business** [1] - 748:23
**busy** [1] - 842:14
**but..** [1] - 850:18
**buyer** [1] - 832:20
**BY** [53] - 748:13, 749:18, 753:20, 757:19, 759:14, 764:7, 764:15, 765:12, 766:1, 766:13, 767:4, 775:12, 781:7, 781:24, 783:6, 792:12, 794:2, 794:19, 798:5, 799:13, 801:10, 803:7, 803:21, 804:24, 805:16, 807:1, 809:7, 809:12, 811:14, 811:19, 812:2, 813:6, 813:15, 814:10, 815:2,

818:5, 821:3, 822:18, 824:9, 825:20, 827:3, 827:13, 828:7, 830:1, 831:1, 831:23, 832:18, 835:11, 836:19, 844:18, 848:10, 849:24, 850:19

**C**

**C5** [1] - 841:8
**caliber** [5] - 827:19, 828:15, 828:17, 829:8, 830:11
**callers** [1] - 779:14
**cannot** [7] - 771:23, 772:6, 786:9, 786:12, 786:13, 786:14, 795:1
**Cantave** [1] - 791:9
**captors** [2] - 757:24, 766:5
**captured** [2] - 844:10, 850:17
**capturing** [1] - 838:3
**car** [11] - 751:10, 752:7, 752:11, 754:23, 756:18, 757:1, 757:6, 821:15, 821:20, 826:13, 832:11
**career** [1] - 836:2
**cartridge** [3] - 824:25, 829:8, 830:11
**cartridges** [5] - 824:24, 825:3, 825:6, 826:10, 828:15
**case** [26] - 747:3, 747:21, 772:22, 772:23, 773:9, 774:21, 776:12, 777:10, 779:5, 780:24, 787:6, 788:9, 791:16, 792:24, 807:9, 817:3, 833:11, 845:15, 851:2, 851:10, 851:11, 851:16, 851:25, 852:9, 852:10, 852:22
**cash** [3] - 758:21, 758:22, 758:23
**Casillas** [6] - 820:12, 828:25, 830:3, 830:23, 831:21, 833:22

**casing** [1] - 825:1
**casings** [2] - 829:8, 830:12
**category** [2] - 824:17, 824:18
**CCLA** [3] - 824:24, 826:11, 830:11
**cell** [1] - 820:9
**CEN** [1] - 833:4
**center** [1] - 848:18
**certain** [5] - 789:6, 833:22, 837:9, 838:12, 846:11
**certainly** [3] - 759:10, 764:14, 815:1
**CERTIFICATE** [1] - 854:2
**certification** [23] - 774:8, 774:20, 774:24, 775:3, 779:24, 781:2, 799:22, 800:17, 800:22, 801:22, 802:1, 802:4, 803:23, 804:1, 808:23, 810:7, 811:7, 814:13, 814:22, 816:5, 816:18, 816:23, 817:3
**certified** [13] - 782:13, 782:18, 782:22, 783:8, 783:12, 783:15, 799:16, 805:20, 806:1, 808:15, 809:16, 814:3, 814:21
**certify** [9] - 799:19, 801:22, 802:2, 802:3, 805:22, 805:24, 808:15, 808:20, 854:3
**certifying** [3] - 800:1, 801:11, 809:25
**chair** [1] - 749:11
**challenging** [1] - 840:17
**chance** [3] - 801:3, 803:17, 803:18
**Chandler** [1] - 767:12
**change** [8] - 763:12, 789:9, 789:21, 790:23, 791:14, 792:1, 792:4
**changed** [1] - 790:5
**changes** [25] - 778:10, 778:17, 778:20, 789:24, 790:9, 790:11, 790:18, 790:20, 790:22,

790:23, 791:20, 791:21, 806:7, 806:11, 806:13, 806:17, 806:19, 807:25, 808:21, 809:23, 810:10, 810:14, 810:17, 814:16

**changing** [1] - 770:2

**characterization** [1] - 795:21

**characterize** [1] - 853:7

**Charlie** [1] - 775:3

**chart** [4] - 845:24, 846:11, 851:13, 851:15

**cheap** [1] - 843:13

**check** [5] - 773:18, 778:4, 790:22, 806:13, 833:10

**Chichi** [17] - 796:25, 797:3, 797:8, 797:9, 797:11, 798:6, 798:12, 802:11, 802:15, 811:11, 812:6, 812:9, 812:12, 812:16, 812:18, 815:4

**choose** [1] - 853:12

**circle** [6] - 795:11, 795:12, 813:4, 850:10, 852:1, 852:5

**circled** [1] - 850:13

**circling** [1] - 796:3

**circumstances** [1] - 840:16

**cities** [1] - 770:22

**citizen** [9] - 748:19, 759:17, 759:19, 763:25, 764:9, 764:16, 765:2, 765:5, 766:6

**citizenship** [2] - 766:9, 766:14

**civil** [1] - 835:21

**clarified** [1] - 770:24

**clarify** [3] - 777:21, 814:12, 849:13

**clarity** [3] - 849:18, 850:25, 853:1

**clarity's** [2] - 823:16, 823:19

**clear** [9] - 748:14, 798:3, 813:4, 819:25, 821:18, 841:15, 841:16, 852:1, 853:4

**cleared** [1] - 842:15

**clerk** [1] - 748:8

**CLERK** [5] - 747:2, 749:13, 811:22, 811:25, 848:6

**client** [1] - 769:5

**close** [11] - 752:6, 752:8, 752:9, 752:10, 784:2, 796:21, 840:9, 841:4, 842:22, 849:3, 850:1

**close-up** [2] - 849:3, 850:1

**close-ups** [1] - 841:4

**closer** [5] - 749:8, 749:11, 749:12, 769:7, 848:25

**closer-up** [1] - 848:25

**closest** [1] - 779:2

**code** [1] - 779:17

**collateral** [2] - 818:24

**collect** [2] - 838:9, 839:7

**collected** [9] - 758:11, 758:21, 819:22, 821:23, 823:5, 826:5, 827:21, 839:15, 840:11

**collection** [2] - 818:20, 840:1

**color** [2] - 828:14, 848:21

**COLUMBIA** [1] - 745:1

**column** [1] - 846:14

**coming** [3] - 749:3, 766:18, 815:11

**common** [1] - 838:17

**companies** [2] - 786:24, 786:25

**company** [9] - 772:2, 774:2, 784:19, 786:2, 786:22, 801:25, 802:7, 807:19, 808:1

**compare** [1] - 748:4

**comparing** [1] - 809:20

**complete** [2] - 811:15, 838:21

**completed** [3] - 767:25, 807:22, 809:19

**completely** [1] - 814:17

**complies** [4] - 824:14, 828:10, 850:11, 852:3

**computer** [8] - 769:5, 788:20, 788:22, 834:3, 834:4, 834:5, 834:13

**computer's** [2] - 788:25, 834:5

**computers** [1] - 834:3

**condition** [4] - 801:5, 815:17, 815:18, 849:16

**conditionally** [4] - 800:23, 801:2, 801:8, 834:19

**conditionally).... ** [1] - 746:15

**conditions** [1] - 840:25

**conduct** [1] - 837:21

**conducted** [1] - 842:7

**conducting** [1] - 838:10

**conferring** [4] - 759:11, 792:11, 824:8, 833:19

**confirm** [1] - 799:22, 828:9, 834:20

**connection** [1] - 819:2

**consent** [1] - 822:4

**consideration** [1] - 803:12

**consistent** [1] - 827:6

**Constitution** [1] - 745:25

**contact** [2] - 790:13, 813:24

**contain** [2] - 826:12, 827:23

**container** [1] - 828:21

**containers** [3] - 828:14, 828:16, 830:12

**containing** [2] - 826:10, 830:12

**contains** [3] - 825:3, 825:15

**content** [1] - 787:19

**contents** [5] - 824:11, 826:23, 826:25, 827:6, 828:9

**context** [6] - 778:25, 779:7, 779:8, 779:9, 808:3, 808:8

**continue** [1] - 801:2

**continued** [1] - 767:22

**contractor** [2] - 772:11, 772:12

**control** [2] - 819:21, 843:3

**convenience** [1] - 846:25

**conversation** [1] - 777:8

**conversations** [4] - 759:24, 777:11,

779:11

**copy** [3] - 787:4, 847:22, 847:23

**correct** [70] - 750:7, 760:14, 760:19, 760:20, 761:3, 761:4, 761:8, 761:11, 761:18, 761:19, 761:24, 762:20, 762:21, 762:23, 763:10, 763:25, 768:6, 769:13, 773:19, 775:22, 775:23, 778:9, 778:24, 779:4, 782:14, 783:9, 783:20, 783:21, 783:22, 785:5, 785:6, 785:8, 785:23, 787:8, 791:3, 791:6, 791:8, 791:24, 792:25, 793:3, 793:18, 799:21, 799:23, 801:22, 802:5, 804:6, 804:14, 805:18, 807:3, 807:7, 807:17, 807:23, 808:2, 808:25, 810:1, 810:8, 810:11, 810:14, 810:15, 810:18, 810:20, 811:6, 812:7, 812:13, 812:21, 812:23, 816:10, 816:24, 849:3, 854:4

**Correct** [3] - 777:23, 791:9, 846:20

**corrected** [1] - 779:4

**correction** [1] - 779:3

**correctly** [4] - 806:15, 819:7, 825:10, 825:16

**correspond** [1] - 775:20

**corruption** [2] - 818:19, 835:21

**couch** [1] - 852:5

**counsel** [5] - 747:7, 747:10, 765:13, 766:4, 833:19

**count** [1] - 771:23

**country** [1] - 770:22

**couple** [6] - 767:23, 787:20, 787:22, 796:10, 811:3, 820:9

**course** [2] - 839:23, 840:2

**court** [19] - 748:15,

757:8, 770:14, 770:19, 770:20, 770:21, 770:25, 771:1, 771:7, 771:17, 771:21, 773:4, 782:13, 782:17, 782:22, 783:8, 783:12, 783:14

**COURT** [111] - 745:1, 747:12, 747:16, 747:20, 747:24, 748:2, 749:11, 753:10, 753:12, 753:15, 753:17, 757:17, 759:10, 759:12, 764:6, 764:12, 765:4, 765:10, 765:22, 766:11, 766:18, 766:21, 766:24, 774:25, 775:2, 775:4, 775:6, 775:9, 781:21, 783:4, 793:24, 794:18, 797:17, 797:21, 798:1, 798:15, 798:19, 800:7, 800:10, 800:23, 802:24, 803:3, 803:16, 804:21, 805:13, 806:24, 809:3, 809:10, 811:16, 813:4, 813:10, 814:8, 815:1, 815:10, 815:13, 815:15, 815:23, 815:25, 816:6, 816:11, 816:13, 816:15, 816:20, 816:22, 816:25, 817:8, 817:12, 817:16, 817:19, 818:2, 820:25, 822:12, 822:15, 823:21, 823:25, 824:5, 824:7, 825:6, 826:18, 826:25, 828:4, 829:15, 829:20, 829:22, 830:20, 831:18, 832:15, 833:16, 833:25, 834:8, 834:17, 835:1, 835:5, 835:8, 836:15, 836:17, 844:15, 847:4, 847:7, 847:11, 847:15, 847:17, 847:21, 847:24,

848:4, 848:8,
849:17, 849:21,
850:14, 853:10,
853:19
**Court** [27] - 745:24,
750:5, 757:9,
772:25, 773:13,
797:7, 799:6,
802:14, 816:4,
816:17, 817:7,
823:18, 824:11,
835:15, 842:2,
843:22, 845:18,
846:6, 847:1,
847:23, 848:7,
848:19, 850:10,
851:15, 852:1,
852:15, 854:3
**court's** [2] - 759:9,
824:4
**Court's** [2] - 748:7,
817:4
**Courthouse** [1] -
745:24
**courtroom** [3] -
771:12, 782:16,
834:1
**courts** [1] - 782:11
**CR** [1] - 745:4
**Creole** [43] - 760:1,
760:2, 760:5, 760:6,
760:7, 760:8,
760:11, 760:14,
760:15, 761:24,
762:1, 762:2,
767:17, 767:19,
769:11, 771:5,
771:11, 771:19,
775:17, 776:15,
776:25, 777:4,
777:5, 777:12,
777:13, 777:19,
777:22, 778:1,
778:14, 780:2,
780:11, 781:8,
781:9, 781:16,
783:15, 804:17,
807:9, 807:10,
807:11, 807:13,
807:14, 808:10,
815:6
**crime** [3] - 818:20,
819:4, 819:6
**criminal** [1] - 747:3
**cross** [11] - 800:6,
800:8, 800:10,
800:11, 800:13,
800:25, 801:4,
801:20, 803:17,
811:13

**Cross** [2] - 746:4,
746:6
**CROSS** [2] - 759:13,
781:23
**cross-examination** [7]
- 800:10, 800:11,
800:13, 800:25,
801:4, 801:20,
803:17
**CROSS-
EXAMINATION** [2] -
759:13, 781:23
**Cross-Examination..
...................** [2] -
746:4, 746:6
**CRR** [1] - 745:24
**cull** [1] - 843:17
**culled** [1] - 848:11
**current** [5] - 768:9,
768:14, 768:19,
768:20, 818:22
**curtain** [1] - 851:24
**custodian** [1] - 816:19
**cut** [1] - 798:21

**D**

**D.C** [1] - 745:5
**date** [3] - 832:23,
832:24, 845:15
**DAY** [1] - 745:9
**days** [3] - 754:18,
760:10, 763:23
**DC** [3] - 745:15,
745:17, 745:25
**deal** [2] - 762:9,
834:16
**dealing** [1] - 785:4
**dealt** [2] - 762:3,
762:17
**December** [1] - 809:16
**decide** [2] - 801:5,
803:13
**decides** [1] - 838:15
**decision** [2] - 810:13,
810:17
**decisions** [1] - 793:18
**declaration** [1] -
816:19
**Defendant** [2] - 745:7,
745:18
**defense** [5] - 759:11,
765:13, 766:4,
792:11, 847:13
**define** [1] - 769:23
**definitely** [2] - 812:24,
817:9
**degree** [1] - 768:2
**demanding** [1] - 783:1

**Department** [3] -
745:16, 770:20,
833:11
**depict** [7] - 796:21,
829:10, 830:14,
831:11, 832:10,
844:1, 844:5
**depiction** [1] - 820:19
**DEPUTY** [5] - 747:2,
749:13, 811:22,
811:25, 848:6
**describe** [5] - 751:1,
824:11, 826:23,
828:12, 830:10
**described** [8] -
755:17, 757:24,
794:5, 826:11,
826:25, 828:9,
842:2, 852:13
**describing** [2] -
824:18, 852:14
**description** [7] -
823:7, 827:7, 832:9,
833:2, 833:3, 833:8,
846:16
**designated** [3] -
795:19, 829:18,
830:6
**desktop** [1] - 834:4
**detail** [2] - 836:10,
836:23
**determination** [1] -
813:16
**determined** [1] -
843:21
**difference** [4] -
769:23, 785:9,
798:2, 808:19
**differences** [2] -
801:24, 801:25
**different** [30] - 758:12,
762:23, 762:24,
763:9, 763:11,
763:13, 763:14,
763:15, 763:21,
765:14, 766:12,
769:20, 771:9,
771:12, 771:22,
778:25, 795:2,
802:21, 802:22,
802:23, 806:22,
812:21, 816:22,
825:8, 834:15,
842:4, 844:9, 852:22
**difficult** [6] - 757:2,
757:4, 757:6,
779:13, 782:25,
794:13
**difficulty** [3] - 749:8,
794:4, 794:7

**digital** [1] - 843:13
**digits** [1] - 827:10
**direct** [3] - 763:20,
800:12, 800:25
**DIRECT** [4] - 748:12,
767:3, 818:4, 835:10
**Direct** [4] - 746:4,
746:6, 746:9, 746:10
**disagree** [1] - 810:21
**discussed** [1] -
816:15
**discussing** [1] -
779:14
**discussion** [2] -
748:5, 790:17
**displayed** [2] - 776:3,
852:6
**DISTRICT** [3] - 745:1,
745:1, 745:10
**Division** [1] - 836:14
**doctor** [2] - 769:10,
769:11
**document** [28] -
774:12, 774:14,
774:18, 775:7,
775:13, 775:17,
777:18, 777:20,
777:24, 778:14,
779:3, 790:21,
794:24, 796:20,
798:24, 799:1,
799:19, 804:17,
805:25, 806:12,
806:18, 807:17,
811:2, 813:21,
838:5, 845:23,
845:25, 848:7
**documentation** [1] -
851:5
**documents** [19] -
770:1, 770:2, 773:7,
777:16, 777:18,
780:5, 780:7,
780:18, 792:6,
795:1, 799:21,
799:25, 800:14,
800:16, 806:3,
811:2, 811:4,
814:15, 839:9
**dollars** [3] - 758:15,
759:3, 759:4
**Donald** [1] - 822:3
**done** [17] - 757:14,
770:16, 773:16,
773:19, 778:4,
790:20, 791:2,
803:25, 808:6,
808:24, 811:7,
814:14, 814:17,
841:14, 842:5,

**digital** [1] - 843:13
845:8, 850:24
**door** [6] - 749:5,
750:20, 751:3,
849:9, 850:1, 851:24
**doors** [1] - 849:10
**dot** [2] - 775:2, 816:22
**down** [16] - 750:5,
754:24, 766:19,
766:23, 793:10,
794:8, 794:21,
796:18, 804:6,
806:21, 815:13,
835:2, 835:7,
843:17, 851:13,
851:24
**download** [1] - 834:12
**drawer** [1] - 840:25
**drawers** [1] - 840:17
**drawn** [1] - 852:4
**drive** [1] - 755:10
**driveway** [1] - 848:17
**driving** [5] - 749:3,
749:20, 751:4,
751:8, 756:8
**drove** [4] - 749:25,
750:1, 751:5, 756:6
**during** [7] - 748:23,
760:10, 821:14,
830:6, 834:15,
844:10, 844:20
**Duroska** [1] - 747:4
**Duroska-Murray** [1] -
747:4
**duty** [1] - 818:24

**E**

**earnest** [1] - 841:23
**easier** [1] - 851:5
**easily** [1] - 851:4
**education** [1] - 768:4
**effect** [1] - 823:22
**efficiently** [1] - 819:7
**eight** [3] - 775:2,
775:16, 837:13
**either** [7] - 761:2,
771:16, 779:17,
801:5, 839:8, 841:2,
847:7
**Elita** [1] - 747:18
**ELITA** [1] - 745:21
**ELMO** [1] - 811:23
**email** [1] - 773:3
**emailed** [1] - 773:2
**employee** [3] - 772:11,
810:8
**empty** [6] - 820:10,
824:12, 825:12,
825:13, 853:3

**end** [4] - 752:14, 756:13, 805:24, 816:9
**Enforcement** [1] - 833:11
**ENGL** [1] - 780:2
**English** [25] - 767:17, 767:20, 767:21, 767:22, 768:7, 769:11, 771:5, 771:11, 771:19, 776:24, 777:4, 777:19, 777:24, 778:1, 778:14, 779:25, 780:6, 780:7, 781:16, 796:3, 796:11, 799:22, 802:14, 804:18, 812:6
**ensure** [2] - 778:7, 819:6
**enter** [2] - 838:14, 849:9
**entered** [2] - 841:17, 850:2
**entire** [2] - 824:12, 839:1
**entitled** [1] - 854:5
**entry** [2] - 819:21, 849:6
**EOIR** [2] - 770:20, 770:24
**equipment** [2] - 788:14, 819:5
**equivalent** [5] - 758:13, 758:14, 759:2, 763:22, 766:3
**ERT** [1] - 825:16
**especially** [1] - 840:16
**ESQ** [3] - 745:16, 745:18, 745:21
**estimate** [2] - 755:21, 801:14
**events** [1] - 757:9
**evidence** [11] - 747:21, 753:19, 753:21, 775:11, 798:20, 798:24, 799:2, 801:9, 809:9, 809:10, 815:21, 817:4, 817:22, 817:24, 818:20, 818:25, 819:3, 819:22, 820:23, 821:2, 822:17, 822:22, 824:3, 824:25, 826:2, 826:5, 826:20, 827:15, 828:2, 828:6, 829:24,

830:22, 831:20, 832:17, 836:5, 836:7, 836:24, 837:2, 837:18, 838:4, 838:5, 838:9, 839:2, 839:3, 839:7, 839:8, 839:14, 839:22, 840:1, 840:8, 840:9, 840:10, 840:13, 844:17, 846:7, 846:11, 847:12, 847:19, 851:12, 852:11
**evidentiary** [3] - 838:2, 840:20, 844:6
**exactly** [8] - 756:4, 760:25, 761:16, 762:18, 772:6, 801:11, 801:13, 808:15
**exam** [5] - 782:20, 782:21, 782:22, 782:25, 783:1
**EXAMINATION** [10] - 748:12, 759:13, 765:11, 767:3, 781:23, 794:1, 803:20, 814:9, 818:4, 835:10
**examination** [11] - 763:20, 798:20, 800:10, 800:11, 800:13, 800:25, 801:1, 801:3, 801:4, 801:20, 803:17
**Examination**............. ..... [2] - 746:5, 746:7
**Examination**............. ...... [1] - 746:7
**Examination**............. ....... [4] - 746:4, 746:6, 746:9, 746:10
**Examination**............. ........ [2] - 746:4, 746:6
**examinations** [1] - 785:16
**example** [7] - 789:4, 790:3, 795:7, 797:12, 797:15, 809:8, 840:17
**excuse** [10] - 750:8, 754:14, 757:3, 757:17, 759:18, 760:18, 761:24, 769:17, 803:1, 833:23
**excused** [2] - 766:19, 815:13

**execute** [1] - 837:12
**executing** [1] - 837:9
**execution** [6] - 836:3, 837:14, 839:1, 839:21, 841:9, 843:12
**executions** [1] - 835:25
**Exhibit** [65] - 746:14, 746:14, 746:15, 746:15, 746:16, 746:16, 746:17, 746:17, 746:18, 746:18, 746:19, 746:19, 746:20, 746:20, 746:21, 746:21, 746:22, 752:24, 752:25, 753:9, 753:18, 753:22, 753:23, 775:10, 776:2, 801:7, 815:20, 817:21, 817:23, 820:13, 820:23, 821:1, 821:8, 821:10, 821:12, 821:19, 822:9, 822:16, 822:20, 823:16, 824:2, 825:23, 825:24, 826:16, 826:19, 827:9, 827:16, 828:2, 828:5, 829:1, 829:13, 829:23, 830:17, 830:21, 831:16, 831:19, 832:13, 832:16, 843:18, 843:20, 844:11, 844:16, 845:23, 846:21, 847:18
**exhibit** [18] - 748:3, 753:10, 774:25, 775:6, 776:2, 798:20, 821:10, 823:17, 823:20, 825:25, 826:22, 830:5, 846:15, 846:19, 846:22, 847:4, 847:7
**exhibits** [9] - 776:17, 780:14, 801:1, 818:2, 823:25, 829:7, 831:7, 834:16, 848:1
**EXHIBITS** [1] - 746:13
**Exhibits** [1] - 823:18
**experience** [4] - 752:19, 787:3, 840:13, 841:5

**expertise** [2] - 837:9, 837:11
**explain** [2] - 772:25, 773:13
**explained** [1] - 797:25
**explanation** [3] - 834:8, 834:9, 843:21
**explore** [2] - 800:16, 801:4
**exposures** [1] - 838:4
**extension** [1] - 776:6
**exterior** [2] - 841:21, 844:2
**extra** [2] - 847:23, 848:1

---

**F**

**fact** [7] - 764:8, 799:21, 799:23, 813:16, 825:15, 834:10, 853:10
**facts** [1] - 779:5
**fail** [1] - 783:24
**failing** [1] - 784:3
**fair** [8] - 780:22, 781:12, 781:16, 795:21, 820:19, 843:11, 846:21, 849:14
**fairly** [8] - 781:8, 829:10, 830:14, 831:11, 832:9, 844:1, 844:5, 846:6
**fall** [1] - 819:8
**familiar** [2] - 774:12, 775:16
**family** [2] - 838:18, 850:6
**far** [8] - 752:5, 752:6, 767:24, 798:22, 798:25, 808:5, 824:5, 840:18
**fast** [1] - 816:6
**FBI** [15] - 752:19, 753:5, 818:12, 818:15, 818:17, 818:22, 835:22, 835:24, 836:4, 837:12, 841:8, 845:3, 846:8, 846:12, 849:10
**FBI's** [1] - 840:4
**FD-302** [1] - 845:3
**FDLE** [2] - 833:10
**February** [1] - 835:23
**federal** [1] - 783:8
**Federal** [1] - 818:11
**federally** [6] - 782:13,

782:17, 782:22, 783:8, 783:12, 783:14
**feet** [1] - 755:21
**felt** [1] - 779:17
**female** [1] - 792:20
**few** [8] - 782:2, 796:1, 799:12, 811:2, 811:3, 824:16, 829:7, 830:2
**field** [2] - 768:17, 768:18
**Field** [2] - 818:25, 835:19
**figures** [1] - 797:13
**file** [8] - 775:13, 776:1, 776:6, 780:1, 801:18, 801:19, 804:10, 805:21
**files** [20] - 775:16, 775:17, 775:20, 775:24, 776:9, 776:11, 776:15, 776:22, 776:23, 777:7, 777:14, 781:1, 788:21, 809:25, 810:4, 810:5, 810:6, 816:12, 816:14, 834:4
**film** [1] - 843:13
**final** [12] - 791:20, 792:8, 799:10, 801:21, 801:22, 802:4, 802:6, 802:9, 808:1, 808:4, 810:13, 814:18
**finally** [1] - 827:8
**fine** [3] - 811:3, 827:2, 853:16
**firearm** [4] - 755:14, 756:2, 820:8, 839:8
**Firm** [1] - 745:19
**first** [22] - 763:3, 763:7, 767:22, 773:8, 773:9, 773:14, 773:15, 773:22, 774:15, 775:13, 775:17, 777:3, 778:7, 779:24, 780:10, 792:20, 813:2, 813:7, 814:3, 846:14, 851:14, 852:13
**first-line** [1] - 773:22
**five** [13] - 775:15, 784:4, 784:6, 784:7, 784:8, 784:10, 823:25, 824:23,

825:4, 825:8, 825:9,
825:11
**flash** [1] - 848:22
**flight** [2] - 834:20,
834:23
**Floor** [2] - 745:20,
745:22
**Florida** [4] - 748:18,
832:6, 833:10,
841:11
**flow** [1] - 779:11
**FM** [1] - 792:20
**folder** [1] - 776:1
**folks** [1] - 797:24
**follow** [2] - 803:18,
842:1
**following** [3] - 774:6,
780:14, 845:8
**foot** [1] - 750:15
**FOR** [5] - 745:1,
748:11, 767:2,
818:3, 835:9
**foregoing** [1] - 854:4
**forth** [1] - 818:21
**foundation** [4] -
757:18, 764:4,
783:4, 799:4
**four** [4] - 775:15,
784:4, 825:4, 825:10
**frame** [1] - 787:19
**fraud** [2] - 818:20,
818:23
**French** [2] - 767:17,
767:19
**frequent** [1] - 772:10
**front** [8] - 753:1,
753:24, 782:10,
811:23, 831:24,
848:2, 850:1, 851:14
**full** [3] - 768:19,
768:20, 825:3
**full-time** [2] - 768:19,
768:20
**fully** [1] - 838:5
**furniture** [1] - 852:5
**FURTHER** [1] - 814:9
**FV1** [2] - 802:17,
802:19

## G

**gears** [1] - 819:8
**Gen** [1] - 833:4
**general** [6] - 773:24,
773:25, 777:6,
823:8, 823:9, 841:24
**generally** [9] - 820:6,
837:6, 837:13,
837:24, 838:24,

839:9, 840:23,
842:1, 850:17
**generic** [1] - 792:17
**gentleman** [2] -
755:12, 755:14
**GERMINE** [1] - 745:6
**Germine** [4] - 747:4,
747:15, 747:17,
747:19
**GGNU78** [1] - 821:6
**Gibson** [2] - 841:20,
843:9
**Gibson's** [1] - 848:14
**Golf** [2] - 821:6
**GOVERNMENT** [4] -
748:11, 767:2,
818:3, 835:9
**government** [23] -
747:7, 747:22,
747:25, 748:2,
766:25, 799:4,
809:8, 816:3, 816:4,
816:25, 817:25,
820:22, 822:8,
823:15, 824:8,
828:1, 829:13,
831:15, 834:11,
834:14, 834:24,
835:8, 849:19
**Government** [36] -
745:13, 746:14,
746:14, 746:15,
746:15, 746:16,
746:16, 746:17,
746:17, 746:18,
746:18, 746:19,
746:19, 746:20,
746:20, 746:21,
746:21, 746:22,
753:18, 775:10,
801:7, 815:20,
817:21, 817:23,
821:1, 822:16,
824:2, 825:23,
826:19, 828:5,
829:23, 830:21,
831:19, 832:16,
844:16, 847:18
**Government's** [24] -
752:23, 752:25,
753:9, 753:22,
753:23, 774:12,
778:6, 814:18,
814:24, 815:3,
820:13, 821:8,
821:10, 821:12,
821:19, 822:20,
825:24, 826:16,
827:9, 827:15,
828:25, 843:10,

845:22, 846:21
**government's** [1] -
823:17
**grade** [2] - 783:25,
784:20
**graded** [2] - 783:24,
784:1
**grader** [1] - 842:21
**gram** [1] - 828:15
**grammar** [1] - 778:23
**gray** [2] - 820:17,
848:22
**great** [4] - 817:14,
845:11, 849:4, 852:4
**Group** [2] - 774:14,
780:9
**growing** [1] - 767:18
**guess** [4] - 789:9,
798:17, 800:18,
834:14
**guessing** [1] - 791:24
**gun** [10] - 749:4,
750:10, 750:12,
750:13, 750:24,
755:14, 756:6,
839:9, 853:8
**guns** [6] - 750:6,
750:9, 750:11,
750:18, 750:21,
750:23
**guy** [4] - 750:2, 751:9,
751:11, 755:9

## H

**Haiti** [14] - 748:21,
748:24, 749:2,
758:21, 758:23,
759:21, 761:5,
761:6, 761:18,
767:10, 767:21,
767:24, 767:25,
819:10
**Haitian** [23] - 752:17,
754:13, 754:15,
758:14, 758:18,
758:19, 759:6,
762:19, 762:25,
763:12, 763:22,
764:3, 764:18,
764:20, 764:21,
765:1, 767:19,
769:11, 775:17,
778:24, 780:1,
780:10, 808:10
**Haitians** [1] - 754:15
**half** [4] - 755:22,
845:24, 852:4, 852:5
**Halloween** [1] -

842:12
**hand** [3] - 821:7,
822:19, 852:6
**handed** [1] - 822:2
**handgun** [1] - 833:9
**hands** [4] - 750:14,
751:2, 755:19, 792:5
**handwriting** [1] -
826:6
**hanging** [1] - 851:24
**happy** [2] - 799:2,
817:5
**hard** [5] - 757:7,
757:13, 788:11,
788:13, 794:4
**hats** [2] - 837:19,
837:20
**head** [1] - 751:3
**headquarters** [4] -
836:10, 836:20,
836:23, 837:1
**headset** [2] - 788:15,
788:16
**headsets** [1] - 788:17
**health** [3] - 763:3,
763:7
**healthcare** [1] -
818:23
**hear** [17] - 752:2,
779:11, 788:11,
788:13, 793:4,
794:4, 794:9,
794:11, 794:13,
794:20, 794:24,
795:2, 795:22,
795:24, 796:5,
796:14, 796:17
**heard** [10] - 752:4,
759:24, 759:25,
761:20, 761:22,
761:24, 761:25,
763:15, 765:14,
807:7
**hearing** [5] - 749:8,
794:5, 794:6, 794:7,
812:20
**held** [1] - 763:23
**help** [2] - 812:24,
833:22
**herein** [2] - 793:8,
813:13
**herself** [1] - 803:5
**hide** [2] - 764:8,
764:16
**high** [2] - 763:5,
767:25
**highest** [2] - 784:22,
786:17
**himself** [2] - 751:22,
843:1

**hmm** [1] - 802:18
**hold** [1] - 754:9
**holding** [8] - 750:14,
755:20, 763:24,
821:19, 825:2,
826:2, 828:19,
828:20
**Honda** [1] - 820:17
**Honor** [57] - 747:2,
747:9, 747:14,
747:18, 747:22,
747:23, 747:25,
749:7, 753:8,
753:13, 765:3,
765:9, 765:20,
766:10, 766:16,
774:23, 775:8,
781:22, 793:22,
794:15, 797:20,
798:16, 799:3,
799:8, 800:5,
800:20, 803:1,
804:23, 809:6,
811:12, 813:12,
814:25, 815:22,
816:2, 817:20,
817:25, 820:22,
822:8, 823:15,
824:6, 828:1,
829:21, 830:17,
831:15, 833:15,
833:17, 833:21,
833:23, 834:19,
834:25, 836:18,
844:13, 847:3,
847:5, 847:14,
847:16, 853:17
**HONORABLE** [1] -
745:10
**hopefully** [1] - 835:3
**hospital** [1] - 769:14
**hostage** [1] - 819:9
**hour** [5] - 749:25,
750:1, 751:5, 751:7
**hours** [5] - 787:18,
787:21, 787:22,
801:15, 801:16
**house** [4] - 842:15,
842:17, 844:2, 844:6
**housed** [1] - 760:9
**HSM** [1] - 831:10
**human** [1] - 839:25
**Human** [1] - 836:14
**hundred** [1] - 771:23
**hundreds** [1] - 842:8
**hunting** [2] - 756:3,
756:5

# I

**ID** [1] - 845:15
**identifications** [1] - 792:14
**identified** [4] - 751:21, 753:5, 793:5, 843:1
**identifies** [2] - 803:5
**identify** [8] - 752:20, 792:15, 793:13, 803:9, 845:19, 848:18, 850:22, 851:4
**imagine** [1] - 763:4
**immediately** [1] - 820:10
**immigration** [4] - 770:21, 770:25, 771:1, 782:10
**Inc** [1] - 828:24
**included** [1] - 822:5
**including** [2] - 824:5, 829:8
**inconsistency** [1] - 817:2
**incorporate** [1] - 851:7
**indicate** [2] - 793:8, 812:14
**indicated** [1] - 815:16
**indicates** [2] - 793:15, 833:10
**indicating** [1] - 852:11
**individual** [8] - 793:11, 796:25, 807:2, 807:5, 807:23, 812:13, 850:7, 850:13
**individuals** [11] - 754:13, 754:15, 754:24, 760:5, 760:11, 763:24, 839:4, 842:16, 842:18, 842:19, 843:5
**indulgence** [3] - 759:9, 814:24, 824:4
**Industries** [1] - 828:24
**inflection** [1] - 812:22
**inform** [1] - 805:7
**information** [1] - 812:23
**informed** [2] - 759:17, 803:22
**informing** [1] - 807:19
**initial** [17] - 787:10, 787:15, 787:24, 788:4, 790:12, 791:14, 793:11,

793:12, 797:23, 798:10, 798:11, 805:13, 807:2, 807:13, 807:14, 813:24, 818:8
**initialed** [1] - 823:4
**initials** [2] - 823:5, 826:6
**initiated** [2] - 841:19, 841:21
**input** [2] - 793:2, 793:3
**instance** [3] - 769:10, 795:17, 796:2
**instances** [1] - 779:20
**intelligible** [3] - 795:3, 795:4, 796:16
**intend** [1] - 846:23
**interaction** [3] - 791:7, 791:10, 791:12
**interior** [3] - 841:22, 844:2, 853:3
**International** [2] - 770:20, 785:13
**internet** [1] - 834:13
**interpret** [7] - 769:1, 770:21, 771:2, 771:13, 782:13, 782:17, 784:19
**interpretation** [9] - 769:1, 769:6, 769:18, 769:19, 769:22, 769:24, 770:6, 771:17, 771:21
**interpreter** [6] - 768:21, 770:14, 770:19, 771:7, 781:10, 782:23
**interpreter/ translator** [1] - 768:15
**interpreters** [1] - 747:5
**interpreting** [15] - 768:17, 771:4, 782:4, 782:7, 782:8, 782:10, 783:20, 784:17, 784:19, 784:21, 785:2, 785:4, 785:14, 785:18, 785:22
**interruption** [1] - 803:3
**introduce** [3] - 767:5, 774:23, 835:15
**introduced** [1] - 809:9
**Investigation** [1] - 818:11
**investigation** [3] -

819:9, 819:12, 819:14
**investigations** [1] - 818:18
**involved** [1] - 826:22
**involvement** [1] - 772:21
**iPad** [1] - 769:13
**iPhone** [1] - 821:13
**isolated** [1] - 791:3
**Israeli** [1] - 828:23
**issue** [4] - 817:11, 817:12, 833:24, 834:2
**issues** [1] - 794:6
**it'll** [1] - 840:23
**item** [12] - 824:18, 830:6, 831:10, 833:6, 840:8, 840:19, 841:4, 841:6, 846:16, 851:18, 853:5
**items** [13] - 751:16, 823:17, 832:25, 839:12, 840:19, 841:4, 844:6, 844:9, 845:1, 845:19, 846:11, 846:22, 853:13
**itself** [4] - 817:3, 819:19, 833:2, 853:5

# J

**jail** [7] - 777:9, 779:12, 787:7, 803:23, 816:4, 816:18, 816:19
**James** [1] - 835:17
**JAMES** [2] - 746:10, 835:9
**January** [3] - 745:6, 836:13, 836:16
**JDB** [1] - 745:14
**JEAN** [3] - 746:6, 767:2, 767:7
**Jean** [2] - 766:25, 767:7
**Jeep** [2] - 848:20, 849:2
**Jennifer** [1] - 841:20
**Jewelry** [1] - 832:5
**jewelry** [1] - 751:19
**job** [12] - 768:14, 768:19, 768:20, 770:10, 770:13, 770:14, 771:24, 778:3, 778:4, 778:21, 837:23,

838:6
**jobs** [3] - 770:5, 770:8, 771:3
**JOHN** [1] - 745:10
**join** [1] - 769:5
**Joly** [1] - 747:4
**JOLY** [1] - 745:6
**Jose** [2] - 818:1, 818:8
**JOSE** [2] - 746:9, 818:3, 818:8
**Joseph** [9] - 748:1, 748:16, 748:17, 752:25, 753:23, 755:20, 759:7, 765:13, 766:18
**JOSEPH** [2] - 746:4, 748:11
**Judge** [1] - 766:20
**JUDGE** [1] - 745:10
**judges** [1] - 817:6
**July** [1] - 836:13
**jury** [2] - 817:8, 817:9
**Justice** [2] - 745:16, 770:21

# K

**K-A-E-L-I-N** [1] - 835:17
**KAELIN** [2] - 746:10, 835:9
**Kaelin** [3] - 835:17, 843:11, 845:17
**Kaelin's** [1] - 847:12
**KAREN** [1] - 745:13
**Karen** [1] - 747:9
**KATIANA** [2] - 746:4, 748:11
**Katiana** [3] - 748:1, 748:16, 752:15
**keep** [1] - 808:19
**keeps** [2] - 837:18
**kept** [1] - 762:23
**kidnap** [2] - 750:3, 751:12, 754:10
**kidnapped** [1] - 755:3
**killing** [1] - 755:25
**KIMBERLY** [1] - 745:13
**kind** [6] - 754:7, 769:4, 796:17, 834:11, 837:12, 839:1
**kitchen** [1] - 838:18
**knowledge** [3] - 781:14, 781:15, 781:17

# L

**L-O-U-R-E-I-R-O** [1] - 818:9
**labels** [3] - 850:22, 851:5, 851:7
**lack** [1] - 791:17
**laid** [1] - 799:4
**language** [4] - 759:25, 782:15, 783:17, 807:6
**languages** [3] - 767:16, 771:2, 771:4
**Lanmo** [12] - 751:12, 751:22, 752:21, 753:4, 754:2, 754:3, 754:4, 754:5, 756:13, 760:13, 762:7, 762:17
**large** [3] - 839:12, 847:24
**larger** [2] - 851:1, 851:3
**last** [12] - 751:25, 760:17, 761:2, 762:6, 802:11, 805:18, 813:9, 813:10, 818:8, 827:10, 830:5, 834:6
**late** [1] - 815:16
**latent** [1] - 839:24
**laughing** [2] - 796:3, 796:5
**Laughter** [1] - 850:16
**Law** [2] - 745:19, 833:11
**law** [1] - 817:3
**lay** [1] - 783:4
**laying** [2] - 840:25, 841:1
**lead** [1] - 794:17
**leader** [8] - 836:6, 838:6, 838:16, 838:25, 840:14, 841:5, 841:14, 844:19
**leaders** [1] - 818:25
**leadership** [1] - 836:14
**leading** [4] - 766:10, 766:11, 794:15, 794:16
**leaf** [1] - 847:9
**learn** [3] - 767:20, 767:21, 767:22
**least** [3] - 831:7, 837:13, 843:2
**left** [4] - 819:23, 836:25, 849:13,

852:6
**left-hand** [1] - 852:6
**legal** [2] - 769:1, 769:21
**less** [1] - 826:21
**letter** [1] - 850:20
**letting** [1] - 826:6
**level** [4] - 769:17, 823:8, 823:9, 838:12
**liberate** [1] - 754:22
**liberated** [2] - 756:10, 756:11
**license** [1] - 821:5
**lied** [1] - 766:8
**life** [1] - 757:13
**likely** [1] - 793:12
**limited** [1] - 798:19
**line** [15] - 773:9, 773:14, 773:22, 795:18, 796:2, 796:8, 796:9, 796:11, 796:16, 802:16, 813:9, 813:10, 815:3, 851:14, 852:10
**lines** [3] - 796:10, 797:7, 812:4
**list** [14] - 748:3, 748:4, 748:5, 753:10, 775:7, 776:15, 776:16, 779:25, 780:10, 795:8, 823:17, 847:4, 847:7, 847:11
**listed** [5] - 775:6, 780:5, 780:14, 832:19, 832:25
**listen** [9] - 778:7, 787:6, 787:7, 788:17, 788:18, 794:12, 794:20, 794:21, 812:12
**listened** [4] - 776:23, 777:21, 788:22, 815:7
**listening** [1] - 788:7
**literally** [3] - 779:10, 779:21, 793:19
**live** [7] - 748:17, 767:11, 767:12, 823:10, 825:1, 830:11, 842:16
**lived** [1] - 767:13
**living** [5] - 767:14, 838:18, 850:6, 851:2, 851:10
**LNU** [2] - 796:25, 797:1
**locate** [1] - 833:22
**located** [4] - 839:3,

851:18, 851:22, 851:25
**location** [2] - 845:16, 852:24
**locations** [1] - 848:12
**log** [3] - 837:18, 845:14
**logo** [1] - 774:15
**look** [9] - 750:11, 755:23, 775:24, 778:23, 780:20, 795:17, 796:10, 799:10
**looked** [6] - 760:21, 776:24, 776:25, 783:11, 800:1, 806:11
**looking** [6] - 779:7, 809:5, 825:24, 838:13, 845:11, 851:13
**looks** [4] - 775:15, 780:1, 825:4, 825:11
**loose** [2] - 825:12, 825:18
**lost** [1] - 784:24
**loud** [2] - 748:14, 796:5
**Louis** [9] - 819:16, 820:5, 822:5, 823:13, 826:13, 827:24, 831:13, 832:6, 832:22
**Louis's** [2] - 820:17, 821:15
**LOUREIRO** [2] - 746:9, 818:3
**Loureiro** [24] - 818:1, 818:9, 818:12, 818:14, 820:3, 820:14, 821:4, 821:9, 821:25, 822:19, 822:21, 823:6, 824:10, 824:16, 825:21, 825:24, 827:4, 827:14, 829:2, 830:4, 831:2, 831:24, 832:19, 835:2
**Lucky** [1] - 832:5
**lunch** [4] - 834:15, 835:3, 853:11, 853:13
**Lunch** [1] - 853:21

## M

**M33** [1] - 828:15

**ma'am** [41] - 748:25, 749:21, 750:25, 751:23, 752:8, 752:12, 752:22, 753:6, 754:4, 754:12, 754:16, 754:18, 755:2, 755:4, 755:13, 756:4, 756:21, 757:12, 758:5, 758:17, 758:22, 758:24, 759:22, 760:3, 760:6, 761:6, 761:9, 761:12, 761:19, 761:21, 762:2, 762:5, 762:14, 762:16, 764:2, 764:17, 766:7, 766:15, 782:1
**main** [1] - 796:14
**maintain** [1] - 810:22
**male** [2] - 792:17, 792:18
**man** [6] - 751:21, 752:1, 752:21, 756:6, 842:23, 842:24
**manage** [3] - 819:4, 819:5
**Manpower** [29] - 772:1, 772:2, 772:5, 772:8, 772:13, 772:22, 772:23, 772:25, 773:8, 773:13, 774:14, 777:15, 780:9, 784:15, 784:18, 784:21, 784:25, 785:11, 785:13, 786:3, 786:22, 790:21, 805:1, 805:2, 805:7, 808:10, 808:12, 810:8, 814:15
**mark** [5] - 794:24, 794:25, 795:18, 796:4, 796:20
**marked** [5] - 774:11, 795:15, 822:20, 827:15, 845:22
**master** [1] - 851:12
**master's** [2] - 768:2, 768:3
**match** [2] - 776:15, 776:19
**materials** [1] - 774:7
**Matt** [1] - 851:19
**matter** [4] - 764:21, 764:22, 764:23, 854:5

**MD** [1] - 745:20
**mean** [16] - 753:3, 755:5, 757:25, 758:3, 758:13, 758:15, 793:17, 795:13, 798:6, 808:4, 808:9, 809:3, 813:16, 838:11, 839:17, 847:24
**meaning** [4] - 770:2, 779:10, 779:18, 813:10
**meanings** [1] - 778:25
**means** [1] - 835:1
**meant** [1] - 795:16
**Media** [4] - 788:22, 788:25, 789:1, 789:3
**medical** [2] - 769:1, 769:21
**medicine** [2] - 763:6
**memorable** [1] - 842:11
**men** [4] - 749:19, 749:22, 749:23, 750:5
**mentioned** [6] - 751:21, 792:21, 794:23, 840:3, 842:15, 843:7
**mentioning** [1] - 819:25
**met** [2] - 760:13, 775:22
**meters** [1] - 755:22
**method** [1] - 837:12
**Miami** [8] - 818:25, 832:5, 835:19, 836:8, 836:21, 836:23, 836:24, 841:8
**microphone** [3] - 749:8, 749:12, 769:7
**middle** [1] - 818:8
**might** [7] - 764:2, 783:4, 800:11, 800:15, 834:12, 840:3, 840:20
**Military** [1] - 828:24
**military** [1] - 768:10
**million** [3] - 752:16, 752:17
**mind** [2] - 824:17, 828:19
**mindful** [1] - 798:24
**mine** [1] - 774:17
**minute** [6] - 770:9, 770:12, 784:24, 787:18, 787:19, 794:23
**minutes** [2] - 787:20,

787:22
**mischaracterizes** [1] - 764:10
**missed** [2] - 756:4, 849:22
**missing** [1] - 805:17
**missionaries** [1] - 819:10
**mixed** [1] - 824:20
**model** [1] - 851:16
**moment** [1] - 845:12
**money** [22] - 751:18, 758:9, 758:10, 758:11, 758:14, 758:18, 758:19, 758:23, 758:25, 759:1, 759:6, 761:14, 762:4, 762:8, 762:19, 762:20, 763:4, 763:12, 764:22, 765:14, 765:17, 766:2
**Morin** [1] - 822:3
**morning** [20] - 747:2, 747:9, 747:12, 747:13, 747:14, 747:16, 747:18, 747:20, 748:8, 759:15, 759:16, 767:5, 781:25, 782:1, 815:15, 818:6, 835:12, 848:2
**most** [4] - 758:13, 782:6, 782:8, 793:12
**motorcycle** [4] - 749:3, 755:9, 755:12, 756:7
**motorcycles** [1] - 749:19
**move** [22] - 749:10, 749:11, 753:8, 769:7, 774:23, 799:2, 800:4, 817:14, 820:22, 822:9, 823:16, 826:15, 828:2, 829:13, 830:17, 831:15, 832:13, 838:19, 838:21, 844:13, 847:3, 848:12
**moved** [5] - 753:15, 800:14, 816:25, 817:17, 841:6
**movement** [1] - 840:13
**moves** [1] - 816:3
**movie** [1] - 755:24
**movies** [1] - 756:2

**moving** [2] - 799:6, 816:7
**mp3** [1] - 776:6
**MP3** [1] - 816:12
**MP3s** [1] - 780:11
**MR** [55] - 747:14, 747:23, 749:7, 749:14, 753:16, 759:9, 775:5, 817:18, 817:25, 818:5, 820:22, 820:24, 821:3, 822:8, 822:10, 822:14, 822:18, 823:15, 823:24, 824:4, 824:6, 824:9, 825:20, 826:15, 826:17, 826:21, 827:2, 827:3, 827:10, 827:11, 827:12, 827:13, 828:1, 828:3, 828:7, 829:13, 829:21, 830:1, 830:17, 830:19, 830:23, 831:1, 831:15, 831:17, 831:21, 831:23, 832:13, 832:14, 832:18, 833:14, 834:19, 834:24, 844:14, 847:16, 849:18
**MS** [128] - 747:9, 747:18, 747:22, 747:25, 748:6, 748:7, 748:13, 749:10, 749:16, 749:18, 753:11, 753:13, 753:20, 757:19, 759:7, 759:14, 764:4, 764:7, 764:10, 764:14, 764:15, 765:3, 765:8, 765:12, 765:20, 766:1, 766:10, 766:13, 766:16, 766:25, 767:4, 774:23, 775:1, 775:3, 775:8, 775:12, 781:5, 781:7, 781:19, 781:22, 781:24, 783:2, 783:6, 792:10, 792:12, 793:22, 794:2, 794:15, 794:19, 797:16, 797:20, 797:24, 798:4, 798:5, 798:14,

798:16, 799:2, 799:8, 799:12, 799:13, 800:4, 800:5, 800:8, 800:20, 801:10, 803:1, 803:7, 803:15, 803:19, 803:21, 804:23, 804:24, 805:15, 805:16, 806:23, 806:25, 807:1, 809:5, 809:7, 809:11, 809:12, 811:12, 811:14, 811:19, 811:24, 812:1, 812:2, 813:5, 813:6, 813:12, 813:15, 814:7, 814:10, 815:2, 815:9, 815:22, 816:2, 816:10, 816:12, 816:14, 816:17, 816:21, 816:24, 817:2, 817:9, 817:14, 817:20, 833:17, 833:20, 834:2, 834:9, 835:11, 836:19, 844:13, 844:18, 847:3, 847:5, 847:10, 847:14, 847:20, 847:22, 848:1, 848:9, 848:10, 849:23, 849:24, 850:19, 853:14
**multiple** [3] - 837:20, 838:4, 851:3
**Murray** [1] - 747:4
**must** [1] - 805:22
**MV1** [5] - 792:17, 792:18, 792:19, 795:19, 802:19

## N

**NA** [1] - 846:18
**name** [38] - 748:15, 748:16, 751:12, 754:22, 755:7, 755:16, 756:4, 757:25, 758:3, 767:6, 767:7, 772:2, 780:3, 792:16, 792:17, 793:2, 793:3, 793:4, 797:3, 798:1, 798:6, 798:12, 803:8, 803:11, 811:11, 812:15, 814:1,

818:7, 818:8, 822:24, 823:2, 826:2, 826:3, 826:4, 832:6, 835:16
**name's** [1] - 823:3
**named** [1] - 796:25
**names** [6] - 775:13, 776:16, 780:1, 780:2, 793:13, 842:19
**narcotics** [1] - 818:19
**nationality** [1] - 764:23
**near** [1] - 851:23
**necessary** [4] - 748:5, 803:18, 819:6, 850:15
**need** [14] - 770:22, 778:21, 787:3, 797:22, 798:2, 811:16, 812:11, 812:17, 827:1, 827:4, 834:10, 834:16, 840:21, 853:11
**needed** [2] - 773:7, 794:22
**negotiate** [3] - 756:18, 757:6, 762:11
**negotiator** [5] - 762:10, 762:13, 762:15, 762:16, 762:17
**neighborhood** [1] - 842:14
**never** [6] - 766:8, 771:20, 772:20, 782:24, 783:3, 790:17
**new** [1] - 847:7
**next** [24] - 747:24, 751:8, 754:5, 756:7, 766:24, 816:1, 833:6, 833:8, 835:8, 838:21, 838:22, 848:15, 848:24, 849:4, 849:7, 849:12, 850:4, 852:7, 852:20, 852:23, 853:2, 853:9, 853:15, 853:16
**night** [3] - 834:6, 842:12, 842:14
**nine** [4] - 754:18, 760:10, 763:23, 775:16
**ninth** [3] - 754:19, 754:20, 754:21
**noise** [1] - 796:18

**noises** [1] - 789:18
**nomenclature** [1] - 824:24
**none** [2] - 786:25, 842:6
**Norma** [3] - 826:9, 829:9, 831:8
**normally** [1] - 842:2
**Northeast** [1] - 841:10
**Nos** [8] - 746:15, 746:15, 746:16, 746:18, 801:7, 815:20, 817:23, 824:2
**note** [2] - 796:6, 796:12
**noted** [1] - 796:10
**notes** [5] - 844:20, 845:4, 845:7, 845:18, 846:5
**nothing** [1] - 765:7
**November** [1] - 821:6
**number** [32] - 751:25, 756:15, 756:17, 756:19, 756:20, 760:17, 761:2, 761:5, 761:6, 761:7, 761:10, 761:11, 761:13, 761:17, 762:11, 762:24, 763:21, 763:22, 774:25, 821:5, 833:2, 833:5, 833:7, 833:9, 837:6, 837:15, 837:20, 840:9, 846:15, 849:19
**numbers** [8] - 762:23, 763:10, 763:16, 775:14, 776:2, 816:7, 833:3, 846:22
**NW** [3] - 745:14, 745:17, 745:25

## O

**object** [1] - 794:15
**objection** [39] - 753:16, 753:17, 764:4, 764:10, 765:23, 775:5, 783:2, 794:18, 797:16, 797:17, 798:14, 798:15, 798:23, 799:8, 800:18, 806:23, 811:17, 817:18, 820:24, 822:11, 822:14, 822:15,

823:23, 823:24, 826:17, 826:18, 828:3, 828:4, 829:20, 830:19, 830:20, 831:17, 832:14, 832:15, 834:24, 844:14, 844:15, 847:15
**objection's** [1] - 811:17
**observe** [3] - 839:3, 840:15, 841:6
**obtained** [3] - 846:8, 846:12
**obvious** [2] - 779:18, 853:12
**obviously** [2] - 785:9, 838:2
**occasion** [1] - 834:1
**occurs** [1] - 840:14
**October** [6] - 819:15, 820:18, 820:20, 832:24, 841:9, 841:25
**OF** [3] - 745:1, 745:3, 745:9
**office** [5] - 776:14, 780:13, 780:23, 800:1, 804:6
**Office** [9] - 745:14, 803:24, 804:5, 804:11, 805:4, 805:6, 806:8, 819:1, 835:19
**officer** [8] - 838:23, 838:24, 838:25, 840:15, 843:8, 844:20, 845:20, 851:6
**officers** [2] - 838:15, 851:20
**Official** [1] - 854:3
**official** [1] - 839:6
**often** [3] - 771:14, 786:1, 840:18
**older** [1] - 842:23
**once** [16] - 772:9, 773:16, 791:25, 792:5, 794:13, 794:22, 802:2, 803:5, 803:8, 803:25, 806:16, 806:20, 808:15, 810:6, 819:21, 838:21
**one** [56] - 749:25, 750:1, 751:3, 753:13, 755:15, 755:16, 755:17, 755:21, 756:8,

762:9, 769:25, 770:3, 775:15, 781:6, 784:17, 784:18, 785:15, 785:24, 786:2, 786:3, 789:13, 792:10, 795:11, 795:12, 797:14, 800:22, 803:12, 805:25, 806:6, 810:19, 811:1, 818:24, 819:6, 821:16, 821:20, 822:5, 823:5, 825:2, 825:4, 828:19, 830:23, 831:21, 834:3, 834:6, 837:25, 839:5, 842:20, 842:21, 843:24, 845:12, 849:22, 851:20
**ones** [1] - 791:21
**open** [8] - 749:5, 776:1, 780:20, 824:10, 826:23, 827:4, 828:8, 849:10
**opened** [2] - 750:20, 761:1
**operating** [1] - 748:23
**opinion** [1] - 799:23
**optimal** [1] - 840:24
**or..** [1] - 824:12
**oral** [1] - 785:5
**order** [2] - 769:16, 847:8
**ORENBERG** [24] - 745:18, 747:14, 747:23, 749:7, 749:14, 753:16, 759:9, 775:5, 817:18, 820:24, 822:10, 822:14, 823:24, 826:17, 827:10, 827:12, 828:3, 829:21, 830:19, 831:17, 832:14, 844:14, 847:16, 849:18
**Orenberg** [4] - 745:19, 747:15, 747:16, 849:17
**original** [4] - 781:10, 806:18, 825:17, 827:22
**originally** [1] - 759:21
**outside** [2] - 779:9, 811:12
**overall** [3] - 838:1, 841:19, 841:21
**overruled** [5] - 765:22,

765:24, 797:17, 798:23, 811:17
**oversee** [1] - 838:25
**overspeaking** [1] - 821:18
**own** [1] - 791:3
**owner** [2] - 842:25, 843:2

## P

**P-A-L-M-T-O-A-R** [1] - 833:8
**p.m** [1] - 853:21
**packaged** [1] - 825:18
**packages** [1] - 828:16
**packaging** [5] - 825:17, 827:22, 839:10, 840:12
**page** [39] - 753:14, 774:14, 774:15, 779:25, 795:18, 796:8, 796:9, 796:24, 797:6, 798:7, 802:12, 802:13, 811:20, 811:21, 813:2, 813:7, 813:11, 814:3, 845:13, 845:23, 845:24, 848:13, 848:14, 848:15, 848:16, 848:24, 849:5, 849:8, 849:25, 850:4, 852:7, 852:20, 852:23, 853:2, 853:4, 853:17
**pages** [3] - 847:9, 847:25, 854:4
**Pages** [1] - 745:7
**paid** [23] - 757:15, 757:18, 757:20, 757:22, 757:23, 758:1, 758:4, 758:7, 758:18, 758:20, 758:25, 759:1, 759:5, 762:19, 762:23, 763:9, 763:10, 763:14, 765:14, 765:17, 765:18, 765:21, 766:2
**palmetto** [1] - 833:9
**Palmtoar** [1] - 833:8
**paper** [7] - 756:14, 756:16, 781:9, 839:11, 839:12, 845:7, 850:20
**paperwork** [2] - 820:9,

829:18
**Park** [1] - 745:19
**parked** [1] - 848:17
**part** [12] - 765:4, 770:13, 771:24, 775:17, 784:13, 794:11, 802:16, 813:3, 819:9, 833:2, 837:3
**part-time** [3] - 770:13, 771:24
**participants** [1] - 796:25
**participated** [1] - 835:24
**participating** [1] - 841:18
**participation** [1] - 819:3
**particular** [5] - 774:6, 801:16, 819:15, 837:7, 851:4
**particularly** [1] - 842:4
**parts** [1] - 794:13
**party** [1] - 769:20
**PASCHALL** [19] - 745:13, 747:25, 748:6, 748:13, 749:10, 749:16, 749:18, 753:11, 753:13, 753:20, 757:19, 759:7, 764:4, 764:10, 765:3, 765:12, 766:1, 766:13, 766:16
**Paschall** [2] - 747:11, 765:10
**pass** [2] - 759:8, 783:24
**passed** [4] - 771:17, 772:18, 783:22, 786:17
**passing** [1] - 748:9
**password** [1] - 760:24
**patient** [2] - 769:10, 769:11
**Pawn** [1] - 832:5
**pay** [1] - 758:22
**PC** [1] - 745:19
**Pelican** [1] - 851:16
**penalty** [2] - 799:20, 814:13
**Pennsylvania** [1] - 745:17
**people** [30] - 749:4, 754:9, 754:10, 754:11, 754:25, 756:3, 757:15, 758:7, 758:20,

759:1, 762:6, 762:7, 762:8, 762:15, 762:22, 763:9, 763:13, 765:18, 766:2, 777:6, 777:9, 777:12, 796:13, 796:19, 837:15, 837:16, 837:19, 839:4, 841:18
**people's** [1] - 757:25
**per** [4] - 787:18, 801:18, 801:19, 838:13
**period** [1] - 844:21
**perjury** [2] - 799:20, 814:13
**permitted** [1] - 811:13
**person** [51] - 752:4, 752:13, 756:23, 761:20, 762:3, 762:5, 762:6, 762:7, 762:9, 762:10, 787:13, 788:4, 790:12, 790:13, 790:25, 791:1, 791:7, 791:10, 791:12, 791:13, 791:16, 792:20, 792:21, 793:12, 793:13, 793:14, 796:14, 798:2, 802:22, 802:23, 803:4, 803:5, 805:18, 805:21, 805:22, 808:1, 808:4, 808:6, 812:15, 812:19, 812:25, 814:15, 823:4, 826:5, 837:22, 837:23, 842:23, 842:25, 843:2
**person's** [1] - 758:1
**personally** [2] - 765:17, 844:9
**personnel** [2] - 819:5, 837:14, 837:20
**Phoenix** [1] - 804:7
**phone** [33] - 751:14, 751:21, 751:22, 751:23, 751:24, 752:1, 752:2, 752:4, 752:6, 752:14, 754:5, 756:15, 756:17, 756:20, 760:16, 760:17, 760:19, 760:21, 760:22, 761:1, 761:2, 761:3, 769:19, 787:7,

802:22, 809:20, 821:14, 821:19, 821:22, 821:25, 822:2
**phones** [4] - 820:9, 821:16, 821:20, 822:5
**photo** [7] - 753:10, 753:12, 837:18, 845:14, 848:14, 849:20, 850:13
**photograph** [9] - 752:20, 753:5, 831:10, 832:10, 838:3, 840:10, 840:23, 840:24, 850:8
**photographed** [2] - 821:23, 852:25
**photographer** [8] - 837:17, 837:23, 837:24, 840:7, 840:22, 841:20, 845:15, 849:14
**photographing** [1] - 840:18
**photographs** [9] - 819:23, 819:25, 820:1, 833:22, 834:10, 834:16, 837:22, 843:7, 843:8
**photography** [4] - 837:24, 838:1, 841:19, 841:21
**photos** [14] - 819:20, 819:21, 843:11, 843:15, 843:17, 843:20, 843:24, 844:1, 845:9, 845:12, 846:5, 848:11, 850:18
**physical** [5] - 845:4, 845:5, 846:11, 846:15, 846:19
**pick** [2] - 756:23, 853:17
**picked** [2] - 752:13, 798:6
**picture** [27] - 820:14, 821:5, 829:2, 829:4, 829:6, 830:4, 830:8, 830:14, 831:2, 831:4, 831:6, 831:11, 831:21, 831:24, 832:2, 832:4, 832:9, 849:4, 849:7, 849:12, 852:6, 852:20, 852:21, 852:23, 853:2, 853:9, 853:15

**pictures** [5] - 830:2, 845:2, 845:17, 848:9, 853:13
**piece** [5] - 750:5, 756:16, 828:20, 850:20
**pieces** [1] - 846:7
**pink** [1] - 821:13
**pivot** [1] - 848:11
**placard** [3] - 840:8, 852:11, 852:14
**place** [11] - 750:2, 755:10, 756:9, 838:3, 839:7, 840:8, 840:11, 840:18, 841:2, 841:6, 848:6
**placed** [2] - 840:11, 847:8
**places** [1] - 816:22
**Plaintiff** [1] - 745:4
**plan** [1] - 842:1
**plastic** [3] - 828:14, 830:12, 839:10
**plate** [1] - 821:5
**played** [1] - 799:6
**Player** [4] - 788:23, 788:25, 789:1, 789:3
**pleasure** [1] - 815:14
**plenty** [2] - 777:11, 779:19
**plug** [1] - 834:6
**podium** [1] - 747:8
**point** [12] - 748:3, 784:21, 786:11, 790:4, 798:18, 798:21, 800:9, 811:5, 812:13, 812:15, 853:11, 853:16
**points** [3] - 784:7, 784:8, 784:10
**policy** [1] - 839:17
**Pompano** [1] - 841:10
**portion** [1] - 844:2
**position** [3] - 768:9, 818:12, 836:25
**possible** [4] - 779:2, 794:8, 796:22, 838:3
**Potomac** [2] - 745:19, 745:20
**practice** [2] - 817:4, 842:2
**prefer** [1] - 824:20
**preliminarily** [1] - 747:21
**premises** [1] - 838:14
**preparation** [3] - 776:12, 843:14, 846:3
**prepare** [3] - 752:15,

844:23, 845:18
**prepared** [1] - 846:2
**preparing** [1] - 844:25
**present** [5] - 747:15, 816:17, 842:17, 842:18, 843:17
**presents** [1] - 816:4
**press** [1] - 811:23
**pressure** [1] - 763:5
**pretty** [2] - 772:17, 812:25
**previously** [3] - 755:17, 813:8, 831:7
**primarily** [1] - 768:7
**print** [1] - 839:24
**problem** [2] - 798:23, 799:6, 835:6
**proceedings** [2] - 771:22, 854:5
**process** [9] - 769:15, 771:6, 805:19, 805:23, 814:12, 819:6, 826:22, 839:16
**processed** [3] - 819:15, 819:19, 820:18
**processes** [1] - 839:14
**processing** [3] - 818:21, 819:4, 819:17
**proctored** [1] - 771:8
**produce** [1] - 846:25
**produced** [3] - 774:21, 780:8, 780:23
**product** [2] - 802:4, 802:6, 802:9, 808:22
**project** [12] - 772:10, 772:23, 773:1, 773:3, 773:5, 773:9, 773:15, 773:18, 773:23, 774:5, 774:6, 801:16
**pronouncing** [1] - 825:9
**property** [2] - 842:25, 843:2
**prosecutor** [1] - 833:17
**protocol** [2] - 819:19, 840:4
**provide** [8] - 771:12, 771:24, 779:2, 782:10, 786:25, 807:5, 812:22, 814:1
**provided** [11] - 771:21, 793:9, 793:16, 806:3, 807:13, 807:14,

813:13, 814:3, 843:4, 847:13, 847:23
**providing** [2] - 769:12, 785:16
**proximity** [1] - 840:9
**public** [2] - 818:19, 835:21
**pull** [5] - 749:8, 752:23, 753:7, 752:21, 828:25
**purpose** [3] - 761:10, 761:13, 819:22
**purposes** [5] - 825:17, 829:19, 849:18, 850:23, 851:5
**push** [1] - 750:20
**pushed** [1] - 750:23
**put** [20] - 751:3, 754:6, 792:16, 792:17, 793:6, 793:10, 793:14, 794:9, 794:10, 795:3, 798:9, 799:18, 806:18, 809:9, 823:3, 825:21, 827:22, 839:7, 839:12, 848:4

**Q**

**quadrant** [1] - 829:19
**quality** [5] - 788:2, 788:3, 788:6, 788:10
**Quantico** [2] - 839:20, 840:2
**questions** [17] - 765:13, 765:15, 766:4, 766:6, 766:17, 781:5, 781:19, 782:3, 794:3, 794:16, 799:12, 800:15, 803:15, 814:7, 814:11, 815:9, 833:14
**quite** [3] - 769:9, 824:16, 833:25

**R**

**R-O-D-N-E-Y** [1] - 767:8
**ransom** [13] - 752:1, 757:15, 757:18, 757:20, 757:22, 757:23, 758:1, 758:4, 758:7, 758:20, 759:1,

761:8, 765:18
**rate** [1] - 763:14
**rather** [2] - 776:25, 782:7
**re** [1] - 811:13
**re-cross** [1] - 811:13
**read** [8] - 797:6, 802:14, 813:9, 813:18, 821:5, 832:20, 832:25, 841:17
**reading** [2] - 796:22, 812:25
**ready** [1] - 815:25
**real** [1] - 771:12
**reality** [1] - 796:23
**realize** [1] - 840:20
**really** [10] - 750:12, 771:23, 779:1, 789:20, 792:24, 808:13, 808:14, 811:4, 850:14, 851:4
**rear** [1] - 849:9
**rebooked** [1] - 834:22
**receipt** [6] - 805:13, 832:5, 832:11, 832:21, 833:1, 833:12
**receipts** [1] - 820:9
**receive** [6] - 772:23, 773:7, 773:15, 783:19, 806:6, 839:21
**received** [21] - 753:19, 775:11, 776:23, 801:9, 815:21, 817:22, 817:24, 818:17, 818:18, 821:2, 822:17, 824:3, 826:20, 828:6, 829:24, 830:22, 831:20, 832:17, 836:4, 844:17, 847:19
**RECEIVED** [1] - 746:13
**recertify** [1] - 811:5
**Recess** [1] - 815:24
**recess** [1] - 853:21
**recognize** [8] - 820:14, 820:16, 829:2, 830:4, 831:2, 831:24, 845:25, 850:21
**recollection** [3] - 777:8, 820:10, 841:25
**record** [25] - 747:3, 747:6, 747:8, 750:14, 755:20,

767:6, 780:16, 801:11, 818:7, 820:1, 821:5, 824:11, 824:19, 826:24, 828:12, 828:23, 829:15, 830:10, 832:20, 835:16, 849:18, 850:12, 852:4, 853:4, 854:5
**recording** [6] - 788:6, 798:16, 812:12, 812:17, 812:20, 812:24
**recordings** [3] - 788:10, 804:13, 807:11
**records** [2] - 780:23, 816:19
**recounting** [1] - 757:8
**recovered** [9] - 822:1, 823:11, 826:12, 827:23, 830:15, 831:12, 832:11, 844:6, 845:19
**recovery** [1] - 839:25
**Recross** [1] - 746:7
**RECROSS** [1] - 803:20
**RECROSS-EXAMINATION** [1] - 803:20
**Recross-Examination........... ........** [1] - 746:7
**rectify** [1] - 794:6
**Redirect** [3] - 746:5, 746:7, 746:8
**REDIRECT** [3] - 765:11, 794:1, 814:9
**refer** [1] - 851:8
**reference** [1] - 796:9
**referenced** [2] - 781:1, 822:13
**referring** [2] - 795:9, 795:10
**refers** [1] - 845:3
**reflects** [1] - 829:16
**refresh** [1] - 842:20
**regarding** [1] - 811:11
**Regine** [1] - 747:4
**registered** [6] - 819:16, 820:4, 823:12, 826:13, 827:24, 831:13
**regular** [5] - 772:8, 779:11, 788:15, 788:16, 788:17
**reject** [4] - 808:19, 810:14, 810:17,

810:19
**rejected** [1] - 810:25
**relates** [1] - 772:22
**release** [3] - 755:6, 755:11, 762:4
**released** [6] - 757:14, 757:22, 757:23, 758:1, 758:6, 763:2
**relevant** [2] - 843:21, 846:16
**remains** [1] - 839:25
**remember** [12] - 765:15, 766:6, 772:6, 786:12, 786:13, 794:10, 795:1, 811:4, 822:2, 842:9, 842:20
**remind** [1] - 749:16
**remote** [1] - 768:21
**remotely** [1] - 769:5
**remove** [3] - 801:5, 815:18, 825:22
**removed** [2] - 824:16, 840:23, 852:24
**removing** [1] - 840:19
**render** [1] - 769:24
**rendition** [1] - 794:8
**renditions** [1] - 770:2
**repeat** [1] - 827:1
**rephrase** [1] - 779:15
**report** [2] - 844:23, 851:7
**Reporter** [2] - 745:24, 854:3
**represent** [1] - 823:18
**representative** [1] - 780:8
**required** [1] - 783:11
**requires** [1] - 838:12
**residence** [11] - 841:16, 841:19, 841:22, 841:23, 843:3, 849:6, 849:9, 850:2, 851:3
**residences** [1] - 851:1
**resign** [1] - 836:25
**resources** [1] - 819:5
**Resources** [1] - 836:14
**respect** [11] - 772:19, 772:23, 774:21, 778:6, 778:13, 779:20, 780:23, 795:18, 800:13, 838:10, 839:14
**respond** [1] - 813:1
**response** [10] - 780:9, 797:10, 818:25, 819:3, 824:25, 836:5, 836:7,

836:24, 837:2, 839:22
**responsibilities** [2] - 819:2, 837:16
**responsible** [1] - 838:1
**results** [3] - 792:8, 801:21, 801:22
**resume** [4] - 747:21, 787:2, 787:4, 815:16
**retrieve** [1] - 822:5
**retrieved** [1] - 828:13
**retrieving** [1] - 828:19
**return** [3] - 836:20, 853:18, 853:19
**returned** [1] - 836:23
**review** [34] - 773:17, 774:3, 774:6, 774:8, 778:4, 778:15, 780:13, 780:18, 781:10, 787:13, 788:10, 789:23, 799:21, 800:21, 804:13, 805:12, 805:18, 805:23, 806:3, 806:9, 807:20, 808:2, 808:4, 808:6, 814:15, 821:10, 822:22, 825:25, 827:15, 843:14, 846:5, 846:11, 853:5
**reviewed** [24] - 775:20, 776:11, 781:11, 789:25, 790:4, 791:11, 791:12, 799:9, 801:25, 803:25, 804:2, 805:8, 805:11, 810:4, 810:6, 810:10, 829:7, 830:5, 831:8, 843:24, 845:9, 845:17, 846:2, 846:7
**reviewer** [10] - 773:12, 773:14, 773:17, 773:21, 774:1, 778:23, 788:1, 791:17, 797:18, 806:3
**reviewing** [6] - 778:22, 791:2, 797:23, 803:23, 809:19, 813:21
**reviews** [1] - 806:10
**Riccardo** [2] - 767:7, 767:8
**RICCARDO** [1] - 767:8
**rifle** [7] - 833:5, 833:6, 851:16, 851:25,

852:9, 852:10, 852:22
**rights** [1] - 835:21
**RODNEY** [2] - 746:6, 767:2
**Rodney** [10] - 766:25, 767:7, 767:8, 767:9, 781:25, 794:3, 799:14, 803:22, 814:11, 815:10
**Rodney's** [1] - 816:15
**role** [6] - 773:11, 819:12, 819:13, 838:23, 841:13
**roles** [2] - 838:6, 838:8
**Room** [1] - 745:24
**room** [31] - 754:6, 754:7, 754:9, 754:10, 754:11, 754:17, 754:25, 838:16, 838:18, 838:20, 838:21, 839:2, 850:6, 850:22, 851:2, 851:4, 851:9, 851:10, 851:11, 851:12, 851:15, 853:16, 853:17, 853:19, 853:20
**rooms** [2] - 850:23, 851:3
**rounds** [1] - 830:12
**RPR** [1] - 745:24
**rule** [1] - 811:16
**Ryan** [1] - 822:3

## S

**SA** [2] - 822:3, 851:19
**sacrifice** [1] - 757:12
**sad** [1] - 756:25
**safety** [2] - 763:3, 841:16
**sake** [3] - 804:21, 823:17, 823:20
**Sanjou** [12] - 751:12, 751:22, 752:21, 753:4, 754:2, 754:3, 754:4, 754:5, 756:14, 760:13, 762:8, 762:17
**saw** [4] - 749:3, 750:13, 756:13, 761:1
**scale** [1] - 786:11
**SCD617477** [1] - 833:9
**scenario** [1] - 771:11
**scenarios** [1] - 771:13

**scene** [6] - 818:20, 819:6, 819:18, 819:20, 819:23, 820:1
**scenes** [1] - 819:4
**school** [2] - 767:24, 767:25
**schooling** [2] - 768:1, 768:5, 768:7
**scope** [3] - 765:20, 800:12, 811:12
**score** [1] - 784:4
**screen** [11] - 753:1, 753:24, 776:4, 776:16, 779:23, 780:14, 795:5, 799:18, 811:22, 811:24, 852:6
**search** [33] - 819:17, 820:6, 821:15, 823:11, 826:13, 827:24, 830:6, 831:12, 835:25, 836:3, 837:3, 837:8, 837:9, 837:14, 837:21, 838:9, 838:10, 838:13, 838:20, 838:21, 839:1, 841:3, 841:9, 841:17, 841:18, 841:23, 842:5, 842:9, 843:4, 844:10, 848:12, 850:23
**searched** [4] - 820:3, 820:20, 829:11, 844:10
**searches** [4] - 839:22, 841:25, 842:5, 842:7
**searching** [4] - 837:23, 838:11, 840:3, 840:17
**seat** [1] - 749:10
**second** [7] - 765:4, 774:15, 779:25, 794:12, 796:16, 811:16, 834:5
**section** [2] - 794:11, 812:3
**sections** [1] - 771:9
**secure** [2] - 773:6, 804:10
**see** [25] - 752:25, 753:23, 757:1, 757:16, 776:3, 776:16, 792:6, 795:8, 805:15, 805:24, 809:16, 812:4, 815:23, 817:10, 825:13,

839:6, 842:13, 845:13, 848:5, 848:16, 849:5, 849:8, 849:25, 850:4, 852:8
**seeing** [1] - 769:10
**seek** [2] - 762:3, 800:9
**SEIFERT** [62] - 745:13, 747:9, 747:22, 748:7, 766:25, 767:4, 774:23, 775:1, 775:3, 775:8, 775:12, 781:5, 781:7, 781:19, 783:2, 794:2, 794:19, 797:20, 797:24, 798:4, 798:5, 799:2, 799:12, 799:13, 800:4, 801:10, 803:7, 803:15, 806:23, 811:12, 814:10, 815:2, 815:9, 815:22, 816:2, 816:10, 816:12, 816:14, 816:17, 816:21, 816:24, 817:2, 817:9, 817:14, 817:20, 835:11, 836:19, 844:13, 844:18, 847:3, 847:5, 847:10, 847:14, 847:20, 847:22, 848:1, 848:9, 848:10, 849:23, 849:24, 850:19, 853:14
**Seifert** [4] - 747:9, 793:24, 803:18, 814:8
**seize** [1] - 840:21
**seized** [2] - 851:9, 851:12
**seizing** [8] - 838:23, 838:24, 838:25, 839:6, 840:14, 844:20, 845:19, 851:6
**selection** [1] - 836:14
**semi** [1] - 833:6
**send** [20] - 770:22, 773:17, 777:15, 790:21, 791:25, 802:2, 804:1, 805:11, 805:12, 806:7, 806:14, 806:20, 808:8, 808:9, 808:17,

808:21, 808:22, 810:18, 810:20, 811:9
**sense** [3] - 796:22, 806:20, 808:7
**sent** [14] - 792:1, 801:24, 804:8, 804:9, 804:12, 804:13, 804:16, 804:22, 804:25, 807:19, 808:1, 808:20
**sentry** [1] - 833:6
**separate** [1] - 831:9
**serial** [3] - 833:5, 833:6, 833:9
**series** [2] - 775:13, 794:3
**serve** [1] - 768:9
**services** [1] - 769:12
**session** [2] - 769:6, 769:14
**sessions** [1] - 769:2
**set** [1] - 848:1
**seven** [7] - 768:13, 768:23, 772:6, 775:16, 786:9, 786:19, 825:5
**several** [2] - 765:13, 814:11
**short** [3] - 750:12, 750:13, 755:15
**shorter** [1] - 755:22
**show** [16] - 752:20, 755:19, 790:2, 790:11, 792:13, 795:5, 814:17, 820:12, 829:1, 829:6, 830:3, 830:10, 831:6, 831:22, 832:4, 852:21
**showed** [1] - 790:3
**showing** [4] - 774:11, 779:23, 809:13, 845:22
**shown** [2] - 811:10, 843:10
**shows** [4] - 805:25, 829:7, 830:11, 831:7
**side** [8] - 770:9, 777:19, 792:16, 796:3, 804:17, 852:6
**sides** [1] - 834:18
**sign** [3] - 774:7, 808:22, 814:13
**signature** [4] - 774:15, 774:16, 805:25, 809:14
**signed** [4] - 799:19,

803:22, 803:25, 810:7
**single** [2] - 789:13, 823:20
**sit** [2] - 790:2, 790:4
**site** [1] - 773:6
**sitting** [2] - 756:8, 757:8
**situation** [1] - 810:25
**six** [8] - 772:6, 775:15, 786:9, 786:18, 787:18, 825:4, 825:5, 836:5
**size** [3] - 756:1, 756:2, 853:5
**skill** [3] - 769:17, 769:18, 838:12
**skip** [1] - 827:5
**slang** [1] - 779:17
**slide** [1] - 849:19
**slightly** [1] - 826:21
**slow** [2] - 794:7, 794:21
**slower** [1] - 788:24
**small** [1] - 800:24
**sofa** [1] - 851:23
**SOI** [1] - 785:13
**someone** [7] - 761:8, 761:14, 771:8, 774:2, 777:21, 779:12, 790:24, 793:3, 793:9, 793:16, 799:9, 803:11, 804:3, 806:4, 806:10, 807:20, 808:12, 813:14, 848:4
**sometimes** [13] - 773:25, 774:1, 778:24, 784:5, 791:13, 794:9, 812:22, 813:25, 814:1, 837:19, 839:12, 850:25
**somewhere** [1] - 847:8
**sorry** [13] - 749:15, 756:11, 770:4, 777:3, 795:12, 800:7, 803:3, 813:5, 825:5, 825:7, 827:10, 836:17, 847:5
**sort** [1] - 779:8
**SOS** [4] - 770:20, 785:15, 785:17, 785:22
**sound** [3] - 750:15, 796:17
**sounding** [1] - 806:21

**sounds** [1] - 789:6
**source** [2] - 769:25, 770:3
**space** [1] - 791:3
**speaker** [1] - 761:25
**speaking** [8] - 777:12, 796:13, 796:14, 796:19, 812:13, 812:15, 812:19, 820:6
**speaks** [2] - 769:11
**Special** [5] - 817:25, 818:14, 835:2, 835:17, 847:12
**special** [4] - 818:13, 818:18, 819:13, 845:17
**specializations** [1] - 839:25
**specialties** [1] - 839:24
**specific** [2] - 804:22, 809:25
**specifically** [3] - 822:3, 841:8, 842:9
**speculation** [1] - 783:2
**speed** [3] - 789:4, 789:9, 789:20
**spell** [3] - 767:6, 818:6, 835:15
**spelled** [1] - 825:10
**spent** [1] - 801:12
**spoken** [2] - 769:24, 783:14
**squad** [5] - 818:23, 835:20, 835:21, 837:7, 841:9
**squads** [1] - 837:8
**SSA** [1] - 822:3
**St** [11] - 819:16, 820:5, 820:17, 821:15, 822:5, 823:13, 826:13, 827:24, 831:13, 832:6, 832:22
**staff** [1] - 773:18
**stand** [3] - 767:1, 829:8, 831:8
**standing** [2] - 802:24, 803:2
**stands** [3] - 797:1, 825:1, 833:10
**start** [5] - 768:19, 773:5, 796:11, 838:17, 845:12
**started** [3] - 786:2, 786:10, 845:11
**starting** [1] - 747:7
**state** [6] - 747:8,

748:14, 748:17, 818:6, 846:6, 849:19
**states** [1] - 799:19
**States** [9] - 747:3, 747:10, 748:19, 767:13, 767:14, 767:23, 768:1, 768:2, 768:5
**STATES** [3] - 745:1, 745:3, 745:10
**stay** [1] - 754:17
**stayed** [2] - 763:5, 763:6
**step** [5] - 766:19, 777:2, 815:13, 827:5, 835:2
**steps** [2] - 766:23, 835:7
**stick** [1] - 815:4
**still** [3] - 752:11, 836:24, 837:3
**stop** [4] - 750:4, 799:1, 832:7, 853:16
**stopped** [5] - 749:4, 749:20, 750:6, 751:8, 751:9
**store** [1] - 832:19
**stored** [1] - 839:15
**story** [2] - 756:25, 758:12
**Stratus** [3] - 768:21, 768:22, 768:23, 769:3, 769:16, 770:6, 771:3, 771:16
**Street** [1] - 745:14
**strictly** [1] - 770:7
**strings** [1] - 775:14
**structures** [1] - 851:1
**studies** [1] - 767:21
**stuff** [1] - 841:1
**subject** [3] - 800:5, 800:8, 800:24
**submitted** [1] - 845:4
**substance** [2] - 798:19, 798:25
**sufficient** [3] - 769:17, 824:22, 837:6
**suggestion** [1] - 810:21
**Suite** [1] - 745:22
**summary** [5] - 845:18, 846:2, 846:6, 846:22, 847:12
**summer** [1] - 748:23
**supervising** [1] - 771:9
**suppose** [1] - 803:17
**supposed** [1] - 840:5
**sustained** [3] - 764:6, 794:18, 806:24

**SV7034765** [1] - 833:5
**SWAT** [3] - 841:14, 842:15, 849:13
**switched** [1] - 802:16
**switching** [1] - 819:8
**sworn** [1] - 747:5
**SWORN** [4] - 748:11, 767:2, 818:3, 835:9
**symbol** [2] - 794:10, 795:1
**symbols** [1] - 795:2
**syntax** [1] - 778:23
**system** [3] - 834:6, 834:13, 837:12

---

**T**

**T-U-L-A-M-M-O** [1] - 825:10
**table** [1] - 747:10
**tactical** [3] - 826:9, 829:9, 831:8
**tag** [1] - 849:3
**talks** [1] - 813:8
**tall** [1] - 769:9
**target** [1] - 770:3
**TDY** [1] - 836:18
**teach** [1] - 840:2
**team** [23] - 818:25, 819:3, 824:25, 836:3, 836:5, 836:6, 836:7, 836:24, 837:2, 838:6, 838:16, 838:24, 839:22, 840:14, 841:5, 841:14, 842:1, 842:15, 844:7, 844:19, 849:13
**technical** [1] - 833:23
**ten** [2] - 775:16, 837:13
**tendered** [1] - 848:7
**term** [3] - 797:19, 797:22, 804:21
**terminology** [1] - 769:21
**terms** [12] - 748:4, 768:16, 769:23, 771:18, 773:13, 778:24, 784:11, 788:19, 789:21, 798:25, 838:8, 838:14
**terrace** [1] - 841:10
**terrible** [1] - 795:11
**terrorism** [1] - 818:20
**test** [23] - 769:19, 769:20, 771:8,

771:9, 771:10, 771:14, 771:17, 772:13, 772:16, 772:18, 783:3, 783:19, 784:12, 784:14, 784:15, 784:17, 784:18, 785:11, 786:1, 786:4, 786:6, 786:8, 786:25

**tested** [2] - 784:22

**testified** [4] - 759:19, 763:20, 782:9

**testify** [1] - 844:3

**testimony** [10] - 764:11, 816:16, 821:9, 822:21, 825:25, 827:14, 843:14, 844:25, 846:3, 847:12

**TESTIMONY** [1] - 746:2

**testing** [2] - 769:15, 771:6

**tests** [2] - 784:3, 786:20

**THE** [140] - 745:1, 745:10, 747:2, 747:12, 747:16, 747:20, 747:24, 748:2, 748:11, 749:9, 749:11, 749:13, 749:15, 749:17, 753:10, 753:12, 753:15, 753:17, 757:17, 759:10, 759:12, 764:6, 764:12, 765:4, 765:7, 765:10, 765:22, 766:11, 766:18, 766:20, 766:21, 766:22, 766:24, 767:2, 774:25, 775:2, 775:4, 775:6, 775:9, 781:21, 783:4, 793:23, 793:24, 794:18, 797:17, 797:21, 798:1, 798:15, 798:19, 800:7, 800:10, 800:23, 802:24, 803:3, 803:4, 803:16, 804:21, 805:13, 806:24, 809:3, 809:10, 811:16, 811:22, 811:25, 813:4, 813:10, 813:13, 814:8,

815:1, 815:10, 815:12, 815:13, 815:14, 815:15, 815:23, 815:25, 816:6, 816:11, 816:13, 816:15, 816:20, 816:22, 816:25, 817:8, 817:12, 817:16, 817:19, 818:2, 818:3, 820:25, 822:12, 822:15, 823:21, 823:25, 824:5, 824:7, 825:6, 825:7, 826:18, 826:25, 828:4, 829:15, 829:17, 829:20, 829:22, 830:20, 831:18, 832:15, 833:16, 833:25, 834:8, 834:17, 834:22, 835:1, 835:4, 835:5, 835:6, 835:8, 835:9, 836:15, 836:16, 836:17, 836:18, 844:15, 847:4, 847:7, 847:11, 847:15, 847:17, 847:21, 847:24, 848:4, 848:6, 848:8, 849:17, 849:21, 850:14, 850:17, 853:10, 853:19

**the..** [1] - 848:23

**themself** [1] - 803:6

**therefore** [2] - 784:20, 812:18

**they've** [1] - 810:16

**third** [2] - 769:20, 808:1

**three** [13] - 755:21, 775:2, 775:15, 801:15, 801:16, 825:4, 825:13, 828:14, 828:15, 828:16, 830:12, 832:6, 832:8

**threw** [1] - 756:23

**throughout** [1] - 767:21

**title** [4] - 775:18, 779:25, 780:2, 780:6

**today** [14] - 748:9, 775:22, 800:2, 821:9, 822:21, 825:25, 827:14, 834:21, 843:14, 843:22, 844:3, 844:25, 846:3,

846:23

**together** [5] - 775:24, 776:14, 780:20, 796:11, 800:1

**tomorrow** [1] - 834:23

**tonight** [1] - 847:10

**took** [17] - 751:14, 751:17, 751:18, 751:19, 751:23, 756:9, 756:23, 760:16, 760:19, 760:21, 768:9, 783:3, 786:8, 819:20, 820:1, 821:24, 832:10

**top** [2] - 795:1, 795:8

**total** [2] - 826:10, 828:16

**trafficking** [1] - 818:19

**trained** [2] - 835:25, 839:18

**training** [7] - 768:4, 818:17, 818:18, 836:2, 836:4, 839:19, 839:21

**trajectory** [1] - 839:24

**transcribe** [1] - 781:8

**transcribed** [1] - 777:21

**transcribing** [1] - 776:24

**transcript** [6] - 793:10, 793:15, 804:17, 807:6, 809:20, 854:4

**TRANSCRIPT** [1] - 745:9

**transcription** [3] - 776:25, 778:8, 781:12

**transcriptions** [2] - 777:16, 777:17

**transcripts** [2] - 789:25, 805:8

**translate** [5] - 769:1, 779:20, 780:10, 784:16, 815:4

**translated** [2] - 807:6, 807:20

**translating** [11] - 768:17, 771:18, 772:19, 782:3, 782:7, 784:11, 784:17, 784:18, 785:7, 785:20, 786:19

**translation** [43] - 769:17, 769:22, 770:1, 770:3, 770:7, 770:9, 770:12, 771:25, 773:9,

773:14, 773:15, 774:9, 774:20, 776:24, 777:1, 778:1, 778:13, 779:2, 781:16, 784:12, 784:20, 784:23, 784:25, 785:14, 786:1, 786:23, 787:15, 788:2, 788:3, 788:4, 790:19, 793:7, 793:11, 793:12, 799:9, 803:23, 804:18, 807:3, 807:15, 809:21, 810:22, 812:17, 815:5

**translations** [14] - 777:19, 790:4, 790:12, 791:8, 799:4, 799:10, 799:16, 799:20, 799:23, 800:2, 800:22, 801:12, 804:16, 811:11

**translator** [33] - 772:14, 773:16, 773:17, 773:22, 773:25, 778:21, 787:11, 787:24, 791:15, 793:9, 793:17, 793:20, 797:3, 797:12, 797:15, 797:18, 797:22, 797:23, 798:10, 798:11, 803:11, 807:13, 808:9, 808:12, 813:14, 813:17, 813:23, 813:24, 813:25, 814:1

**translators** [1] - 797:25

**treated** [1] - 819:18

**treaters** [1] - 842:13

**TRIAL** [1] - 745:9

**trial** [2] - 817:10, 817:13

**trick** [1] - 842:13

**trick-or-treaters** [1] - 842:13

**tried** [3] - 789:10, 789:11, 794:7

**true** [4] - 799:20, 799:23, 800:2, 805:20

**trunk** [1] - 829:17

**truth** [1] - 755:23

**try** [5] - 801:1, 838:2, 840:24, 848:12,

850:17

**trying** [4] - 761:14, 779:8, 803:13, 834:20

**Ts** [1] - 816:8

**Tulammo** [4] - 825:9, 825:14, 829:9, 831:8

**Tulammo's** [1] - 825:10

**turn** [2] - 834:15, 847:25

**turned** [1] - 841:17

**two** [26] - 749:4, 749:23, 750:5, 750:10, 750:13, 760:4, 769:23, 774:14, 775:2, 775:15, 777:11, 781:6, 807:5, 821:16, 825:4, 825:12, 826:9, 827:10, 831:7, 834:3, 837:19, 839:4, 842:18, 845:23, 848:17

**two-page** [2] - 774:14, 845:23

**type** [3] - 769:15, 777:3, 788:14

**types** [1] - 778:20

**typically** [1] - 841:2

**U**

**U.S** [21] - 745:14, 745:16, 745:24, 752:17, 752:18, 758:14, 758:15, 758:23, 759:3, 759:4, 759:17, 759:19, 763:25, 765:1, 765:5, 803:24, 804:5, 804:11, 805:4, 805:5, 806:8

**UI** [4] - 795:12, 795:23, 795:25, 813:8

**ultimate** [1] - 799:10

**under** [5] - 775:17, 780:5, 799:19, 814:13, 840:4

**underscores** [1] - 775:14

**undertake** [1] - 839:23

**Uniform** [1] - 821:6

**unintelligible** [4] - 795:14, 795:20, 795:23, 813:8

unit [1] - 836:14
UNITED [3] - 745:1, 745:3, 745:10
United [9] - 747:3, 747:10, 748:19, 767:13, 767:14, 767:23, 768:1, 768:2, 768:5
unless [2] - 847:8, 848:4
unusual [1] - 842:4
up [32] - 752:13, 752:23, 753:7, 753:21, 755:20, 756:23, 761:1, 767:18, 776:16, 776:19, 790:8, 800:25, 802:24, 803:2, 806:4, 807:17, 810:7, 824:20, 825:23, 827:9, 828:19, 828:20, 828:25, 830:7, 839:15, 848:5, 848:9, 848:25, 849:3, 850:1, 851:23, 853:17
update [1] - 847:6
updated [1] - 748:3
ups [1] - 841:4
uses [1] - 837:12
usual [1] - 787:19

## V

VA [1] - 745:23
vague [1] - 777:8
value [3] - 838:2, 840:21, 844:6
various [4] - 770:21, 776:17, 820:8, 823:9
vehicle [23] - 755:1, 755:3, 755:8, 758:3, 819:15, 819:19, 819:22, 819:23, 820:3, 820:7, 820:17, 820:19, 821:17, 821:24, 822:1, 822:6, 823:12, 827:24, 829:11, 829:18, 830:15, 831:12, 848:18
vehicles [2] - 757:25, 848:17
version [3] - 791:21, 802:14, 848:25
versions [3] - 799:22,

814:19, 814:21
versus [1] - 747:4
via [2] - 769:5, 769:13
video [6] - 768:21, 769:3, 769:4, 769:5, 788:19, 788:21
Video [6] - 768:21, 768:22, 769:3, 769:16, 771:3, 771:17
view [1] - 852:22
vis-à-vis [1] - 790:18
visits [1] - 769:4
voice [11] - 748:14, 792:17, 792:18, 792:20, 793:8, 793:15, 795:19, 812:21, 812:22, 813:13
voices [2] - 792:14, 813:17
volunteer [2] - 837:3, 837:8
Vophsie [1] - 747:5
VSKA [1] - 833:4

## W

wait [4] - 799:5, 816:6
waiting [1] - 755:9
Walder [9] - 819:16, 820:5, 820:17, 823:12, 826:13, 827:24, 831:13, 832:6, 832:22
wall [2] - 850:20, 851:23
wants [2] - 801:4, 817:7
warrant [10] - 835:25, 836:3, 837:12, 837:14, 838:13, 841:9, 841:18, 843:4, 843:12, 848:12
warrants [3] - 837:3, 837:8, 837:10
Washington [5] - 745:5, 745:15, 745:17, 745:25, 836:12
watch [1] - 751:19
watching [1] - 754:25
Wayne [2] - 854:9, 854:9
WAYNE [2] - 745:24, 854:3
weapon [1] - 853:6
wear [1] - 837:19

Wednesday [1] - 745:6
welcome [2] - 793:23, 815:12
white [1] - 821:13
whole [2] - 757:13, 823:7
willing [1] - 834:14
Wilson [1] - 745:22
Win [1] - 826:9
WIN [1] - 826:10
Windows [4] - 788:22, 788:25, 789:1, 789:3
witness [31] - 747:24, 752:23, 759:8, 764:4, 766:24, 781:6, 781:20, 794:16, 794:17, 799:5, 799:8, 800:17, 800:21, 816:1, 816:2, 820:12, 821:7, 826:23, 829:1, 830:3, 831:22, 833:14, 834:15, 834:20, 835:8, 839:5, 843:10, 847:20, 850:12, 852:4
Witness [7] - 766:23, 813:21, 824:14, 828:10, 835:7, 850:11, 852:3
WITNESS [23] - 748:11, 749:9, 749:15, 749:17, 765:7, 766:20, 766:22, 767:2, 793:23, 803:4, 813:13, 815:12, 815:14, 818:3, 825:7, 829:17, 834:22, 835:4, 835:6, 835:9, 836:16, 836:18, 850:17
Wolf [4] - 824:23, 825:9, 825:13, 831:9
woman [1] - 842:23
word [5] - 756:12, 785:5, 785:7, 791:17, 811:1
Word [7] - 777:16, 777:17, 777:18, 777:20, 778:14, 806:12, 806:18
wording [1] - 795:22
words [10] - 779:10, 779:13, 779:16, 779:17, 782:16,

788:16, 790:3, 790:24, 792:5, 812:14
works [2] - 773:13, 805:21
worry [1] - 763:1
worse [1] - 764:2
write [1] - 796:18
written [5] - 770:1, 785:7, 822:24, 823:2, 823:3

## Y

year [8] - 771:10, 771:15, 783:19, 785:12, 785:14, 785:24, 835:23, 836:15
years [13] - 767:14, 767:15, 767:23, 768:13, 768:16, 768:18, 768:24, 772:7, 786:9, 786:19, 835:23, 836:5, 836:6
yesterday [1] - 846:10
yourself [5] - 767:5, 791:2, 804:2, 835:15, 850:10

## Z

zero [2] - 775:2