**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | |
| | : | **CRIMINAL NO. 21-CR-699-1 (JDB)** |
| **JOLY GERMINE,** | : | |
| | : | |
| Defendant. | : | |
| | : | |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

The United States of America respectfully submits this sentencing memorandum for defendant Joly Germine (hereinafter "defendant Germine"). The government requests that this Court sentence defendant Germine to the sentence calculated under the U.S. Sentencing Guidelines—life imprisonment, 36 months' supervised release for any period of release, and a special assessment of $4,800. This sentence is appropriate because defendant Germine is responsible for the specified unlawful activity that underpins his money laundering convictions: multiple hostage takings of U.S. citizens. As the leader of the Haitian gang 400 Mawozo, defendant Germine directed, "commanded, induced, procured, or willfully caused" these hostage takings, U.S.S.G. § 1B1.3(a)(1)(A), in addition to his criminal conduct in the conspiracy to smuggle semi-automatic firearms from the United States to Haiti for use by the gang and to launder ransoms paid by U.S. persons taken hostage by the gang to purchase such firearms. In particular, defendant Germine's actions merit a Guidelines compliant sentence because of the seriousness of the charges, the number of victims and hostage taking events, and Germine's efforts to use those victims as leverage to achieve personal profit and his political goals. A sentence of life imprisonment adequately serves the interests of justice as codified in 18 U.S.C. § 3553(a).

## PROCEDURAL HISTORY

On November 30, 2021, a grand jury indicted defendant Germine and co-defendants Eliande Tunis, Jocelyn Dor, and Walder St. Louis.  On July 19, 2022, a grand jury returned a Superseding Indictment. On November 7, 2023, a grand jury returned a Second Superseding Indictment against defendants Germine and Tunis, charging them in total with 48 counts: conspiracy to violate the Export Control Reform Act, in violation of 50 U.S.C. § 4819 (Count 1); conspiracy to commit smuggling and defraud the United States, in violation of 18 U.S.C. § 371 (Count 2); fifteen counts of violating the Export Control Reform Act, in violation of 50 U.S.C. § 4819 (Counts 3-17); three counts of Smuggling, in violation of 18 U.S.C. §§ 554(a), 2 (Counts 18-20); fourteen counts of Laundering of Monetary Instruments (international promotional), in violation of 18 U.S.C. §§ 1956(a)(2)(A), 2 (Counts 21-34); and fourteen counts of Laundering of Monetary Instruments (proceeds), in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i), 2 (Counts 35-48).

On November 17, 2023, defendant Germine filed several pretrial motions. The Court held an evidentiary hearing on December 21, 2023, and then entered an order on January 2, 2024, denying defendant Germine's motions and permitting the government to introduce certain evidence under Fed. R. Crim. P. 404(b) and defendant Germine's custodial interview.

On January 18, 2024, this Court began a bench trial. On January 30, 2024, at the conclusion of the Government's case-in-chief, which was comprised of 24 witnesses including several U.S. victims of hostage-takings by 400 Mawozo, defendant Germine informed the Court that he intended to plead guilty to all counts. On January 31, 2024, defendant Germine pled guilty to the Second Superseding Indictment. The Court set defendant Germine's sentencing for May 15, 2024, which was continued to June 24, 2024.

## FACTUAL BACKGROUND

400 Mawozo is a Haitian gang and criminal organization that operated in and around the Croix-des-Bouquets area to the east of Port-au-Prince, Haiti. Relevant to this case, from at least on or about January 12, 2020, until December 18, 2021, 400 Mawozo has been engaged in armed hostage takings of U.S. citizens in Haiti for ransom, including:

- Between on or about June 24, 2021, and on or about July 10, 2021, U.S. citizens D.R. and her husband were taken hostage at gunpoint and held by 400 Mawozo, and their release was secured after approximately $25,000 was paid as ransom. D.R. identified Lanmo Sanjou as the leader of the hostage takers. *See* 01/22/2024 Trial Tr. 482:1-496:8 (D.R. testimony); 01/26/2024 Trial Tr. 1359:9-25 (stipulated testimony of R.R.).

- Between on or about August 5, 2021, and on or about August 13, 2021, U.S. citizen K.J. was taken hostage at gunpoint and held by 400 Mawozo, and her release secured after approximately $50,000 was paid as ransom. K.J. identified Lanmo Sanjou as the leader of the hostage takers. *See* 01/24/2024 Trial Tr. 748:14-766:15 (K.J. testimony).

- Between on or about August 27, 2021, and on or about September 2, 2021, U.S. citizen J.L. was taken hostage at gunpoint and held by 400 Mawozo. Although a ransom was initially demanded, J.L. was released without the payment of a ransom. J.L. identified Lanmo Sanjou as the leader of the hostage takers. *See* 01/24/2024 Trial Tr. 946:16-978:15 (J.L. testimony).

- On or about October 16, 2021, seventeen Christian missionaries, sixteen of whom were U.S. citizens, were taken hostage, including five children, one as young as eight months old. Beginning on or about October 18, 2021, 400 Mawozo, through one of its leaders, Lanmo Sanjou, began taking credit for these hostage takings on social media and making

public ransom demands. Specifically, on or about October 21, 2021, Lanmo Sanjou, an unindicted coconspirator in this case, appeared in a social media video and announced that the gang was holding the hostages for ransom and wanted $1 million per victim in ransom. *See* 01/18/2024 Trial Tr. 35:20-79:21 (Federal Bureau of Investigation (FBI) Special Agent Ryan Bonura testimony); 01/29/2024 Trial Tr. 1416:15-1458:15 (J.P. testimony).  Most of the missionaries were held for 62 days.

Defendant Germine is a Haitian citizen who, prior to his arrest in this case, resided in Port-Au-Prince. Beginning at least on or about March 2021, and continuing until on or about October 31, 2021, defendant Germine conspired with the leaders of 400 Mawozo, including his co-defendants Tunis, St. Louis, and Dor, as well as Sanjou, to purchase firearms for the gang, which were then exported and smuggled from the United States to Haiti, without having first obtained the required licenses from the U.S. Department of Commerce's Bureau of Industry and Security. In addition, defendant Germine conspired with his co-defendants to defraud the United States by interfering with and obstructing a lawful government function, that is, the enforcement by the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) of laws and regulations related to the purchase and sale of firearms, by means of deceit, craft, trickery, and dishonesty. Finally, defendant Germine received funds from individuals linked to 400 Mawozo in Haiti for the specific purpose of purchasing firearms in the United States to send to the gang.

The Court heard ample evidence regarding defendant Germine's involvement in the criminal scheme while presiding over this case's pretrial proceedings, the trial of defendant Germine, and the sentencings of codefendants Dor, St. Louis, and Tunis. Given that familiarity with the record in this case, the Government summarizes the evidence specifically relevant to

issues related to defendant Germine's Guidelines calculation and sentencing.

### A.   Defendant Germine Led 400 Mawozo and Its Hostage Taking Operations

Defendant Germine was a leader over 400 Mawozo's hostage taking operations, including during the June-August 2021 timeframe when U.S. citizens D.R., her husband, and K.J. were taken hostage, as shown by the testimony of witnesses at trial, Germine's statements made to law enforcement, Germine's oral and written communications with his co-conspirators, and Germine's logs showing calls with other gang leaders. This evidence all established, by at least a preponderance of the evidence, that: (i) from at least August 2020 through his arrest, defendant Germine was a leader of 400 Mawozo; (ii) from at least April 2021, Sanjou worked for Germine and took his instructions throughout this time period, as did Gaspiyay, another gang leader; (iii) in at least June 2021, Germine agreed with another gang leader (Vitel'Homme Innocent) to commit kidnappings and to split the profits; (iv) from at least June 2021 through his arrest, Germine directed Sanjou and Gaspiyay regarding the gang's hostage taking operations; (v) during the summer of 2021, the hostage taking ransoms were paid to Sanjou, who provided them to Germine through other gang members; and (vi) Germine directed Santia Jean, the gang's bookkeeper, about how the payments for ransoms would be disbursed to himself, the gang, and to conspirators, to include co-defendants Tunis, Dor, and St. Louis. Defendant Germine's goals were to make money for the gang and himself, though he was also motivated by political goals.

#### *Jean Pelice Testimony*

Jean Pelice, a former 400 Mawozo gang leader and cousin of defendant Germine, testified at trial about defendant Germine's leadership of the gang and control of hostage taking operations, including during the June-August 2021 timeframe. According to Pelice:

- Lanmo Sanjou "worked for" defendant Germine. *See* 01/29/2024 Trial Tr. 1419:1-6;

1432:12. While Sanjou was "the leader" of the gang, defendant Germine was "the king." *Id.* 1437:10-12. Sanjou was not able to receive proceeds of hostage taking ransoms without defendant Germine's "approval". *Id.* 1438:14-15.

- In June-July 2021, defendant Germine told Pelice that another gang leader (Vitel'Homme) had entered the neighborhood. Defendant Germine and Vitel'Homme agreed to a joint kidnapping scheme. Under the scheme, Vitel'Homme would bring kidnapping victims to 400 Mawozo and they would split the profit from the ransom payments. *Id.* 1422:1-1423:1; 1436:21-22.

- When ransom money was paid, it would go to defendant Germine via Santia Jean, Germine's "sister-in-law." *Id.* 1424:9-18. Pelice brought the money in cash from Sanjou, which were ransom payment proceeds, to Jean, who reported the same back to defendant Germine. *Id.* 1425:6-25; 1427:8-1428:6; 1438: 9-11.

- Defendant Germine would "instruct" Jean to provide money to the gang, specifically to Sanjou, so that the gang could make "payroll". *Id.* 1426:13-19. Defendant Germine would also "tell Santia" to send money to others to buy guns for him. *Id.* 1426:17-19.

- Defendant Germine's status and wealth were derived from the gang. "Before becoming a gang member, [Germine] was nothing. Everything that he has came from the gang." *Id.* 1443:18-19.

Consistent with the same, Pelice testified in a separate proceeding that defendant Germine had control of the gang's operations via his prison cell phones, and Sanjou and Gaspiyay received calls from Germine. *See generally* Ex. A p. 13-14. Pelice recalled statements of defendant Germine made to Pelice about the 17 missionaries in or around October 2021, including that Vitel'Homme told Germine about the missionaries, Germine sent another gang member (Koleg) to kidnap them,

and Koleg brought the missionaries to Lanmo Sanjou and Gaspiyay. Ex. A p. 33:6-16. Pelice also

stated that defendant Germine stated that the missionaries would be the ticket for him to be released

from jail. Ex. A p. 35:5-19.

**Walder St. Louis Testimony**

Co-defendant Walder St. Louis also testified about defendant Germine's control of the

gang and involvement in the criminal scheme, going back to August 2020. According to St. Louis:

- Defendant Germine was the leader of 400 Mawozo in Haiti, considered the "king" of the gang, and was referred to in that fashion as early as August 2020. *See* 01/25/2024 Trial Tr. 1066:13-14; 1069:24.

- Defendant Germine referred to Sanjou as "someone who works for him" in conversations overheard by St. Louis. *Id.* 1090:3-6.

- Sanjou would make money from the hostage takings and provide that money to defendant Germine. *Id.* 1089:14-23. St. Louis overheard Defendant Germine talking about kidnappings with Tunis, Lanmo, and Koleg.  *Id.* 1089:18-23

- Defendant Germine sent Tunis to St. Louis's house in August 2020 in order to convince St. Louis to be part of the gun purchasing scheme. *Id.* 1070:1-10.

- Defendant Germine would talk on the phone with Tunis while Tunis and St. Louis were at Florida gun shops to purchase weapons for the gang. *Id.* 1142:15-17.

**Germine's Statements to Law Enforcement**

Defendant Germine's custodial statement to the Federal Bureau of Investigation (FBI)

indicates his direction and control over the gang, including during the June-August 2021

timeframe. About the gang members, defendant Germine stated "they are illiterate, right? They

need my guidance, right, so that they don't actually, they don't actually -- so they don't commit

too many crimes." Gov. Ex. 600.T p. 21. According to defendant Germine, "Whatever I ask [the gang] to do for me, they will do. . . . if someone is persecuting me and I tell them to eliminate that person, they will kill that person." *Id.* at p. 39-40. By defendant Germine's own admission, the gang did not act on his behalf without his authority. "I always want to have – I always want to control whatever it is that they are doing for me on my behalf." *Id.* at p. 40. Thus, when the gang kidnapped nuns, defendant Germine "ordered [the gang] to let them go" and the gang did. *Id* at p. 41. (According to public news reporting, the nuns were kidnapped in April 2021, showing Germine's control over the gang's hostage taking dating back to that time. *See* Berger, Miriam, "Who is 400 Mawozo, the Haitian gang accused of kidnapping American missionaries?", The Wash. Post. (Oct. 17, 2021), *available at* https://www.washingtonpost.com/world/2021/10/17/haiti-kidnapping-400-mawozo-christian-aid/ ("In April, 400 Mawozo kidnapped five priests and two nuns, among them French nationals, and held them in harsh conditions for three weeks. Catholic universities and schools in Haiti shut down in protest. The gang demanded $1 million for the group's safe return. Haiti's justice minister told the Wall Street Journal on Monday that a ransom was paid for the release of just two of the priests abducted in April. The group was ultimately released.").)

Defendant Germine's control of the gang continued up through the time of his arrest. Following defendant Germine's transfer to U.S. custody, he agreed to make a call to Gaspiyay, wherein he asked Gaspiyay to release a government official from the Dominican Republic to help Germine with his case. *See* 01/29/2024 Trial Tr. 1594:13-25; 1595:17-23. Gaspiyay told defendant Germine that he would order Sanjou to make the release and would kill Sanjou if he refused. *Id.*

1596:6-23.

### Witness 2

An additional individual who did not testify at trial provided statements related to defendant Germine and his control of the gang, including in July 2021.[1] "Witness 2" was familiar with members of 400 Mawozo due to his friendship with 400 Mawozo members. Witness 2 is personally familiar with defendant Germine, Gaspiyay, Pelice, Tunis, and Vitel'Homme, as well as other members of the gang, and Witness 2 was able to identify photographs of the same to the FBI. Witness 2 provided the following information to the FBI:

- According to statements by defendant Germine, prior to the assassination of Haitian President Moise (in July 2021), political rivals of Moise met with gang leaders, including Vitel'Homme. Defendant Germine attended the meeting by phone. The political rivals told the gang members about the planned assassination of President Moise and asked for their support and silence. The gangs were made promises in order to obtain their support. These promises were not kept.

- According to statements by defendant Germine, Germine intended to keep the missionaries captive as a consequence to the politicians not keeping their promises to gang leaders. Defendant Germine believed that (former) Haitian Prime Minister Ariel Henry's desire to use the kidnapping to provoke a U.S. Military response, and then to use that response to support his (Henry's) presidential bid.

- As recently as February 2022, defendant Germine asserted that he was in control of 400 Mawozo and the Croix-Des-Bouquets area, noting that he had police connections in the area.

---

[1] Information about this witness was provided by letter to defense on September 12, 2022.

- In or around April 2022, defendant Germine stated that a hostage held by 400 Mawozo would be released if the hostage's employer proved he had killed Jean Pelice.

Witness 2's information is all consistent with defendant Germine exercising control over the 400 Mawozo gang, including in July 2021 when defendant Germine was chosen as the gang's representative at a political meeting. Defendant Germine, by his own statements to Witness 2, noted his control over the hostage taking operations of the gang.

### *Defendant Germine's Communications*

Additionally, defendant Germine's written and oral communications corroborate Germine's leadership over 400 Mawozo and direction of the hostage taking operations in Haiti, including during the June-August 2021 timeframe. For instance, the cell phone evidence produced at trial showed the following exchanges between defendant Germine and Tunis:

- On June 14, 2021, Tunis sent a voice message to defendant Germine: "You had work today, friend? Didn't you have to work today? . . . You always find something when you go out there." Govt. Ex. 140 at 37. Defendant Germine responded that "we had to handle another job, we happened to find it, then we took care of it. You already know that we do it on the spot." Govt. Ex. 140 at 37.

- On June 18, 2021, Tunis sent a voice message to defendant Germine asking about a video she had seen in which she recognized the voice of a 400 Mawozo member Gaspiyay yelling "Get out. Motherfucker." Govt. Ex. 140 at 35.[2] Defendant Germine responded that "[t]his happened at his house. They took him there with his boxers

---

[2] At trial, FBI Special Agent John Dugue testified that he observed several telephone conversations between defendant Germine and the 400 Mawozo member named "Gaspiyay" in which Germine told Gaspiyay to tell Lanmo Sanjou to release a diplomat from the Dominican Republic who had been taken hostage by 400 Mawozo. 01/29/2024 Trial Tr. 1594:16-1596:23.

on . . . We're in his house right now. We recorded the video; the video started when we were in his house. Did you see the part where they were dragging him? Yes, they're dragging him to the car. We'll put him in the car. We are going to eat his dick." Govt Ex. 140 at 35. Defendant Tunis then responded "Didn't you take his gun? I know he's got one." Govt. Ex. 140 at 35.

- On August 14, 2021, Tunis sent a voice message to defendant Germine informing him that the "little brother" of her friend who "lives in Croix-des-Bouquets" had been taken hostage. Govt. Ex. 140 at 36. Tunis said that she "didn't tell her anything," but said "she is crying and has no consolation" and "I'm now asking you if . . . not for them, for me . . . did you guys go to work today? If the little brother is, if the brother is . . . You understand? It's you guys who do things . . . Deco [nickname for Germine], do you have someone of that profile inside?" Govt. Ex. 140 at 36. Defendant Germine responded with a text message: "We will talk later." Govt. Ex. 140 at 36. The next day, August 15, 2021, Tunis sent a voice message to defendant Germine that she had just spoken to her friend, and "she says 'thanks, thanks, thanks, thanks to you . . . a thousand thanks . . . .'" Govt. Ex. 140 at 36.

- On October 14, 2021, defendant Germine sent defendant Tunis a voice message regarding an ongoing hostage taking operation:

    The guy we found with this car babe, we found 600,000 dollars on him. There is only 400 left to make it 1,000,000 dollars. We found him with this money. We automatically kidnapped him. He is the director of OAVCT. OAVCT is a big government company. This guy is full of cash. He has an official car, his car is tinted, with flashing lights, he has a microphone. He drives a police car. He has over 600,000 dollars on him, so you already know. We held him hostage right away. He said not to kill him, he has lots of money at home, he has plenty of money at home, so we just need to go get money at his house. This is what he told us. We already cashed in. Be cool, slick head!

11

Govt. Ex. 140 at 34; 101.38. A few minutes later, defendant Tunis responded by voice

message with advice and encouragement:

> Wow! What a thief, man! The money has been made. . . . For a man to
> have that much money on his person! Well, you're going to ask him tw-
> ice, twice as much as the amount you found on his person . . .Nice work.
> Thief. You're a real mafia! You will not stop being a thief!

Govt. Ex. 140 at 34. Defendant Tunis then sent a text message: "Well, Pa, make [them]

give you your $400,000.00 U.S., after the 2 million in Haitian currency." She followed

up with another text message a few minutes later: "I'm not a thief . . . [*hug emoji*] I'm

the wife of a gang leader [*laughing emoji*] [*laughing emoji*]." Govt. Ex. 140 at 34.

- On October 18, 2021, defendant Germine sent a picture of a French language news
  article to Tunis with the headline (translated in English): "Kidnapping in Haiti: The
  United States is preparing to negotiate the release of the 17 missionaries held by the
  400 Mawozo gang." Govt. Ex. 140 at 39. Thereafter, defendant Germine and Tunis
  engaged in an extended back-and-forth about the situation of the 17 missionaries who
  had been taken hostage by 400 Mawozo.

| | |
|---|---|
| **Tunis** (text): | Wesle told me the plans you have for later today. Attack them hard and the block the road close to the police station baby |
| **Germine** (voice): | Can you see what's written here, babe? . . . The kidnappers in Haiti, the United States . . . prepare to negotiate the release of 7 [sic] mercenaries abducted by the gangs of 400 Mawozo. . . |
| **Germine** (voice): | …We'll hold a meeting today because you know there was a strike today. . . .Tomorrow morning from 4:00 a.m. bullets will start firing. From 4:00 a.m. I'd like to hit the patrol while we're firing. At 4 o'clock in the morning I'll tell Ti Wilson to block all the streets. Block everything. Hide all motorcycle keys, hide everything . . . . |
| **Germine** (voice): | . . . call me while reading it to explain to me so I know what these thieves say about me. I can see that they |

|  |  |
|---|---|
|  | mention my name. They mentioned my real name, these thieves, man. |
| **Tunis** (voice): | . . .Can you see where they say that when this group kidnaps you, they'll have sex with you, they'll rape you and beat you up? Oh my God, these people exaggerate. . . .Hmm, they say there are 5 kids among the 17 people. . .They didn't mention their age . . |
| **Germine** (voice): | . . . . I asked Lanmò about their location, I was told it was in Mòn Kabrit, . . .That's where Lanmò told me that they have a house. That's what he said to me. He told me that they have a house in Mòn Kabrit. |
| **Tunis** (voice): | Babe, who has a house at the bottom of Mòn Kabrit? . . . they were airing it a few hours ago. . . on Fox, the 2 missionaries. They were airing it. . .Who has a house at the bottom of Mòn Kabrit? |
| **Tunis** (voice): | . . .They're shaken regarding the children. . . .They're shaken because they know, they know this group does not play around. . . .Don't worry about them. You know what happened is good; it's really good. While under stress and shaken, they're putting pressure on the government to do what they're supposed to do. . . .They're putting pressure on the government so that they can provide an appropriate response. In the meantime, you will stand tough! It's give and take. You stand tough! . . .The government is under pressure . . .They haven't called Mò? |

Govt. Ex. 140 at 38-40.

### *Phone Calls with Other Gang Managers and Leaders*

Finally, call records obtained by the FBI show numerous phone calls around the time of

the hostage taking of the 17 missionaries (October 16, 2021, at approximately 1:30 p.m.) are

consistent with Germine's control of and involvement in 400 Mawozo's hostage taking operations.

Call records for defendant Germine's phone number show repeated communications between

defendant Germine (YY),[3] Sanjou (LSJ),[4] and Gaspiyay (GAS), including two three-way calls

---

[3] Germine used the telephone number 50937925752. Govt. Ex. 212.
[4] Sanjou used the telephone number 50943777977. Govt. Ex. 212. Evidence from Tunis's cell phone showed that, on September 4,2021, Sanjou texted Tunis from the 7977 number and subsequently asked her in an audio message to add minutes to the phone number 50936774844. Govt. Ex. 106. p. 19.

between these gang leaders (highlighted in yellow).[5] On October 16, defendant Germine and

Sanjou spoke for approximately 77.78 minutes.

| Calling Number | Called Number | Date | Time | Duration |
|---|---|---|---|---|
| YY-50937925752 | LSJ-50936774844 | 10/16/2021 | 7:35:41 AM | 0.48 |
| YY-50937925752 | LSJ-50943777977 | 10/16/2021 | 9:50:37 AM | 5.35 |
| YY-50937925752 | LSJ-50943777977 | 10/16/2021 | 10:46:24 AM | 0.75 |
| LSJ-50936774844 | YY-50937925752 | 10/16/2021 | 11:15:28 AM | 0.30 |
| YY-50937925752 | LSJ-50936774844 | 10/16/2021 | 11:23:53 AM | 9.67 |
| YY-50937925752 | LSJ-50936774844 | 10/16/2021 | 11:43:04 AM | 0.97 |
| YY-50937925752 | LSJ-50936774844 | 10/16/2021 | 12:29:07 PM | 1.02 |
| YY-50937925752 | LSJ-50936774844 | 10/16/2021 | 12:43:58 PM | 15.05 |
| LSJ-50936774844 | YY-50937925752 | 10/16/2021 | 12:59:24 PM | 1.08 |
| YY-50937925752 | LSJ-50936774844 | 10/16/2021 | 1:02:37 PM | 0.70 |
| LSJ-50936774844 | YY-50937925752 | 10/16/2021 | 1:04:33 PM | 9.37 |
| YY-50937925752 | LSJ-50936774844 | 10/16/2021 | 1:14:55 PM | 0.25 |
| LSJ-50936774844 | YY-50937925752 | 10/16/2021 | 1:48:23 PM | 3.45 |
| LSJ-50936774844 | YY-50937925752 | 10/16/2021 | 2:31:59 PM | 0.17 |
| YY-50937925752 | LSJ-50936774844 | 10/16/2021 | 3:30:22 PM | 0.23 |
| LSJ-50936774844 | YY-50937925752 | 10/16/2021 | 3:35:28 PM | 0.35 |
| YY-50937925752 | LSJ-50936774844 | 10/16/2021 | 4:00:38 PM | 0.15 |
| YY-50937925752 | GAS-50946452040 | 10/16/2021 | 4:14:33 PM | 10.05 |
| YY-50937925752 | LSJ-50936774844 | 10/16/2021 | 4:21:19 PM | 3.10 |
| LSJ-50936774844 | YY-50937925752 | 10/16/2021 | 4:59:47 PM | 1.57 |
| YY-50937925752 | LSJ-50936774844 | 10/16/2021 | 5:33:05 PM | 4.60 |
| LSJ-50936774844 | YY-50937925752 | 10/16/2021 | 5:47:49 PM | 3.05 |
| YY-50937925752 | LSJ-50936774844 | 10/16/2021 | 6:32:36 PM | 0.78 |
| YY-50937925752 | LSJ-50943777977 | 10/16/2021 | 6:33:54 PM | 4.42 |
| YY-50937925752 | LSJ-50943777977 | 10/16/2021 | 6:38:36 PM | 0.72 |
| LSJ-43777977 | YY-50937925752 | 10/16/2021 | 6:45:43 PM | 0.72 |
| LSJ-43777977 | YY-50937925752 | 10/16/2021 | 6:49:06 PM | 0.58 |
| LSJ-43777977 | YY-50937925752 | 10/16/2021 | 7:00:40 PM | 0.18 |
| LSJ-43777977 | YY-50937925752 | 10/16/2021 | 7:03:20 PM | 1.12 |
| LSJ-43777977 | YY-50937925752 | 10/16/2021 | 7:07:57 PM | 1.98 |
| YY-50937925752 | GAS-50946452040 | 10/16/2021 | 8:48:02 PM | 2.77 |
| YY-50937925752 | LSJ-50936774844 | 10/16/2021 | 10:53:56 PM | 0.82 |
| YY-50937925752 | LSJ-50943777977 | 10/16/2021 | 10:55:19 PM | 4.82 |
| YY-50937925752 | GAS-50946452040 | 10/16/2021 | 10:55:31 PM | 4.62 |

---

[5] Gaspiyay used the telephone number 50946452040 to communicate with St. Louis and referred to himself in the messages by the name Gaspiyay. Govt. Ex. 120 p. 541.

**B. Defendant Germine Spearheaded 400 Mawozo's Scheme to Smuggle Firearms from the United States to Haiti.**

Defendant Germine was a primary facilitator in the scheme to use ransoms paid by U.S. persons to purchase firearms in the United States and smuggle those firearms from the United States to Haiti for 400 Mawozo. The evidence establishes that, from March to November 2021, defendant Germine oversaw the purchase of at least 24 semi-automatic firearms in Florida to be shipped to 400 Mawozo in Haiti, as summarized below.

| | Make | Model | Type | Caliber/ Gauge | Visited Seller | Transaction Completed |
|---|---|---|---|---|---|---|
| i. | PSA | AK-47 | Rifle | 7.62x39mm | 3/13/2021 | 3/20/2021 |
| ii. | IWI | Galil | Rifle | 5.56 | 3/13/2021 | 3/20/2021 |
| iii. | Jimenez Arms | JA Nine | Pistol | 9mm | 3/13/2021 | 3/20/2021 |
| iv. | Colt | M4 Carbine | Rifle | 5.56 | 3/13/2021 | 3/20/2021 |
| v. | Taurus | PT29FS | Pistol | 9mm | 3/23/2021 | 3/31/2021 |
| vi. | SAR | SAR-9 | Pistol | 9mm | 3/23/2021 | 3/31/2021 |
| vii. | Century Arms | Paratrooper | Rifle | 7.62x39mm | 4/17/2021 | 4/18/2021 |
| viii. | Radom | Hellpup AK47 Style | Pistol | 7.62mm | 4/17/2021 | 4/18/2021 |
| ix. | Baretta | 92X | Pistol | 9mm | 9/22/2021 | 9/22/2021 |
| x. | Century Arms | VSKA | Rifle | 7.62x39mm | 9/28/2021 | 9/28/2021 |
| xi. | Century Arms | VSKA | Rifle | 7.62x39mm | 9/29/2021 | 9/29/2021 |
| xii. | Century Arms | VSKA | Rifle | 7.62x39mm | 10/1/2021 | 10/1/2021 |
| xiii. | Century Arms | VSKA | Rifle | 7.62x39mm | 10/1/2021 | 10/1/2021 |
| xiv. | Century Arms | VSKA | Rifle | 7.62x39mm | 10/5/2021 | 10/5/2021 |
| xv. | Riley Defense | Rak 47 | Rifle | 7.62x39mm | 10/5/2021 | 10/5/2021 |
| xvi. | Barrett Manufacturing | 82A1 | Rifle | .50BMG | 10/6/2021 | 10/6/2021 |
| xvii. | Springfield Armory | M1A | Rifle | 308 | 10/6/2021 | 10/6/2021 |
| xviii | Century Arms | VSKA | Rifle | 7.62x39mm | 10/6/2021 | 10/16/2021 |
| ixx. | Century Arms | WASR-10 | Rifle | 7.62x39mm | 10/6/2021 | 10/16/2021 |
| xx. | Palmetto Arms | PA15 | Rifle | 5.56 | 10/6/2021 | 10/16/2021 |
| xxi. | SAR | SAR-9 | Pistol | 9mm | 10/4/2021 | 10/11/2021 |

| | | | | | | |
|---|---|---|---|---|---|---|
| xxii. | Ruger | Five Seven | Pistol | 5.7x28mm | 10/14/2021 | |
| xxiii. | Century Arms | Centurion 12 Ga. | Shotgun | 12 gauge | 9/21/2021 | 10/16/2021 |
| xxiv. | Century Arms | VSKA | Rifle | 7.62x39mm | 10/17/2021 | 10/17/2021 |
| xxv. | Century Arms | VSKA | Rifle | 7.62x39mm | 10/17/2021 | 10/17/2021 |

Govt. Ex. 320.01 at 5. The conspirators planned at least three shipments from the United States to Haiti: At least two shipments of firearms from Florida to Haiti were completed, one in May 2021 and at least one on an unclear previous date. 01/23/2024 Trial Tr. 565:12-566:4 (W.S. testimony); Govt. Ex. 140 at pg. 44. A third shipment of firearms was planned for October 2021, but the firearms were seized by the FBI before they could be shipped. Govt. Exs. 320.02, 320.03, 320.04.

Related to the second shipment, in March 2021, Tunis received a total of $7,500 in four separate money transfers sent by Jean via MoneyGram and Western Union. Govt. Ex. 500A at 4. On March 20, March 31, and April 18, 2021, Tunis and, at her direction, St. Louis, purchased eight firearms. Govt. Ex. 320 at 2-14. Tunis then arranged with a local shipping agent for those firearms to be shipped to 400 Mawozo in Haiti in or around May 2021. *See* 01/23/2024 Trial Tr. 565:12-566:4 (W.S. testimony). That shipment arrived in Haiti in approximately late June 2021.

The evidence shows that defendant Germine was active in choosing the weapons and conveyed the same to his U.S. based co-defendants. For instance,

- On September 16, 2021, defendant Germine sent a voice message to Tunis instructing her that "I'm taking 2 M14s . . . and 2 Galils then I will purchase the other ones later," Govt. Ex. 101.14, in relation to guns that were later purchased by Dor. In that same message, defendant Germine gave Tunis advice on how to evade suspicion for purchasing so many weapons, stating: "I don't want you to do it all in one day, baby, so they don't see it too much and then don't want to give it to you, alright?"

- On October 10, 2021, defendant Germine sent a voice message to Tunis stating telling

her that he was sending a picture of a bullet he wanted and telling Tunis, "[t]he boss said that he bought a box for me." Germine further explained that "These are big guns, you only need bullets to wipeout a whole country." Govt. Ex. 101.35. The picture sent related to a .50 caliber rifle, eventually purchased by Dor.

As demonstrated by the WhatsApp messages, between June and October 2021, Tunis was managing St. Louis and Dor related to the purchases of weapons. This management was, however, at the behest of and under the direction of defendant Germine. In addition to the testimony of St. Louis, examples from the WhatsApp messages show the control of defendant Germine related to St. Louis's purchases:

- On September 15, 2021, defendant Germine sent a WhatsApp message to Tunis, regarding a conversation he had with St. Louis. Defendant Germine wrote, "Babe, I told Walder about it. I told him, 'Look when you are told to do something, I notice that you always try to do your own thing.' . . . He informed me that he could buy many weapons with his license. I told him about the Galil. He told me, 'I thought I already bought the Galil?' I told him that the Galil is not fully automatic. He talk to me about the part again." Trial Exhibit 140 at 56; 101.13.

- On October 6, 2021, St. Louis was at a store to purchase firearms in furtherance of the scheme when he sent Tunis a voice memo asking for instructions on the paperwork: "The paper. I will fill it out. And what should I do next? Patrick will tell you how much money, how much the amount will be? It's up to you to tell me what to do." Govt. Ex. 140 at 101. About 20 minutes later, Tunis forwarded defendant St. Louis's message to defendant Germine. Govt. Ex. 140 at 100. Defendant Germine then responded to Tunis, who one minute later forwarded the message to St. Louis:

Baby, while Walder is there, ask him to go to Patrick to take care of everything, and then you can go get the things, okay? Just go get the things. Walder can buy everything. Tell Walder to buy everything. Go ahead and send him the message for me. With Jocelyn, I only had Jocelyn buy the things for us. Jocelyn bought six things in one… in two days. He bought six things. He got in and got out with all his things, man, in two days. Walder has the same license as him. If Walder does not do something for me is because he does not want to. He is just acting stupidly. You can send him the message. Tell him it is I who sent him the message. Walder can just go in and get the things for me.

Govt. Ex. 140 at 100-101.

- Later on October 6, defendant Germine sent Tunis a voice memo:

Everything is ready. Everything, 3 years, ready... everything. I already have the receipts for everything. So, it's just the money they're sending. The amount comes 2,854. So, everything is ready now. I have the receipt, if you want. I can send the picture of the receipt to you. I will tell your wife that too. Everything is ready.

Govt. Ex. 140 at 100. Defendant St. Louis then provided these firearms to Tunis for shipment to 400 Mawozo in Haiti. 01/25/2024 Trial Tr. 1075:14-19.

WhatsApp messages prove that defendant Germine also supervised Dor's purchase of weapons for the gang. For instance:

- On September 25, 2021, defendant Germine sent a WhatsApp message to Tunis, complaining about his inability to get the weapons he wanted, stating "These are not what you keep your territory under control with . . . . Let's ask Jocelyn to order it. Tell Jocelyn that." Govt. Ex. 140 at 67; 101.50.

- On September 29, 2021, defendant Germine told Tunis about a conversation he had with Dor about a specific weapon that Germine wanted. When Dor told defendant Germine that they could only rent a certain weapon, Germine stated: "And I told Jocelyn this same guy he sees with it in his hands, this guy can help him find the mags. The guy can help him find the mag. This is another one they'll sell to me. The guy

wants to sell it to me for 8,000 dollars. This one is fully automatic." Govt. Ex 140 at 75.

- On September 30, 2021, defendant Germine told Tunis in a WhatsApp that he had given Dor specific instructions with respect to magazines: "If you see there's no spare mag, order it immediately. That's what I'm telling Jocelyn too. We'll also order the mag. We won't take weapon with a single mag . . . ." Govt. Ex. 140 at 79.

- On October 1, 2021, defendant Dor sent Tunis a picture of the .50 caliber rifle in a display case. Govt. Ex. 140 at 142. Three days later on October 4, Dor sent two videos to Tunis on WhatsApp. The first video appears to have been shot by Dor in a store, showing the same .50 caliber rifle on display. Govt. Ex. 140 at 97.  The second video is from YouTube, in which an individual shows the power of a .50 caliber rifle against bulletproof glass. Govt. Ex. 140 at 97. Approximately an hour later, Tunis had an 86-minute call with defendant Germine during which Germine also placed a three-way call to Dor, who was on the call for 46 minutes. Govt. Ex. 212 at 9. Then, after communicating separately with Tunis about payment details, Tunis sent a text message to Dor to confirm his bank account. Govt. Ex. 140 at 143.

- On October 5, 2021, Tunis updated defendant Germine on status of payments for the firearms purchases: "Pa, I owe Jocelyn $2,000.00, besides the tax off $15,000.00. We owe him about $3,000.00. He bought some of the things for $2,000.00, and some others for $1,800.00." Govt. Ex. 140 at 96.

Defendant Germine also supervised money transfers to purchase the weapons, as described by Pelice and St. Louis, and demonstrated in the WhatsApp messages. The messages show that defendant Germine had control over Jean and Tunis with respect to the money transfers, and further

that they had to confirm with receipts the amount of money spent on the weapons. *See generally* Govt. Ex. 500B; *id.* at 17 ("Baby, Santia called you this morning, but she didn't find you. She called me and told me that you already talked to her last night. What should she do? So, I had her send the same amount, 2,000 to Jocelyn, hmmm . . . . 4,000 to Jocelyn, 5,000 to me but she told me . . . . I told her to send you the receipt . . . to send it to Jocelyn, Jocelyn's [receipt].").

## <u>SENTENCING CALCULATION</u>

### A. **Statutory Maximums**

The applicable statutory maximum penalty for each count of the second superseding indictment is as follows:

<u>Count One</u>: Conspiracy to Violate the Export Control Reform Act, in violation of 50 U.S.C. § 4819 has a maximum penalty of imprisonment not more than 20 years, a fine not more than $1,000,000, or both.

<u>Count Two</u>: Conspiracy to Commit Smuggling and to Defraud the United States, in violation of 18 U.S.C. § 371 has a maximum penalty of imprisonment not more than five years, a fine not more than $250,000, or both.

<u>Counts Three through Seventeen</u>: Export Control Reform Act, in violation of 50 U.S.C. § 4819 has a maximum penalty of imprisonment not more than 20 years, a fine not more than $1,000,000, or both.

<u>Counts Eighteen through Twenty</u>: Smuggling, Aiding and Abetting, in violation of 18 U.S.C. §§ 554(a), 2 has a maximum penalty of imprisonment not more than 10 years, a fine not more than $250,000, or both.

<u>Counts Twenty-One through Thirty-Four</u>: Laundering of Monetary Instruments (Promotion), Aiding and Abetting, in violation of 18 U.S.C. §§ 1956(a)(2)(A), 2 has a maximum

penalty of imprisonment not more than 20 years, or a fine not more than $500,000 or twice the value of the monetary instrument or funds involved in the transportation, transmission, or transfer, whichever is greater, or both.

Counts Thirty-Five through Forty-Eight: Laundering of Monetary Instruments (Proceeds), Aiding and Abetting, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i), 2 has a maximum penalty of imprisonment for not more than 20 years, or a fine not more than $500,000 or twice the value of the monetary instrument or funds involved in the transportation, transmission, or transfer, whichever is greater, or both.

**B.  Summary of Sentencing Guidelines Calculation**

Defendant Germine faces an advisory Guidelines range of life imprisonment based on his offenses of conviction. *See* ECF No. 219, Final Presentence Report (PSR) ¶ 151 (June 7, 2024). This calculation is driven by defendant Germine's convictions in Counts 35-48 of proceeds-based money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i), under which defendant Germine is accountable for the hostage takings for ransom from which the laundered funds were derived. *Id.* ¶ 93.  The Government agrees with nearly all of the calculations from the Presentence Investigation Report ("PSR") regarding defendant Germine's applicable Guidelines, *see* PSR at ¶¶ 68-112. The Government disagrees with the recommendation of the PSR writer that Germine should be sentenced to 240 months' imprisonment, which represents at least a five-level downward variance from the applicable Guidelines range (Level 38: 235-293), for which no basis is provided by the PSR writer for such a dramatic reduction.

**1.  Guidelines Calculations for the Offenses of Conviction**

The export-related offenses—Count 1 (conspiracy to violate ECRA), the smuggling object of the conspiracy charged in Count 2, and Counts 3-20 (violations of ECRA)—all start with a base

offense level of 26 under U.S.S.G. §§ 2X1.1(a) and 2M5.2(a)(1) because the offense conduct involved the export of more than two semi-automatic small arms. No specific offense characteristics apply, so the base offense level for these counts remains 26.

The other object of the conspiracy charged in Count 2, a conspiracy to defraud the United States in violation of 18 U.S.C. § 371, has a base offense level of 12 under U.S.S.G. § 2C1.1(a)(2). That offense also has no applicable specific offense characteristics, so the base offense level remains 12.

The international promotional money laundering violations in Counts 21-34 start with a base offense level of 8 under U.S.S.G. § 2S1.1(a)(2). The value of the laundered funds adds 6 levels pursuant to U.S.S.G. §§ 2S1.1(a)(2) and 2B1.1; because the offense involved firearms and national security, 6 points are added pursuant to U.S.S.G. § 2S1.1(b)(1)(iii); and because the defendant was convicted under 18 U.S.C. § 1956, two additional levels are added. Therefore, the total base offense level for those counts is 22.

For Counts 35-48, laundering of the proceeds of specific unlawful offenses in violation of 18 U.S.C. § 1956(a)(1)(A)(i), the Guidelines direct the Court to apply U.S.S.G. § 2S1.1(a)(1). Under that provision, the base offense level is "[t]he offense level for the underlying offense from which the laundered funds were derived," if "(A) the defendant committed the underlying offense (or would be accountable for the underlying offense under subsection (a)(1)(A) of §1B1.3 (Relevant Conduct)); and (B) the offense level for that offense can be determined." Here, the underlying offense from which the laundered funds were derived was the hostage taking of U.S. persons for ransom. Defendant Germine should be held accountable for those three hostage takings because they are relevant conduct under § 1B1.3(a)(1)(A). Therefore, his base offense level is 32 under U.S.S.G. § 2A4.1(a).

The specific offense characteristics of those hostage takings increase defendant Germine's offense level by eleven levels to 43. First, the hostage takings included ransom demands, so six levels are added under U.S.S.G. § 2A4.1(b)(1). Second, the hostage takings were conducted using dangerous weapons, so two levels are added under U.S.S.G. § 2A4.1(b)(3). Third, the hostages were held for more than seven days, so one level is added under U.S.S.G. § 2A4.1(b)(4)(B). And fourth, because defendant Germine was convicted under 18 U.S.C. § 1956, two additional levels are added under U.S.S.G. § 2S1.1(b)(2)(B). Accordingly, the base offense level for Counts 35-48 is 43.

### 2.   Grouping the Offenses of Conviction Under U.S.S.G. § 3D1.2

All of defendant Germine's offenses of conviction group together into a single group, except the second object of the conspiracy in Count 2, conspiracy to defraud the United States.

Group One comprises the offenses related to smuggling firearms to Haiti. Count 1 charges a conspiracy to violate the Export Control Reform Act, violations of which are charged substantively in Counts Three through Seventeen. These counts will all group. *See* U.S.S.G. § 3D1.2(d). Counts 18-20 will group together as they charge the same offense, and with the export control counts under U.S.S.G. § 3D1.2(b), because they are "two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan." The common scheme or plan is to smuggle weapons to Haiti in violation of export controls.

Counts 21-34 all group together under U.S.S.G. § 3D1.2(d), because the "offense level is determined largely on the basis of the total amount of harm." Each count of money laundering is for an amount between $1,000 and $3,000. These counts would group with the underlying Export Control Reform Act and smuggling charges, because they "embod[y] conduct that is treated as a specific offense characterizing in, or other adjustment to, the guidelines applicable to the money

laundering counts." In this instance, that is the 6-point adjustment for offenses related to firearms or national security under U.S.S.G. § 2S1.1(b)(1)(iii).

Counts Thirty-Five through Forty-Eight similarly group together under U.S.S.G. § 3D1.2(d), and also group with the export control and smuggling counts because, although the 6-point adjustment under U.S.S.G. § 2S1.1(b)(1)(iii) does not apply to offenses that fall under U.S.S.G. § 2S1.1(a)(1), these counts are "two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan." As noted above, the common scheme or plan is to smuggle weapons to Haiti in violation of export controls.

Group Two involves the portion of the conspiracy charged in Count Two that cannot group with the above counts. Per U.S.S.G. § 3D1.2, Application Note 8, when a defendant is convicted of conspiring to commit several substantive offenses, and also of committing one or more substantive offenses, the parties must treat the conspiracy count as if it were several counts, each charging conspiracy to commit one of the substantive offenses. The application note then directs to U.S.S.G. § 1B1.2(d) and accompanying commentary. Pursuant to U.S.S.G. § 1B1.2(d), a conviction on a count charging a conspiracy to commit more than one offense shall be treated as if the defendant had been convicted on a separate count of conspiracy to each offense that the defendant conspired to commit.

Here, Count 2 is a dual-object conspiracy. The first object is to commit the crime of smuggling. The defendant is also charged with three counts of the substantive offense of smuggling. As noted above, this object will group with the conspiracy and substantive export control counts, the substantive smuggling counts, and the money laundering counts in Group One. The second object is to defraud the United States, by obstructing the function ATF. The Government submits that, because the export control and smuggling counts involve the U.S.

24

Department of Commerce, but this portion of the conspiracy involves the ATF, there are two different victims, and these counts cannot group. U.S.S.G. § 3D1.2(b). Therefore, this count must be assessed separately.

Because Counts 35-48, proceeds-based money laundering, are the most serious count comprising Group One—i.e., because it has the highest offense level of the counts in the group— its offense level of 43 constitutes the adjusted offense level for Group One. Group Two has only one count, with an adjusted offense level of 12. Under 3D1.4(c), Group Two can be "disregard[ed]" because it is 9 or more levels less serious than Group One. No units will be added.

To Group One's adjusted offense level of 43, the Court should apply two separate role adjustments to increase defendant Germine's offense level by four levels because defendant Germine was a manager or supervisor of the criminal activity in this case under U.S.S.G. § 3B1.1(a). Therefore, defendant Germine's combined total offense level is 47.

Because defendant Germine has no prior criminal history, he has no criminal history points and is sentenced under Criminal History Category I. Accordingly, the advisory Guidelines range applicable to defendant Germine in this case is life imprisonment.

### 3. Imposing a Sentence for Multiple Counts of Conviction under U.S.S.G. § 5G1.2

While each of the counts of conviction carries a statutory maximum of 20 years or less, the Guidelines require that if the appropriate sentence exceeds the highest statutory maximum of an offense of conviction, "the sentence imposed on one or more of the other counts shall run consecutively . . . to the extent necessary to produce a combined sentence equal to the total punishment." U.S.S.G. § 5G1.2(d); U.S.S.G. § 5G1.2, Cmt., n.1 ("If no count carries an adequate statutory maximum, consecutive sentences are to be imposed to the extent necessary to achieve the total punishment."). In other words, the Guidelines direct that courts should "impose maximum

and consecutive sentences to the extent necessary to make the total punishment equal in severity to what the guidelines would require were it not for the statutory maxima." *United States v. Veysey*, 334 F.3d 600, 602 (7th Cir. 2003).

Courts routinely impose sentences well above the statutory maximum of any single count of conviction where a defendant was convicted of multiple counts and the applicable Guidelines range called for a higher sentence. *See, e.g.*, *United States v. Horton*, 770 F.3d 582, 584 (7th Cir. 2014) (affirming that the defendant's guidelines range was "life, subject to a statutory maximum sentence of 30 years on each count" and imposing a 90-year sentence while noting that "when there are multiple counts of conviction . . . the guidelines instruct the sentencing court to impose maximum and consecutive sentences to achieve what the guidelines sentence would have been but for the statutory maximum.") (citing, *inter alia*, U.S.S.G. § 5G1.2(d)); *United States v. Lewis*, 594 F.3d 1270, 1275 (10th Cir. 2010) ("[I]t was eminently reasonable for the district court to impose a sentence functionally equivalent to life imprisonment by imposing the maximum sentence for each crime of which [defendant] was convicted and making the sentences consecutive."); *United States v. Sarras*, 575 F.3d 1191, 1208-09 (11th Cir. 2009) ("Because the statutory maximum [for the count with the highest statutory maximum] was less than the total guidelines punishment of life imprisonment, § 5G1.2(d) of the guidelines called for the sentences for multiple counts to run consecutively as the advisory guidelines sentence.").

## C.  Offense Conduct, Specific Offense Characteristics and Adjustments

### 1.  Under U.S.S.G. §§ 2S1.1(a)(1) and 1B1.3(a)(1)(A) & (B), Defendant Is Responsible for 400 Mawozo's Hostage Takings of U.S. Persons for Ransom, the Underlying Offense from which the Laundered Funds were Derived

Defendant Germine is accountable under the Money Laundering Guidelines for the underlying crime from which the proceeds were derived—the hostage takings of three U.S. citizens

in the summer of 2021 (D.R., her husband, and K.J.). For defendants convicted of money laundering under U.S.S.G. § 2S1.1(a)(1), the base offense level is "[t]he offense level for the underlying offense from which the laundered funds were derived, if (A) the defendant committed the underlying offense (or would be accountable for the underlying offense under subsection (a)(1)(A) of § 1B1.3 (Relevant Conduct)); and (B) the offense level for that offense can be determined[.]" U.S.S.G. § 2S1.1(a)(1). Under Section 1B1.3(a)(1)(A), a defendant's "relevant conduct" encompasses both the defendant's own acts and those that the defendant "aided, abetted, counseled, commanded, induced, procured, or willfully caused." In determining "relevant conduct," the court must look to "the contours of the underlying scheme itself rather than the mere elements of the offense charged." *United States v. Caballero*, 936 F.2d 1292, 1298 (D.C. Cir. 1991).

Here, defendant Germine is responsible for the hostage takings of three U.S. citizens (D.R., her husband, and K.J.) because he was managing and controlling the gang's hostage taking activities in June-August 2021, when those hostage takings occurred ("the relevant time period"). At least a preponderance of the evidence shows that defendant Germine "commanded, induced, procured, or willfully caused" these hostage takings.

First, defendant Germine was generally described by multiple witnesses and himself to be a leader of 400 Mawozo, including during the relevant time period. Defendant Germine was referred to by Pelice, Tunis, St. Louis, and himself (in messages) as the gang's "king." Pelice stated that everything defendant Germine had was derived from the gang. Pelice and St. Louis both testified that Sanjou, identified as the lead hostage taker by the victims, worked for Germine. Defendant Germine admitted that the gang members listed to him, took direction from him, and otherwise would do what he told them to do, including kill individuals if he instructed. After his

arrest, Gaspiyay and Sanjou did so listen to him, agreeing to release a Dominican hostage, and with Gaspiyay saying he would kill Sanjou if he did not agree to follow these orders. Defendant Germine's leadership of the gang was so well-known that, according to Witness 2, Germine represented the gang at a meeting of gang leaders to discuss the assassination of President Moise prior to July 2021.

Second, defendant Germine was specifically in control of the gang related to hostage takings during the relevant time period. Pelice testified that defendant Germine was in control of the gang sufficient in June or July 2021 to strike an agreement with Vitel'Homme for their gangs to commit kidnappings together and share the profits. *See* 01/29/2024 Trial Tr. 1422:1-1423:1; 1436:21-22. That evidence of control over hostage taking is corroborated by Germine's own statement that he instructed the gang to release nuns taken hostage in April 2021, as well as the messages between defendant Germine and Tunis that show that Germine specifically gave directions related to hostage takings in June and August 2018. *E.g.*, Govt. Ex. 140 at 37 (June 14, 2021: Tunis asked Germine if he "had work today" and noted that "You always find something when you go out there," an allusion to the gang's hostage taking operations.); *id.* at 35 (June 18, 2021: Germine communicated with Tunis about being in the house of a hostage and "dragging him to the car."); id. at 35 (Germine stated "we had to handle another job, we happened to find it, then we took care of it. You already know that we do it on the spot."). Further the messages show that, at Tunis's request, Germine secured the release of another hostage in June 2018. Govt. Ex. 140 at 36.

Third, defendant Germine was in control of the proceeds of the gang's hostage takings at the relevant time period. Pelice testified that when ransom money was paid, it would go to defendant Germine via Jean. Pelice specifically described how, after he re-joined the gang in June-

July 2021, he brought the money in cash from Sanjou, which were ransom payments proceeds, to Jean, who reported back the same to defendant Germine. Defendant Germine corroborated the same in his statement to law enforcement, i.e., that Santia was obtaining the money from Sanjou through a delivery. Govt. Ex. 600.T. at p. 50. Police also testified that Germine was fully in control of the money, keeping control through Santia, which is corroborated by the numerous WhatsApp messages wherein Germine explains his directions to Santia. *E.g.*, Govt. Ex. 500.B at p. 12 (Germine: "I'll have Santia send money tomorrow."); *id.* at p. 27 (Santia: "Now I called Deco. . . I called Deco so I could ask Deco what to do or whatnot to do.").

Further, the above evidence is consistent with evidence of Germine's control after the relevant time period, specifically his control over the hostage takings of the 17 missionaries. The WhatsApp messages between defendant Germine and Tunis show that Germine was a decision-making authority regarding the missionaries' hostage taking and was specifically involved in detail about execution of the plan. *E.g.*, Govt. Ex. 140 at 39 (Germine explaining how bullets would fly and they would hit a police checkpoint); *id.* (Germine explaining that he had discussed with Sanjou the location where the missionaries were being held). According to both Police and Witness 2, Germine stated that he intended to keep the missionaries captive for political reasons, including to secure his own release. So, too, St. Louis testified that during the course of the joint criminal activity he overheard defendant Germine speak on the phone with defendant Germine and other gang members "about kidnappings," showing Germine's open discussions about the gang's hostage taking operations. 01/25/2024 Trial Tr. 1089:18-23. Finally, there is ample evidence to support that the weapons procured by defendant Germine were in the hands of 400 Mawozo at that time that the 17 missionaries were kidnapped, showing the significance of the gun-trafficking crime to the control Croix-Des-Bouquets, Haiti by 400 Mawozo.

Thus, in total, a preponderance of the evidence shows that, during the relevant time period, defendant Germine was leading 400 Mawozo, he was specifically directing its operations related to hostage takings, and he was receiving and controlling the disbursement of the proceeds of the hostage takings. Thus, under Section 1B1.3(a)(1)(A), defendant Germine "aided, abetted, counseled, commanded, induced, procured, or willfully caused" the hostage takings of the three U.S. nationals (D.R., her husband, and K.J.), and thus those crimes provide the operative Sentencing Guidelines score under U.S.S.G. § 2S1.1(a)(1).

It is not necessary for the Government to show specific facts of defendant Germine's involvement with each and every detail of each of the relevant hostage takings. The language of Section 1B1.3(a)(1)(A) is at least as extensive as aiding and abetting or principal/agent liability. *E.g.*, *United States v. Gonzalez*, 501 F.3d 630, 642 (6th Cir. 2007) ("[Defendant] was held responsible for his own acts as either a principal or as an aider and abetter . . . [and his sentence for that particular offense conduct must therefore be calculated under U.S.S.G. § 1B1.3(a)(1)(A)."); *United States v. Cross*, 121 F.3d 234, 238 (6th Cir. 1997). Here, defendant Germine led the gang and entered into an agreement with Vitel'Homme to commit hostage takings prior to or during the relevant time frame. The gang's hostage takings of the three U.S. nationals (D.R., her husband, and K.J.), flow from his instructions and control of the gang regarding this course of conduct. Under these facts, a preponderance of the evidence shows that he "aided, abetted, counseled, commanded, induced, procured, or willfully caused" the relevant hostage takings through his actions controlling the gang, its hostage taking operations, and the money flowing therefrom. *E.g.*, D.C. Jury Instruction 3.2000 (Aiding and Abetting) ("[Y]ou must find that the defendant knowingly associated himself/herself with the commission of the crime, that s/he participated in the crime as something s/he wished to bring about, and that s/he intended by

his/her actions to make it succeed.").

It is also not necessary for the Government to show that defendant Germine knew that any of the hostages taken under his direction or control (including D.R., her husband, and K.J.) were U.S. nationals. Section 1203's "statutory language suggests no intent requirement other than that the offender must act with the purpose of influencing some third person or government through the hostage taking, a point on which the jury received proper instructions. Nor are we aware of any legislative history suggesting that Congress meant to impose a specific intent requirement." *United States v. Yunis*, 924 F.2d 1086, 1096 (D.C. Cir. 1991) (citation omitted).

### 2. Defendant Acted as a "Organizer or Leader of a Criminal Activity" Under U.S.S.G. § 3B1.1(a)

A four-level enhancement is appropriate because an "organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). Courts consider several factors in applying the aggravated role enhancement, including "the recruitment of accomplices," "the degree of participation in planning or organizing the offense," "and the degree of control and authority exercised over others." U.S.S.G. § 3B1.1, cmt. n. 4.

Defendant Germine was the "king" of the gang, by his own proclamation. He managed and directed Sanjou, Gaspiyay, Koleg, Pelice, and Jean in Haiti, as well as the U.S.-based conspirators, Tunis, Dor, and St. Louis. Defendant Germine also specifically served in a leadership role in the money laundering scheme, providing directions to Jean and Tunis about the manner of the laundering activity. WhatsApp messages admitted at trial show Germine's control. *See, e.g.*, Govt. Ex. 500B at 41 (October 11, 2021: Tunis (i) sent text messages to Santia Jean to ensure she sent $2,500 to Walder St. Louis via Western Union, *id.* at 35, (ii) sent a picture of the Western Union receipt for the $2,500 money transfer to Walder St. Louis, *id.* at 39, and then (iii) sent a text message to defendant Germine that "Walder went to get the money I told him to go get the thing

from Patrick.").

### 3. Defendant Has Not "Clearly [D]emonstrate[d]" Acceptance of Responsibility Under U.S.S.G. § 3E1.1

In determining whether a defendant "clearly demonstrates acceptance of responsibility for [her] offense," one consideration is "the timeliness of the defendant's conduct in manifesting the acceptance of responsibility." 3E1.1, App. Note 1(H). In this case, defendant Germine pled guilty at the virtual close of the Government's case, after the Government was ready to pass its last witness. Defendant Germine "made the Government play its hand in open court before changing [her] plea," and "[t]his tactical move is more than enough to warrant denial of an acceptance adjustment." *United States v. Omigie*, 977 F.3d 397, 406 (5th Cir. 2020) (citation omitted); *see also, e.g.*, *United States v. Diaz-Gaudarama*, 614 F.3d 387, 390 (7th Cir. 2010) ("We have long held that the last-minute nature of a guilty plea provides a significant basis to deny an acceptance-of-responsibility reduction.") (collecting cases). Accordingly, defendant Germine's last-minute guilty plea also provides a separate basis to find that he has not clearly demonstrated acceptance of responsibility.

## SENTENCING RECOMMENDATION

A district court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall,* 552 U.S. 38, 49 (2007). The Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark." *Id.* at 46-49. The district court should next consider all of the applicable factors set forth in 18 U.S.C. § 3553(a). *Id.* at 49-50. Indeed, the Guidelines themselves are designed to calculate sentences in a way that implements the considerations relevant to sentencing as articulated in § 3553(a). *United States v. Rita*, 551 U.S. 338, 347-50 (2007).

The § 3553(a) factors include (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed correctional treatment; (3) the Sentencing Guidelines and related Sentencing Commission policy statements; and (4) the need to avoid unwarranted sentence disparities.

Here, application of the § 3553(a) factors demonstrates that a Guidelines-compliant sentence of life imprisonment is appropriate.[6]

### 1. The Nature and Circumstances of the Offense

The nature and circumstances of the significant crimes committed in this case by defendant Germine warrant a Guidelines compliant sentence. Defendant Germine was a leader in a scheme to launder ransom payments earned from violent armed hostage takings in Haiti to the United States. He supervised using the laundered funds to purchase at least 24 semi-automatic firearms, which were acquired through paperwork dependent on false statements. Defendant Germine knew that the firearms would be used for violent ends, including taking even more hostages at gunpoint, because he was directing that same activity in Haiti. Testimony from various witnesses, defendant Germine's statements, and defendant Germine's WhatsApp messages show that he was in control with respect to the tactics and ransom negotiations of the gang's hostage taking victims. Defendant Germine carried out all of these acts knowing that they would contribute to perpetuating the widespread violence and instability in Haiti, and in order to further the same to benefit his gang's

---

[6] The Probation Office has recommended a below-Guidelines sentence of 240 months' (20 years) imprisonment but failed to identify any rationale that would support such a significant downward variance from defendant Germine's Guidelines range.

control and his own profit. Defendant Germine used the profits earned from hostage takings to buy himself luxury goods and throw himself birthday parties in prison, where he maintained multiple cell phones to conduct the gang's activities.

Defendant Germine's offense conduct falls in two distinct but related categories. First, smuggling powerful semi-automatic weapons from the United States to Haiti is an extremely serious criminal offense. The Export Control Reform Act of 2018 allows the Department of Commerce to prohibit certain items to be exported from the United States to foreign countries without a license through the Export Administration Regulations ("EAR"). In particular, the EAR restrict the export of items that could make a significant contribution to the military potential of other nations or that could be detrimental to the foreign policy or national security of the United States. 15 C.F.R. Part 774, Supp. No. 1 (Commerce Control List). The items the co-defendants purchased for export at defendant Germine's direction—firearms and ammunition—are among the most sensitive items subject to the EAR controls. Among other reasons, firearms are controlled for national security, regional stability and anti-terrorism reasons. *Id.* at 1-2. In other words, violating the export control laws constitutes a serious criminal offense because those laws help protect the national security and economy of this country, and impact our foreign policy with other nations— in particular the important U.S. interest in ensuring the stability of Haiti. And the evidence introduced at trial made clear that defendant Germine was well aware of the destructive capacity of these weapons and the destructive purposes for which they would be used in Haiti. *See, e.g.*, 01/25/2024 Trial Tr. 1098:16-19 (St. Louis testimony that the firearms were going to 400 Mawozo and "they were also going to be used during the elections"); Govt. Ex. 140 at 79 (defendant Germine voice memo to defendant Germine noting in part: "this weapon, he told me, is a weapon that's used to go to war . . ."); Govt. Ex. 140 at 102 (defendant Germine voice memo to defendant

Tunis noting in part: "They are big guns, baby, big guns" that "I can use to do a lot of bad things," and that "you can wipe out an area completely" and "you only need bullets to wipe out a whole country"); Govt. Ex. 140 at 44 (while discussing firearms shipments in June 2021 and their frustration with the Haitian president, defendant Germine noted that she had "two with me" and stated that she would "charge them up right now and shoot his fucking face before I leave.").

Many of the specific firearms purchased at the direction of defendant Germine were particularly powerful. At the trial, ATF Senior Special Agent Jaime Morales provided expert testimony that the firearms purchased during the scheme were intended for combat and, notably, that the Barrett .50 caliber rifle is a firearm used by militaries for disabling vehicles at long distance. Tr. 689:6-690:8 (describing the Barrett .50 caliber rifle as used by the U.S. military against equipment and accepts a bullet which is half an inch in diameter). That expert testimony supports defendant Germine's own statements about how the .50 caliber rifle would be used. Govt. Ex. 101.35 ("That's something that I can use to do a lot of bad things, man, while I'm on a motorcycle . . . these are big long guns. When you are on a motorcycle with your gun on you . . . you can wipe out an area completely."). The other firearms purchased in the scheme had similar purposes. *See, e.g.* 01/23/2024 Trial Tr. 674:17-23 (description of a Centurion BP-12 shotgun as "a combat shotgun" intended "for close-quarter engagements"); 01/23/2024 Trial Tr. 676:3-677:9 (description of VSKA AK-47 variant with holographic scope as "very helpful in combat"). *Compare* Govt. Ex. 101.14 (Germine: "You are going to take care of the Galil.") and Govt. Ex. 101.10 (Germine: "I need 3 M14s. I'd love to get an M14 and 3 Galil"), *with* 01/23/2024 Trial Tr. 706: 5-19 (SA Morales: "Galil is a model of combat rifle produced by the Israeli Weapons Industries. It is an improvement on the AK-47 original design. . . . An M14 is the military designation of the rifle that we looked at, the Springfield Ordnance M1A. It's that same firing

system. But it's also used by the Marine Corps. They call it the M21, put a sniper scope on it, and that's how they designate it. But it's an M14. It's the same firing system, built by Springfield.");

The U.S. Sentencing Commission has recognized the seriousness of violations which threaten security or foreign policy interests of the United States. *See* § 2M5.2, Application Note 2. Here, defendant Germine not only committed export violations that threatened the security and policy interests of the United States but did so by supervising the purchase of at least 24 separate firearms for smuggling from the United States to Haiti, along with hundreds of rounds of ammunition.

Second, as described at length above, hostage taking is a serious offense, especially when it includes ransom demands carried out at gunpoint. While insidious wherever it takes place, hostage taking is rampant in Haiti and threatens the stability of the entire country. *See, e.g.,* "U.N. Warns of Spike in Killings and Kidnappings across Haiti as Deployment of Armed Force Stalls," *AP News*, https://apnews.com/article/haiti-gangs-killed-raped-injured-a947708120e8a143d81071adb29bf7ae (last accessed May 22, 2024). It serves as a major revenue driver for the various gangs that control territory throughout Haiti and threaten the continued viability of the fragile national government. *See, e.g.,* "Haitian Gang's Growing Funds, Arsenals Challenge Planned Intervention," *U.S. News & World Report,* https://www.usnews.com/news/world/articles/2024-02-13/haitian-gangs-growing-funds-arsenals-challenge-planned-intervention-report (last accessed May 22, 2024). And the successful laundering of the ransom funds from those hostage takings allows these violent activities to flourish and ensures they continue.

Moreover, the Court should consider the nature and circumstances of other crimes committed by defendant Germine, specifically (i) the hostage takings at gun point of the 17

missionaries, including 16 U.S. citizens and 5 children, held for 62 days (ii) the hostage takings at gun point of U.S. citizen J.L., held for 5 days, and (iii) the other hostage takings of Haitian citizens and other foreigners, described at trial by D.R., K.J., and J.L., and in Germine's WhatsApp messages. Notably, the gun trafficking conspiracy was exposed due to the attention brought on 400 Mawozo from its hostage taking of the missionaries, given the number of victims and their ages, one of whom was eight months old at the time of the hostage taking. All of these individuals are additional victims of defendant Germine and his scheme to raise funds for his gang and himself through an organized armed hostage taking conspiracy, facilitated by the importation of firearms from the United States. It is notable that defendant Germine was specifically involved in the decisions of what hostages to take and when they should be released in high profile cases, such as the nuns and the missionaries. The latter Germine used as a chit to negotiate with the Haitian government, hoping such negotiations would lead to his freedom. These crimes, not accounted for in the Guidelines calculation, show the severity of defendant's overall criminal actions and should be taken into account when considering the appropriate sentence, which the Government submits is the Guidelines sentence recommendation of life imprisonment.

Moreover, were the applicable Guidelines sentence recommendation not life in prison, the Government would likely seek an upward departure from the Guidelines, as contemplated for "extreme" cases under U.S.S.G. § 2M5.2, Application Note 2. The nature of the offenses, to include the very serious offenses against the 17 missionaries, sophistication of the criminal activity, and the security implications at play all support the Government's request for a Guidelines compliance sentence.

### 2.   The History and Characteristics of the Offender

Defendant Germine's history and characteristics do not warrant a variance under 18 U.S.C. § 3553(a)(1) and support the requested sentence. Defendant Germine does not have significant education (completing the ninth grade (PSR ¶ 137)), but does not appear to be significantly disadvantaged comparative to other individuals growing up in Haiti. Defendant Germine attained a status as a leader of the gang and amassed significant wealth for himself, to include luxury items, multiple cell phones, and free reign in prison. Even after coming to the United States, defendant Germine did not reflect on the crimes he committed and show respect for the justice system. For instance, defendant Germine refused to leave his cell for the pre-trial hearing on January 8, 2024. Thereafter, in jail calls, defendant Germine complained that he refused to appear because the guard woke him up at 4:00 a.m., when his hearing what not until 4:00 p.m., and the Judge would not take the bench before that time.[7] Additionally, defendant Germine expressed that another witness in the case could be killed in jail if other inmates knew the information the witness had shared.[8] The Government is not aware of any circumstances that warrant anything other than a Guidelines compliant sentence.

### 3.   The Need to Promote Respect for the Law, to Afford Adequate Deterrence, and to Protect the Public.

A significant sentence is necessary to afford adequate deterrence and promote respect for the law. Defendant Germine was a leader in a scheme that smuggled powerful weapons from the United States to Haiti, knowing full well that those weapons had been bought with ransom money and that the smuggled weapons would be used to take even more hostages and further destabilize

---

[7] *See* Jail Call of 1/12/2024 at 12:55pm (file name 1705082135_5019_13_206_18.wav). Official translation to follow.
[8] *See* Jail Call of 1/11/2024 at 11:50pm (file name 1704991829_5019_12_172_505.wav). Official translation to follow.

the country of Haiti. And, as described above, he is accountable for those hostage takings. These offenses show a complete disregard not just for U.S. law and security, but a complete disregard for the fate of the country of Haiti and its people. A sentence that is too lenient would convey the wrong message, including to other gang leaders who remain in Haiti and continue to wreak havoc on security in the country and commit crimes against U.S. nationals. *See, e.g.*, *United States v. Vitel'Homme Innocent*, Case No. 1:23-cr-00310 (D.D.C.) (indictment of Vitel'Homme for a hostage taking of two U.S. citizens, which resulted in the death of one of the victims). Instead, the Court should send a message to Haiti's gang leaders—and those who would support their brutal criminal schemes—that violations of U.S. law will be punished seriously. A Guidelines compliant sentence for a notorious Haitian gang leader, under whose direction 400 Mawozo committed significant crimes impacting the Haitian people and U.S. citizens, is appropriate.

### 4. The Need to Avoid Unwarranted Sentencing Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct

Defendant Germine's intimate involvement in the workings of the gang and supervisory role therein justify a Guidelines compliant sentence, which is reasonably greater than that of his co-defendants. In addition to supervising his co-defendants and Jean in relation to the purchasing of the weapons, defendant Germine was also supervising the gang members down in Haiti, to include Sanjou, Gaspiyay, Koleg, and Pelice, regarding the hostage takings themselves. Defendant Germine's criminal culpability is, therefore, defined at a much higher level under the Guidelines that that of his codefendants. Even with respect to the weapons trafficking alone, while Dor and St. Louis were average participants in the scheme and Tunis a manager of the conspiracy, defendant Germine was unquestionably the leader in the scheme, specifically choosing the straw purchasers, authorizing the movement of money, and directing the purchases of weapons.

Defendant Germine is significantly more culpable than co-defendants Dor, St. Louis, and Tunis, and thus warrants a significantly higher sentence.

Defendant Germine is more similarly situated to other conspiratorial leaders of groups seeking control and political action through the criminal scheme, who have been sentenced in this court to lengthy sentences. In *United States v. Palmera Pineda*, Judge Lamberth sentenced the defendant, a senior member of the Colombian FARC, to sixty years in prison[9] based upon evidence he conspired with other members of the FARC to detain several American citizens to be used as bargaining chips in negotiations with the government of Colombia. Case No. 04-cr-00232, *aff'd* 592 F.3d 199, 199 (D.C. Cir. 2010). This court has also imposed significant sentences when hostage taking is combined with other serious offenses, to include national security offenses. *United States v. Yunis*, 924 F.2d 1086, 1090 (D.C. Cir. 1991) (affirming the sentence of five years for conspiracy, thirty years for hostage taking, and twenty years for air piracy for Yunis's participation in a Jordanian airplane hijacking to get Palestinians to leave Lebanon, where all the victims were released). In contrast, in *United States v. Tchibassa*, the defendant, a high-ranking member of the Angolan "Front for the Liberation of the Enclave of Cabinda" was sentenced to 293 months for the hostage taking of a *single* U.S. citizen, where the primary motivation was only money and no other political motive. 452 F.3d 918, 921 (D.C. Cir. 2006) (noting that the hostage takers demanded money from the victim's employer, Chevron). Given defendant Germine's leadership of his criminal organization, his design of a hostage taking and gun trafficking scheme to control gang territory and put pressure on the Haitian government, and the number of victims impacted by this scheme in both the United States and Haiti, a Guidelines compliant sentence of

---

[9] This sentence was the maximum sentence the government could request based on the conditions of extradition from Columbia. *See* Dept. of Justice Press Release, Senior Member of FARC Narco-Terrorist Organization Sentenced to Sixty Years for Hostage-Taking Conspiracy (Jan. 28, 2008), *available at* https://www.justice.gov/archive/opa/pr/2008/January/08_nsd_069.html

life imprisonment is appropriate.

As the "king" of 400 Mawozo, defendant Germine orchestrated the gang's hostage taking strategy, decided which weapons the gang needed to procure to carry out its violent operations, directed the actions of the gang members involved in the hostage takings, and commanded the disposition of the financial rewards. Defendant Germine did so not only to increase his wealth, the gang's wealth, and the gang's control, but also to achieve his political goals, negotiate with political leaders, and secure his own release from a Haitian prison. While celebrating the bounty of his riches, including luxury clothing items and multiple phones in jail, defendant Germine's actions actively exacerbated the political instability in Haiti and participated to unrest for the Haitian people. Based on the foregoing, the Government requests defendant Germine be sentenced to life in prison, in accordance with the applicable Sentencing Guidelines range.

## CONCLUSION

Wherefore, the government recommends that defendant Germine receive a sentence of life imprisonment, 36 months' supervised release, and a $4,800 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

*/s/ Karen Seifert*
Karen P. W. Seifert (N.Y. Bar No. 4742342)
Kimberly L. Paschall
Assistant United States Attorneys

MATTHEW G. OLSEN
ASSISTANT ATTORNEY GENERAL

Beau D. Barnes
Trial Attorney
Counterintelligence and Export Control
Section

National Security Division
U.S. Department of Justice