UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,          .
                                   .
          Plaintiff,               .    CR No. 21-0699-01 (JDB)
                                   .
     v.                            .
                                   .    Washington, D.C.
JOLY GERMINE,                      .    Monday, June 24, 2024
                                   .    11:11 a.m.
          Defendant.               .
. . . . . . . . . . . . . . .


SENTENCING HEARING
BEFORE THE HONORABLE JOHN D. BATES
UNITED STATES DISTRICT JUDGE


<u>APPEARANCES</u>:

For the Government:          KAREN P. SEIFERT, AUSA
                             KIMBERLY L. PASCHALL, AUSA
                             U.S. Attorney's Office
                             601 D Street NW
                             Washington, DC 20530

                             BEAUDRE D. BARNES, ESQ.
                             U.S. Department of Justice
                             950 Pennsylvania Avenue NW
                             Washington, DC 20530

For Defendant:               ALLEN H. ORENBERG, ESQ.
                             The Orenberg Law Firm, PC
                             12505 Park Potomac Avenue
                             6th Floor
                             Potomac, MD 20854

                             ELITA AMATO, ESQ.
                             2111 Wilson Boulevard
                             Suite 8th Floor
                             Arlington, VA 22201

Court Reporter:              BRYAN A. WAYNE, RPR, CRR
                             U.S. Courthouse, Room 4704-A
                             333 Constitution Avenue NW
                             Washington, DC 20001

```
 1                    P R O C E E D I N G S
 2           THE DEPUTY CLERK:  We're on the record in criminal
 3   case 21-699, United States of America versus Defendant 1, Joly
 4   Germine.  We have Ms. Regine Duruska Murray and Mr. Guy Danjoint
 5   who have been sworn in for the record, and for probation we have
 6   Ms. Hana Field.  Starting with government counsel, please
 7   approach the podium and state your appearance for the record.
 8           MS. SEIFERT:  Good morning, Your Honor.  Karen Seifert
 9   for the United States.  With me at counsel table is AUSA
10   Paschall and Trial Attorney Barnes.
11           THE COURT:  Good morning to you all.
12           MR. ORENBERG:  Good morning, Your Honor.  Allen
13   Orenberg on behalf of Mr. Germine, and I'm with Co-Counsel Elita
14   Amato.
15           THE COURT:  Good morning.
16           MR. ORENBERG:  Your Honor, we have a preliminary
17   matter that we would like to discuss at the bench.
18           THE COURT:  You do?
19           MR. ORENBERG:  Yes, we do.
20           THE COURT:  All right.  Come on up.
21       (Bench conference.)
22           MR. ORENBERG:  Good morning.  So at approximately nine
23   o'clock last night, I received an email containing this letter
24   which is addressed to Your Honor.  I don't know if the Court has
25   directly received it.
```

 1          THE COURT:  No, I haven't.

 2          MR. ORENBERG:  Oh.  Okay.  Here's my concerns:

 3    It's from a person in Haiti who purports to be an attorney

 4    that has some sort of attestation clause about translation, so

 5    I'm assuming that it was originally written in Haitian Creole.

 6          THE COURT:  Has this already been provided to the

 7    government?

 8          MS. SEIFERT:  The government received this, Your

 9    Honor, by an email to our public affairs officer, and it also

10    looked like the person who sent it tried to copy chambers but

11    didn't have an address for chambers, and then asked that we

12    forward it to the Court.  I sent it to your chambers last night,

13    but it looks like maybe it still has not made it there.  Perhaps

14    I had the wrong email as well.  But anyway, yes, the government

15    has this.  We received it last night, and we sent it to chambers

16    and to defense counsel.

17          MR. ORENBERG:  Right.  I apologize for not mentioning

18    that.  I did receive it from government counsel, and so did

19    Ms. Amato.

20          THE COURT:  Question number one: Is it something that

21    either side is suggesting that I should review prior to the

22    sentencing?

23          MS. SEIFERT:  I think that the Court -- this individual

24    wants the Court to consider the letter.  The individual is

25    referenced in the defendant's letter; that's my understanding.

1    And he's responding to something that the defendant has said,

2    and so I think the Court can take it into consideration and give

3    it whatever weight the Court wants.  This person has not in any

4    way been solicited by the United States.  The letter is as much

5    a surprise to us as it is to Your Honor.

6         MR. ORENBERG:  Your Honor, we have not had an

7    opportunity -- obviously, some 14 hours ago the letter landed

8    in my cell phone, and I suspect Ms. Amato's about the same time.

9    We have not had an opportunity to review this with our client,

10   nor have we had an opportunity to have it translated so we can

11   properly review it with our client.  If the government says that

12   the Court is entitled to consider whatever materials are

13   available to it --

14        THE COURT:  You don't have to tell me that I'm

15   entitled to consider it.

16        MR. ORENBERG:  Correct.

17        THE COURT:  They're suggesting that, having been

18   submitted, I should read it.

19        MR. ORENBERG:  If that's the path the Court's going to

20   take, then we're going to ask for a postponement of the hearing

21   today so we can have it translated to make sure that it comports

22   with this English version, and if we have any issues with that,

23   we'll discuss it with --

24        THE COURT:  Okay.  Everyone can take a five-minute

25   break while I read through the letter, and you can read the

letter as well.  And if you feel you need to discuss anything

with your client, you can discuss it with your client during

this time period.  I doubt after I read it -- it's possible, but

I doubt that I'm going to continue the sentencing.

MR. ORENBERG:  Okay.

THE COURT:  We'll take a break so that I can read it

and so that you can read it, and if you feel you need to have

any kind of discussion with your client, you can do so.

MR. ORENBERG:  Thank you, Your Honor.

THE COURT:  All right.

(End of bench conference.)

THE COURT:  We're going to have to take a brief break

to review a document.  It won't be very long, but we'll take

what probably will amount to, oh, I would say at most a

10-minute break.  Thank you.

(Recess from 11:15 a.m. to 11:25 a.m.)

THE COURT:  All right.  With respect to the

preliminary matter, which involves a letter that has not been

docketed -- at this moment, at least, it has not been

docketed -- that I was provided this morning, I've now read the

letter, and I will not be taking it into account with respect to

the sentencing.  It is a letter that basically challenges some

things that Mr. Germine has said in his communications through

counsel with the Court, and I don't think the defense has had

time to address these.  And as you'll hear in a few minutes

anyway, I don't think Mr. Germine's letter has a particularly

positive impact on his sentencing request in this case.

So, with that, if either side thinks that the letter needs

to be made a part of the record, docketed, please do so, but I'm

not going to take it into account with respect to the sentencing.

Any questions?

MS. SEIFERT:  No, Your Honor.

MR. ORENBERG:  No, Your Honor.

THE COURT:  All right.  So we will proceed with what

we're here today for, which is sentencing in this matter.  And

it is a sentencing that has some issues in it that we need to

resolve along the way, but we'll start with the usual questions,

and that is first to the defense, Mr. Orenberg: Have you and

Ms. Amato and Mr. Germine received the presentence report, had a

chance to review it, and are there any remaining issues, other

than the guideline-related issues of acceptance of responsibility,

perhaps role in the offense, and perhaps the base offense level,

all of which we'll talk about in a moment.  Any other issues?

MR. ORENBERG:  No other issues, Your Honor.  And yes,

the Court is correct; I and Ms. Amato have reviewed both the

draft version and the final version and the probation office

recommendation supplement in Haitian Creole.  It's been

translated into Haitian Creole for him.

THE COURT:  Thank you.  Same series of questions to

the government:  Have you received and reviewed the presentence

investigation report, and are there any remaining issues, other
than those issues that relate to the guideline calculation?

MS. SEIFERT:  No, Your Honor.  There are no remaining
issues.  We have received and reviewed, and we agree with the
guidelines calculation but not with the recommendation.

THE COURT:  All right.  I will accept the presentence
investigation report as findings of fact on issues that are not
in dispute, and that's consistent with Federal Rule of Criminal
Procedure 32(i)(3)(A).

The case does fall within the Sentencing Reform Act of
1984, by which the United States Congress created the Sentencing
Commission, and that commission has issued detailed guidelines
for judges to consider in determining the sentence in a criminal
case.  There are sentencing ranges set for specific offenses,
and those ranges are contained in a guidelines manual.

But the guidelines are not mandatory.  They are instead
advisory, although they must be consulted by the Court in
determining the appropriate sentence in this case.

Am I proceeding too quickly for the interpreters, or is it
all right?

THE INTERPRETER:  It's fine, Your Honor.  Thank you.

THE COURT:  Okay.  Thank you.

So I'm going to assess and determine the proper sentence
by referring to and considering the sentencing guidelines along
with all other relevant factors.  There's no presumption that

1    the guidelines sentence is the correct sentence, and the guidelines

2    will be treated as advisory, not mandatory, but they will be

3    considered along with all other relevant factors consistent with

4    Section 3553(a) of Title 18.

5        So we're here because the defendant has pled guilty.  Now,

6    he pled guilty at the close of the government's case following a

7    two-week trial, and he pled guilty to all 48 counts of the

8    second superseding indictment.  I think, for the record, I

9    should review what those counts are, and I will do so now:

10        Count 1.  Conspiracy to Violate the Export Control Reform

11    Act.  It's a violation of 50 U.S.C. § 4819.

12        Count 2.  Conspiracy to Commit Smuggling and Defraud the

13    United States is a violation of 18 U.S.C. § 371.

14        Counts 3 through 17 are Export Control Reform Act

15    violations.  That's Title 50 § 4819 of the U.S. Code.

16        Counts 18 through 20.  Smuggling, aiding and abetting,

17    in violation of Title 18 § 54(a) and § 2.

18        Counts 21 through 34 are the first set of money laundering

19    counts, laundering of monetary instruments, what we call

20    "promotion" in violation of Title 18 of the U.S. Code Section

21    1956(a)(2)(A), as well as the aiding and abetting provisions

22    at Section 2.

23        And then mirror image in Counts 35 through 48, the same

24    events, but laundering of monetary instruments, what we call

25    "proceeds," in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and

1    §2, aiding and abetting.  And those are the 48 counts.

2        So my first obligation is to do a guideline calculation,

3    and that's where a lot of the issues and time in the sentencing

4    needs to be devoted.  I'm using the 2023 guidelines manual.

5    There are many counts, as you've just heard.  There are some

6    complexities, but not as many as were in a previous sentencing

7    with respect to this case.

8        But I will first hear from counsel briefly on any guideline

9    calculation issues that they wish to address.  I think

10   acceptance of responsibility is in dispute.  It's not clear to

11   me that the enhancement or increase for an organizer or leader

12   under §3B1.1(a) is in dispute, but if you think it is, then tell

13   me what your views are on that.

14       And then lastly, I need to make a determination with

15   respect to the guideline that applies to the money laundering

16   proceeds counts under 2S1.1(a)(1) and then 1B1.3(a)(1)(A).  And

17   if you wish to address that, please do so.  I'll hear first from

18   the government and then from the defense on these issues.

19       Ms. Seifert.

20       MS. SEIFERT:  Thank you, Your Honor.

21       As previously stated, the government agrees with the

22   calculation of the guidelines as put forward by the presentence

23   report writer, and I'll just briefly touch on the issues that

24   the government understands might be, or from defendant's papers,

25   appear to be in dispute.

1    The government agrees with the application of the

2    guidelines as put forward by the PSR writer that there should

3    not be any award for acceptance of responsibility in this case.

4    I note that the Court did not provide Ms. Tunis, who pled guilty

5    on the eve of trial, with any points for acceptance of

6    responsibility.  So, too, here I think it would be only fair

7    that Mr. Germine, who went through trial up until the very last

8    witness, likewise not be considered eligible for acceptance

9    points.

10    I also note that in defendant's letter, moreover, he walks

11    away from the conduct in this case to which he pled guilty,

12    stating that he did not know that it was against the law to buy

13    weapons in the United States and import them to Haiti, and that

14    he didn't realize that until he came to court in the United

15    States and that he would have not done the conduct had he known,

16    which again I think is inconsistent with what he pled to at

17    trial, which was that he did know and he willfully disregarded

18    a known legal duty at the time in which he did enter into a

19    conspiracy to export weapons from the United States to Haiti.

20    So all of that I think augurs against providing any acceptance

21    of responsibility points here.

22    I would also just note for the record that, contrary to

23    defendant's claim, the government certainly does not agree that

24    he provided a full statement accounting for his conduct upon his

25    arrest.  I think if the Court recalls the testimony of the agent

1    who was with him upon his arrest, Agent Harrison, Agent Harrison

2    actually even testified to that fact, that he in fact did not

3    get a full statement of accountability, in his opinion, and so

4    the Court can rely on Agent Harrison's representations of the

5    same.

6        Secondly, defendant clearly operated as a leader of the

7    gang.  It doesn't appear to the government either that that's

8    in contest, but certainly the Court has ample evidence that it

9    heard at trial, and then that is recitated in the government's

10   sentencing memo that defendant clearly operated as a leader

11   with respect to this conspiracy including conduct affecting

12   Ms. Tunis, Mr. Dor, and Mr. St. Louis as well as other

13   coconspirators based in Haiti, Mr. Sanjou and Ms. Santia Jean,

14   and as well as his cousin, who you heard from Mr. Pelice who

15   testified that defendant instructed him to bring money to

16   Ms. Santia Jean.

17       Third, the government agrees with the presentence report

18   writer that the victim of the eligibility with respect to the

19   victim points with respect to the government agencies, which I

20   believe the Court also awarded extra points for with respect to

21   Ms. Tunis, and we agree with that calculation here as well.

22       And then fourth, I think the issue that's most at issue

23   between the parties is whether or not Mr. Germine should be

24   responsible under 2S1.1 for conduct that is relevant conduct

25   under 1B1.3(a)(1)(A).

1      The government has spent a lot of time in its memo

2   explaining all of the reasons why the Court thinks that the

3   government has shown -- or whether the government thinks that

4   it has shown by a preponderance of the evidence that in fact

5   the defendant was involved in by either aiding, abetting,

6   counseling, commanding, inducing, or procuring or willfully

7   causing the kidnappings of the two -- or three victims, two

8   different hostage takings, that occurred in June and July of

9   2021.  And those would be the kidnapping of D.R. and her husband,

10  who the Court heard from at trial, and the kidnapping of K.J.

11  Both of those occurred during the time frame of the summer of

12  2021.

13      The Court heard evidence at trial, including very

14  persuasively in the government's view from Mr. Pelice, that when

15  Mr. Pelice returned from his time away from the gang in June or

16  July of 2021, the defendant told him at that time that he had

17  previously agreed with Vitel'Homme Innocent to enter into an

18  agreement to kidnap individuals for ransom and the two gangs

19  would work together and split the profits.

20      The government's evidence shows by a preponderance at least

21  that all of the kidnappings involved here — D.R., her husband,

22  and K.J. — are happening within the context of that conspiracy

23  and therefore that defendant is accountable for that conduct.

24      Defense argues that -- I think unpersuasively -- that the

25  government doesn't prove at trial that Mr. Germine participated

1    in the kidnappings of U.S. citizens.  Of course, that wasn't

2    the government's obligation at trial, and the government's

3    obligation at trial was merely to prove beyond a reasonable

4    doubt with respect to the actual laundering of the funds; but

5    the government submits that it could, and the evidence does

6    support that defendant in fact participated in those

7    kidnappings, the kidnappings of D.R. and her husband and K.J.

8          THE COURT:  There's quite a bit of evidence in the

9    record with respect to the defendant's participation in and

10    direction of kidnappings.  Tell me what the evidence is that

11    specifically goes to these two kidnappings as to which both

12    U.S. citizens were the victims and ransom was received.

13          MS. SEIFERT:  So I don't think the government has

14    put forward evidence that clearly aligns defendant with every

15    individual victim.  The only victims that is in the record,

16    there's a few strains of victims in the record that are not

17    these U.S. citizens who testified at trial, but other

18    individuals.

19        So there are a few times in the exchanges with Ms. Tunis

20    or in the testimony of Mr. Pelice or Mr. St. Louis, whether a

21    discussion of defendant and specific set of victims, and that's

22    mainly the missionaries, because obviously that was, as

23    discussed in the record, a very newsworthy event and also the

24    nuns and the priests that were kidnapped.

25          THE COURT:  Also the diplomat from the Dominican

1    Republic.

2         MS. SEIFERT:  And the diplomat, yes.  Exactly.  Thank

3    you.  But that, of course, is at the tail end.  So that is

4    really happening during defendant's arrest.  So what I mean is

5    from the conduct of when defendant is involved in the conspiracy

6    to kidnap, the communications of defendant with Ms. Tunis as

7    well as the communications that he had with Mr. Pelice and which

8    Mr. Dor heard really only hone in on a couple of sets of very

9    notorious, I guess, events.  And I think that makes sense,

10    because what the Court heard from the other victims is there

11    were a lot of victims being kidnapped at any given time.  When

12    J.L. testified, he described how there was like another room

13    where there was a whole bunch of other people in the other room.

14         So any given victim, at any given time, is not necessarily

15    warranting a discussion amongst the conspirators.  The big

16    groups of victims that are these very notorious acts the gangs

17    took, the missionaries and the priests and the nuns, those did

18    get a much greater response and a lot more communication between

19    the gang leaders, but that doesn't mean that he didn't set the

20    entire conspiracy in motion when he and Vitel'Homme agreed that

21    they were going to commit these kidnappings.

22         That is the essence of what they were doing was -- as

23    Mr. Pelice described, Vitel'Homme is warring with the gang on

24    the border of their territory, and Mr. Germine decides to make a

25    deal to broker a peace between these two gangs and work together

1    and split the profits.

2            THE COURT:  And that's in the relevant time period.

3            MS. SEIFERT:  That's in the relevant time period.

4    The evidence that Mr. Pelice put forward was that when he comes

5    back, which he says is either June or July of 2021, that

6    Mr. Germine tells him he's already agreed to that.  So that's

7    already going on by June or July of 2021, that there's an

8    agreement between these gangs to kidnap for ransom.

9        And he's the leader, and all of the evidence amply supports

10   that he's the leader.  He's the one in position to make that

11   agreement with Vitel'Homme, the leader of the other gang, and

12   the two of them then are working together and causing their

13   gangs to work together.  And just as he's responsible for

14   everything that the gang does under his direction, so was, you

15   know, Vitel'Homme.  They don't have to be the one out on the

16   street actually doing the kidnapping.  It's all under his course

17   of conduct that he has directed and divined.

18       And then he's receiving the proceeds of these kidnappings,

19   which is also obvious from the record both in that he instructs

20   Mr. Pelice to go get the proceeds from Lanmo Sanjou and to bring

21   them over to Santia Jean, and then that money flows back to

22   Ms. Tunis and others in support of not only his own personal

23   wealth but also in support of getting more guns to support the

24   gang.

25       So all of that is within the course of conduct that he sets

up, that conspiracy, and he is responsible for all of -- I mean,
the government's argument is that that's all relevant conduct.
Even the missionaries is relevant conduct for the purpose of
just determining the guidelines factors and what guideline
applies under 1B1.3(a)(1)(A).  We're only talking about those
two sets that happened in June, July, August, that summer.

But, of course, when we get back up to discuss the 3553(a)
factors, the government intends to talk about the entirety of
all of the individuals who were kidnapped under the scheme,
because that's all relevant conduct that's happening during the
time period of this event.

I'm happy to address any of the other evidence the
government has put forward.  Most of it I know the Court has
already seen and heard by sitting through trial.  Of course,
we had a few new things in the record, so happy to address any
of those, or I'll just take my leave and rely on our papers.
Thank you, Your Honor.

THE COURT:  So be it.  Thank you very much.

Ms. Amato?

MS. AMATO:  Yes.  So Mr. Orenberg and I have divided
the work here, but I'm going to address the acceptance of
responsibility component.  We are still asking Your Honor to
give Mr. Germine credit for acceptance of responsibility and
reduce the guidelines by two points.  We appreciate and
recognize that the third point would not be applicable at this

1    point.

2        But the guidelines under 3E1.1 application note 2 do

3    provide for a Court to downward adjust by two levels even if

4    someone has gone to trial.  Application note 2 says that

5    conviction by trial, however, does not automatically preclude

6    a defendant from consideration for such a reduction.  The

7    application note further goes, at the last line of that

8    paragraph, that in each such instance, however, determination

9    that a defendant has accepted responsibility will be based

10    primarily upon pretrial statements and conduct.

11        And we submit that in this case his pretrial statements and

12    conduct did show that he accepted responsibility.  He did speak

13    with law enforcement on his flight from Haiti to the United

14    States.  He did provide them an incriminating statement against

15    himself.  I mean, he did accept responsibility in that statement.

16    He may not have provided them all information about all the

17    other participants, but he certainly did incriminate himself.

18        And then in addition, when he landed in the United States,

19    and particularly in Virginia, he did work with the government

20    and work with law enforcement and make phone calls upon their

21    request to individuals in Haiti to request that the Dominican

22    diplomat be released.  So those actions in and of themselves I

23    believe provide the Court with the type of acceptance of

24    responsibility that I would say do not preclude him from

25    receiving the two-point reduction.

1    THE COURT:  I don't think he's precluded under the

2    guideline provisions, but the question is whether he should get

3    the acceptance of responsibility reduction.  And can you point

4    me to another instance where a criminal defendant went through

5    two weeks of trial and then, at the very last moment, after the

6    government's overwhelming case, decided to plead to the

7    indictment that such a circumstance has given rise to an

8    acceptance of responsibility being applied?

9    MS. AMATO:  I do cite in my pleading on page 4 a case

10   of *United States v. Jones*, which is a D.C. Circuit case from

11   1993.  I don't recall as I stand here right now how long the

12   trial was, but that defendant did go to trial.  He did not

13   actually even plead guilty.  He went through the whole trial, he

14   was found guilty, and then the judge did -- after trial, the

15   individual, the defendant, acknowledged his wrongdoing.

16   And so it was based on his acknowledgement of his

17   wrongdoing that the judge then did grant the downward reduction

18   of two levels.  The judge didn't give him the low end of the

19   guideline; he gave him the six months higher than the low end.

20   But he did give this defendant a two-level downward adjustment

21   of responsibility for having - afterwards, at least - acknowledged

22   his wrongdoing.  So that is one case that I found in that this

23   did occur.

24   The government points to Tunis and says, well, Your Honor

25   didn't give her the two-level points, but I would submit that

every defendant should still be looked at differently, even if

they're part of the same case.  Ms. Tunis testified.

Mr. Germine never testified, either at trial or under oath or at

the motions hearing.  I believe Your Honor had found Ms. Tunis

to not be credible at least as to certain parts of her testimony.

THE COURT:  Yeah, her testimony was at the motions

hearing.

MS. AMATO:  Correct.  But it was still under oath.

THE COURT:  Absolutely.

MS. AMATO:  And so I can -- so I point to that to

differentiate.  We do not have that type of scenario here.

So there is a difference, and the Court can determine the

acceptance of responsibility differently with two defendants in

the same case, and that's again because there are different

paths and avenues that they have taken, and he has not testified

either at the motions hearing under oath or at trial.

He accepted guilt in this case.  We were on the last

government witness.  He did not put the government through the

ringer of cross-examining him.  He did not take the stand at

trial.  We did not put on a defense case at trial.  And again, I

would submit that, because of his initial having spoken with law

enforcement as well as assisting law enforcement in the release

of the Haitian, that that should be taken into account and

credited.

Some of the other cases, Your Honor, that I cited, *United*

*States v. Parker*, which was a Second Circuit case, talks about

that one of the goals of sentencing is rehabilitation.  And then

connected to that, the *Williams v. New York* case, which is a

Supreme Court case, stated that a defendant's admission of

responsibility or expression of contrition is often a significant

first step towards rehabilitation and, for that reason, deserving

of a possible reward in the form of a lessened sentence.

          And so for all of these reasons and the activity that he

did do upon his arrival to the United States, that should be

credited, and I believe the right manner to credit that is with

the acceptance of responsibility.  We are not going to add

anything further relative to role.  We will just rest on our

papers, and Mr. Orenberg I believe will address any other

guideline issues.  Thank you.

          THE COURT:  All right.  Thank you, Ms. Amato.

          MR. ORENBERG:  Thank you, Your Honor.

          Yes, I'm going to address I guess what we're calling the

grouping issues and the 2S1.1 issue.

          Your Honor, at the outset, it's somewhat befuddling to me

that the probation office and the government would say that the

ATF is not part of the government.

          THE COURT:  Does that really matter?  It doesn't

affect the ultimate guideline calculation here, does it?

          MR. ORENBERG:  No, it doesn't.

          THE COURT:  The grouping doesn't wind up giving --

1    under the calculation by the government and probation office,

2    the grouping doesn't wind up giving any additional sentence.

3            MR. ORENBERG:  The Court is correct.  But it sets a

4    bad precedent, I think, for not only in this case but for cases

5    that come after us that perhaps the government in the future

6    would rely upon what's established in this case with respect to

7    the ATF is not part of the government?  It's an integral part of

8    the government, and I think for purposes of clarity and accuracy

9    that the Court -- for the reasons --

10           THE COURT:  I don't think they have specifically said

11   the ATF is not part of the government.

12           MR. ORENBERG:  Well, they say that --

13           THE COURT:  They're saying that the ATF can be viewed

14   as a distinct part of the government, distinct from other parts

15   of the government, for purposes of identifying the victim in the

16   case.

17           MR. ORENBERG:  Right, but that in and of itself I

18   think should be problematic for this court.  This frankly is

19   a situation of first impression for me between these two

20   competing -- well, I don't know if they're competing, but these

21   two aligned government agencies with respect to guidelines

22   calculations.  I'm not quite sure if the Court has had

23   experience in considering and deciding this very same topic, but

24   I do think that the Court should not -- even though we do -- and

25   I agree with you, we kind of arrive at the same place.  I'm not

1    disputing that.  But I do think that the Court, for clarity and

2    accuracy purposes, should make a decision whether or not the ATF

3    should be grouped together in this particular scenario in this

4    particular sentencing.

5        Now, with respect to the 2S1.1, I'm not going to belabor

6    the Court with a lot of arguments, because I'm aware of what the

7    Court did in the Tunis sentencing.  I've read the transcripts in

8    that sentencing.  But what concerns me is that Ms. Seifert stood

9    here a few minutes ago and said, if I -- I'm paraphrasing with

10   respect to this particular issue, that the government did not

11   put forward direct evidence or evidence of Mr. Germine in every

12   single kidnapping in this case.

13       And I think by saying that, what Ms. Seifert and the

14   government is asking this Court to do is to analogize, just take

15   a bag of M&Ms composed of many different colors of M&Ms and

16   reach in and hopefully grab the one color that you want to rely

17   upon, whether it's the red or the blue or whatever, and I don't

18   think that's the way for this Court to go.

19       THE COURT:  That's not really an accurate analogy.

20   Basically, what the government is saying is there's plenty of

21   evidence that Mr. Germine was the leader.  I hesitate to use

22   that term because Sanjou is referred to as the "leader," and

23   Mr. Germine is referred to as the "king."  So he's at the top

24   of this hierarchy for the gang and the gang's activities during

25   the relevant time period, which is the summer of 2021.  And

there's lots of evidence with respect to communications with
Ms. Tunis and testimony from Mr. Pelice and testimony from
Mr. St. Louis, lots of evidence with respect to his involvement,
Mr. Germine's involvement, from a distance, either the distance
of jail in Haiti to the gang or the distance -- well, that's
basically the distance.

Lots of evidence of his involvement in kidnappings,
kidnappings both before and after the two that are of direct
relevance here, and the government just wants me to say it
wouldn't make sense to say that he wasn't engaged in the two
kidnappings that produced ransom with respect to U.S. citizens
being held.  There doesn't happen to be direct involvement in
terms of communications with Ms. Tunis, but there's lots of
evidence of his involvement in the kidnappings in general.

MR. ORENBERG:  But the government asks you to rely
upon the testimony, the sworn testimony, of Mr. Pelice, who sat
here in this courtroom for -- I think we went over two days with
him, or part of one day and part of another day with him, and
as the Court is well aware, he had a plea agreement, and he had
his own motives and --

MS. SEIFERT:  Objection, Your Honor.  That misstates
the record.  Mr. Pelice did not have a plea agreement.

MR. ORENBERG:  Oh, that's right.  I apologize.

But Mr. Pelice, nevertheless, I think the Court is aware,
has his own agenda, if you will, in this case.

1          THE COURT:  His own agenda in the case?

2          MR. ORENBERG:  Well, he's subject to the --

3          THE COURT:  He's hoping to avoid long-term incarceration?

4          MR. ORENBERG:  Correct.  Yes, Your Honor.  Okay.

5     And the government -- or Ms. Seifert mentioned him at least

6     three, maybe four times as someone you could rely upon to

7     demonstrate that Mr. Germine was involved, part of the

8     conspiracy, orchestrating, whatever you want to say, and then

9     Ms. Tunis also.  And the Court already found that Ms. Tunis in

10    that motions hearing wasn't credible.  I mean, how can the Court

11    fully rely upon these two particular witnesses that the

12    government asked --

13         THE COURT:  It's not that much testimony of Ms. Tunis.

14    It's the communications through emails and chats and so forth.

15         MR. ORENBERG:  Right.  Thank you, Your Honor.  Yeah,

16    the communications, but still Ms. Seifert and the government is

17    asking the Court to rely upon witnesses who have an obvious

18    motive, I call it agenda, to do what they need to do to get a

19    lesser sentence in this case.

20         THE COURT:  Well, that didn't seem to work for

21    Ms. Tunis, did it?

22         MR. ORENBERG:  I'm not going to comment on that at

23    this point in time, but nevertheless, what Ms. Seifert is asking

24    the Court to do is to, in other words, pick and choose from a

25    bunch of different, shall we say, M&Ms and put them together in

one bag and say that he should be held accountable under 2S1.1

for the kidnapping activities that occurred.

Does the Court have any further questions?

THE COURT:  I don't think so.

MR. ORENBERG:  Okay.

THE COURT:  Thank you, Mr. Orenberg.

All right.  So I need to make some decisions here with

respect to the guideline calculation.  As I said, it's

complicated to some extent, but there are basically these three

issues, one of which is not really in dispute, and that is the

3B1.1(a) role in the offense.  And while the defense has said

we're not going to say anything further, there really isn't any

doubt based on the record that Mr. Germine was an organizer or

leader of the gun-smuggling effort, the charges in this case.

He was the king of the gang, from his own statements and

the statements of others.  "Others" meaning Ms. Tunis, Mr. Dor,

Mr. St. Louis, and those back in Haiti.  Ms. Santia Jean and

Sanjou also, Pelice, followed his directions on several

occasions.  The fact that others occasionally followed

Ms. Tunis's directions or decided to do things without any

direction from Mr. Germine does not mean that they were not,

when he asserted them, following his directions completely.

He was, with no question, an organizer or leader of the

gun-smuggling effort, and he often gave directions.  And they

were followed, and followed with some fear with respect to what

he might do if they didn't follow his directions.  So that
four-level increase for the role in the offense will be applied.

I also, under 3E1.1, have concluded that there should be no
acceptance of responsibility here.  There's no clear
demonstration of an acceptance of responsibility.

Three things:  With respect to what Mr. Germine did when he
was apprehended and brought to the United States, yes, he did
some things that were helpful to the government with respect to
-- in particular, to one ongoing kidnapping, but he did not
fully accept responsibility.  He was not fully forthcoming and
cooperative at that point.  So I think that is less than
anything close to a full acceptance of responsibility.

And I will say that the letter that Mr. Germine has
submitted through counsel to the Court is an indication to me
that he has not fully accepted responsibility.  That letter
is not an acceptance of responsibility; it is an excuse or an
explanation for some of his conduct.  It is not a full
acceptance of responsibility.

And thirdly, perhaps most importantly, I think the
circumstances of this case, with a 48-count second superseding
indictment, Mr. Germine forcing the government to go to trial,
the government putting on two weeks of evidence; and then when
the government was finished with putting on its evidence,
Mr. Germine decided to plead to the second superseding
indictment, all 48 counts, that is not the kind of action that

calls for application of the acceptance of responsibility provision under 3E1.1(a), and I will not apply it here.

So that brings us to the more complicated issue with respect to the base offense level. The primary driver behind the government and the probation office's high sentencing guideline range is 2S1.1(a)(1), which sets the base offense level at the underlying offense from which the laundered funds were derived. That's for Counts 35 through 48, the money laundering proceeds counts.

The underlying offense in this case, of course, is the hostage taking of U.S. persons for ransom. There's no disagreement on that. And the offense level for hostage taking can be determined under 2S1.1(a)(1)(B), so that requirement is satisfied. And that leaves the Court with having to determine whether Germine would be accountable for the hostage takings of U.S. citizens under 1B1.3(a)(1).

He's accountable for -- under that provision, (a)(1)(A) in particular, he's accountable for all acts and omissions that he committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused. The government must prove by a preponderance of the evidence that Germine committed, aided, abetted, counseled, etc., either the kidnapping of D.R. from June 24 through July 10 or the kidnapping of K.J. from August 5 through 13 of 2021. Those are the two instances. U.S. Citizen J.L. was also kidnapped, but there was no ransom paid with

respect to that event.  But those are the two instances in which a U.S. person was kidnapped and ransomed.

I find that the government has proven by a preponderance of the evidence that the defendant committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused the hostage takings of U.S. citizens for ransom.  Basically, the government's evidence at trial with respect to the gun smuggling counts also proved that Germine controlled 400 Mawozo's hostage taking efforts.  So I need to review that evidence a little bit. I'll try to do so quickly, but there's a lot of it.

As I said, he's responsible for the hostage takings of three U.S. citizens — D.R., her husband, and K.J. — because he was managing and controlling and was the leader of the gang's hostage taking activities in that June through August 2021 time period when those hostage takings occurred.

He's described by multiple witnesses and himself to be a leader of 400 Mawozo.  Indeed, the "king."  Pelice, Tunis, St. Louis, and he himself all describe him in that way.  Pelice stated that everything that Germine had was derived from his gang activities.  Both Pelice and St. Louis testified that Sanjou, who is identified as the leader with respect to the hostage takings on the ground in Haiti, actually worked for Germine.  And Germine admitted that gang members listened to him, took direction from him, and otherwise would do what he told them to do in his communications with Ms. Tunis and others.

1    When he was arrested later on, Sanjou did listen to him and

2    agreed to release the Dominican diplomat.  And according to

3    another witness, Mr. Germine actually represented the gang at

4    a meeting of gang leaders to discuss the assassination of the

5    president of Haiti prior to July of 2021.

6    Germine was specifically in control of the gang with

7    respect to hostage takings.  Pelice testified to that and said

8    that Germine was in control of the gang in a sufficient manner

9    to strike a deal with Vitel'Homme for the two gangs to commit

10   kidnappings together and share the profits.  And that is

11   corroborated by Germine's own statements that he instructed the

12   gang to release nuns who were taken hostage earlier in April of

13   2021 as well as the messages between he, Germine, and Tunis that

14   show that he specifically gave directions related to hostage

15   takings in the relevant time period during the summer of 2021.

16   He was in control of the proceeds of the gang's hostage

17   takings during this relevant time period.  Mr. Pelice testified

18   that when ransom money was paid, it would go to Germine through

19   Santia Jean.  He also testified that Germine was fully in

20   control of that money, keeping control through Santia Jean.  And

21   that's consistent with the messages in which Germine explains

22   his directions to Santia Jean, and that's in WhatsApp messages

23   and other messages with Ms. Tunis.

24   That's consistent with the evidence of his control after

25   the relevant time period, specifically with respect to the

1  hostage taking of the 17 U.S. citizen missionaries including

2  very young children.  Messages between Mr. Germine and Ms. Tunis

3  show that Germine was a decisionmaking authority regarding that

4  hostage taking and was specifically involved in detail about

5  execution of the plan.

6      Indeed, according to Pelice and another witness, Germine

7  stated that he intended to keep the missionaries captive for

8  political reasons, indeed in an attempt to secure his own

9  release from prison in Haiti.  And there's sufficient evidence

10  to support the conclusion that the weapons procured through the

11  gun smuggling were actually in the hands of 400 Mawozo at the

12  time of the kidnapping of the missionaries in October of 2021.

13      So, looking at it in total by a preponderance of the

14  evidence, I think that there is more than sufficient evidence

15  during the relevant time period to conclude that Germine was

16  leading 400 Mawozo, was directing its operations relating to

17  hostage takings, including the hostage takings of U.S. citizens

18  for ransom, and that it was receiving and controlling the

19  disbursement of money relating to those hostage takings, the

20  ransoms that are the proceeds for the money laundering counts.

21  And therefore, again in the language of 1B1.3(a)(1)(A), he

22  aided, abetted, counseled, commanded, induced, procured, or

23  willfully caused those hostage takings.

24      Let me refer to a couple of other specific pieces of

25  evidence.  There are the exchanges with Ms. Tunis in which

1    Germine tells Tunis that he's king.  On June 18 -- and these are
2    from the relevant time period.  On June 18 he tells Tunis about
3    dragging a non-U.S. citizen hostage from his home.  Tunis asks
4    Germine if he "had work today," and that's -- taken from the
5    totality of the messages, that's often a reference to hostage
6    taking.  And on that date, he says -- she says that you always
7    find something when you go out there.

8         In August there are text messages in which Tunis thanks
9    Germine for securing the release of a non-U.S. citizen hostage
10   by the gang, demonstrating his significant role with respect
11   to the gang's hostage taking operations even if not of a U.S.
12   citizen.

13        There are the messages in the October time period when
14   Germine tells Tunis that there was a strike today on October 18
15   and discusses what's going to happen with respect to the police
16   and activities, and he even tells Tunis where the missionaries
17   are being held.

18        The testimony of Pelice I've already referred to.  It
19   indicates that Germine controlled 400 Mawozo activities from
20   jail.  He was in control of the gang in this time period of
21   June and July 2021 sufficient to enter into an agreement with
22   Vitel'Homme for the gangs to commit kidnappings together and
23   share the profits.  And Pelice testified to Germine's control
24   of the money received at various points in the transcript of
25   the trial here and that Germine instructed Vitel'Homme to kidnap

1    the missionaries.  St. Louis also testified that he heard

2    Germine speak on the phone with 400 Mawozo members about

3    kidnappings.

4        Germine went -- later on, when he was in FBI custody in May

5    of 2022, he indicated that "whatever I ask 400 Mawozo to do for

6    me, they will do," and indeed, he even notes that they kidnapped

7    some nuns and "I ordered them to let them go."  And then he

8    secures the release of a Dominican Republic diplomat who was

9    held hostage.  All of this indicates his influence with the gang

10   over kidnappings.

11       So, under the combination of 2S1.1(a)(1) and 1B1.3(a)(1)(A),

12   and then the reference to 2A4.1, the kidnapping provision, I

13   find that the base offense level is properly calculated through

14   that combination, and I'm now going to give the guideline

15   calculation that will be applied here.

16       So there are a lot of counts.  The guideline for Count 1 is

17   2M5.2.  That's true for 2a.  The conspiracy to commit smuggling

18   is 2M5.2.  And for 2b, the conspiracy to defraud the United

19   States through a series of proffers references, it's 2C1.1.

20       For Counts 3 through 17, again it's 2M5.2.  For Counts 18

21   through 20, it's 2M5.2.  And then for the money laundering

22   counts for the first set, 21 through 34, it's 2S1.1; and then

23   for the second set, 35 through 48, it's also 2S1.1.

24       You group all of these together with the exception of Count

25   2b, which is the conspiracy to defraud the United States, and

the others are all grouped pursuant to 3D1.2(b) because the

counts involved the same victim and two or more acts or

transactions connected by a common criminal objective or

constituting part of a common scheme or plan.

There's a second group, which is 2b alone.  It doesn't

group with the grouping of all the other counts under 3D1.2

because you have a different victim.  I do conclude that the ATF

is a separate and distinct victim from the victim in the other

counts, but as I noted, even if that count were grouped with all

the others as the defendant has argued, it would not change the

guideline calculation here.

So the calculations.  Focusing on Counts 35 through 48, the

guideline for offenses under 18 U.S.C. § 1956 is found at 2S1.1.

That section provides that the base offense level is that for

the underlying offense from which the laundered funds were

derived if the defendant committed the underlying offense or

would be accountable for the underlying offense under

§1B1.3(a)(1)(A), so relevant conduct concept.  And the offense

level for that offense can be determined as I've already found

that it can be.

Kidnapping is covered under guideline §2A4.1, and that's

where we wind up, and the base offense level, therefore, is 32

pursuant to 2A4.1(a).  Six levels are added to that because a

ransom demand or demand upon the government was made pursuant to

2A4.1(b)(1).  Two levels are added because a dangerous weapon

1    was used.

2        These kidnappings were committed with armed men at gunpoint

3    who stopped vehicles and kidnapped the occupants, and indeed

4    that's what the gun smuggling was all about, to get weapons to

5    the gang for use in its criminal activities including hostage

6    taking.  So those two levels are added under 2A4.1(b)(2).

7        And then one further level was added because the victim was

8    not released before seven days had elapsed.  And you can look at

9    the kidnapping from June 24 to July 10 for that, and that level

10   is added under 2A4.1(b)(4)(B).  That means a total of nine

11   additional levels are added to the level 32, bringing us to

12   level 41.  There are two more levels that are added for special

13   offense characteristic because the defendant was convicted under

14   Section 1956, and that is pursuant to 2S1.1(b)(2)(B).

15       And finally, Mr. Germine was an organizer or leader of a

16   criminal activity that involved five or more participants and

17   was extensive, and therefore four levels are added under

18   3B1.1(a).  That brings the adjusted offense level to 47, a very

19   high offense level.  That's for Count Group 1.

20       Group 2 is that sole offense in Count 2b of the second

21   superseding indictment, and the base offense level there is 12

22   under 2C1.1(a)(2).  The only increase is for the role in the

23   offense, which brings it to a level 16.  Then you have to figure

24   out how these two groups are assessed for the multiple-count

25   adjustment.  It's pretty simple here.

1    Group 1 is the highest offense level, 47.  Group 2 at a

2    level 16 is more than nine levels below, and therefore there's

3    no increase for the grouping.  The greater adjusted offense

4    level of 47 is what controls.  That's the combined adjusted

5    offense level as well.

6    There's no acceptance of responsibility, as I've already

7    found, and then pursuant to Chapter 5, Part A, comment note 2,

8    in the rare case where the total offense level is in excess of

9    43, the offense level is treated as being 43.

10    We have offense level 43.  We have criminal history

11    category I because there's no prior criminal conduct that is

12    utilized for a guideline calculation, and the guideline range

13    is, therefore, life imprisonment.  There's no adjustment under

14    4C1.1.  And that is the guideline calculation as the Court has

15    concluded.

16    So I will ask counsel if there's any objection to those

17    conclusions other than the objections that have already been

18    stated with respect to offense level, criminal history category,

19    and advisory guideline range.  Ms. Seifert.

20    MS. SEIFERT:  Not from the government.

21    THE COURT:  Mr. Orenberg, other than the objections

22    you've already made on the record.

23    MR. ORENBERG:  Yes, Your Honor.  Just to clarify, I

24    think I heard the Court say, when it was discussing Group 2, or

25    Count Group 2, Count 2b, that it was a 16-level -- that the base

1    offense level was 16 under 2C1.1(a)(2).

2        THE COURT:  No.  I didn't say the base offense level

3    was 16.  I said the base offense level was 12, but when you add

4    in the role and the offense of four levels, you get an adjusted

5    offense level of 16.

6        MR. ORENBERG:  Right.  Okay.  Got it.  Thank you,

7    Your Honor.

8        THE COURT:  All right.  Sentencing guidelines are

9    advisory, but they'll be considered by the Court along with all

10   of the other relevant factors.  And now, Ms. Seifert, your

11   second chance to tell me what sentence I should impose here.

12       MS. SEIFERT:  Thank you, Your Honor.

13       Under the 3553 factors, as well as described by the

14   sentencing guidelines, the government submits that the

15   appropriate sentence is a guidelines compliant sentence of life

16   in prison.  As the Court just calculated the guidelines,

17   defendant's actually already received an adjustment downward to

18   43 from his original score of 47, which does show how severe the

19   offenses here are and how serious the criminal conduct is.

20       The whole point of the sentencing guidelines is to give the

21   Court a rational reason and basis about how to calculate the

22   appropriate sentence and not to just kind of pick a number out

23   of the air, and yet here the government submits that's exactly

24   what both probation and defense are asking Your Honor to do.

25       Probation picks a number of 240 months with no explanation

as to why.  That's a five-level downward variance from the
applicable guidelines range, which would be a bottom level of a
level 38.

Defense is asking Your Honor to put a sentence in of
210 months.  Again, no basis for a variance.  And that is a
six-level downward variance to a low-end guideline sentence
of 37.

Again, the government submits that as I'll review the
factors that we think are most important for the Court to
consider, but this is exactly the type of case where the
guidelines make sense for the Court to credit them and to
credit that that is the appropriate sentence here.

THE COURT:  I'm going to be a little technical now.

MS. SEIFERT:  Yes.

THE COURT:  How does the government get to a life
sentence when each of the counts has a statutory maximum of
either 20, 10, or 5 years?  Even if I do consecutive sentencing,
I wind up with a number, not life.  How can I possibly impose a
sentence technically that is life imprisonment?

MS. SEIFERT:  So I think -- you're correct,
Your Honor.  What the Court would do under the guidelines is to
stack all the sentences and give the maximum of stack time, so
adding them all together.

THE COURT:  And it winds up with several hundred --

MS. SEIFERT:  Many hundred years.

1          THE COURT:  But it's not a life sentence?

2          MS. SEIFERT:  Correct, Your Honor.  Effectively a life

3    sentence, but you're right, it does end up being several

4    hundreds of years because of the number of counts and the

5    maximum sentence on each of the counts.

6       So let's start with the nature and circumstances of the

7    crime.  Obviously, the gun trafficking itself is a very serious

8    crime.  The Court is well aware and has many cases involving

9    violence in Haiti, and specifically violence done by gangs in

10   Haiti, and that violence has bled over into the United States

11   and affected victims in the United States.

12      And, of course, I think we're all aware from the news

13   reports that Haiti has devolved into chaos.  It has failed

14   governance, and a lot of that is due to the control of gangs

15   like 400 Mawozo.  And defendant as its leader -- as the Court

16   just found, as its king -- is a big part of that problem.  And

17   so that's something that is in the background of what is an

18   appropriate sentence here, as he is a fairly young man and his

19   return to Haiti would allow him an opportunity to take back

20   control of that gang and to continue to sow violence in Haiti

21   and against the Haitian people and affecting the United States.

22          THE COURT:  I understand that concern, and I share

23   that concern.  Bottom line, though, if I sentenced him to --

24   let's pick a number out of the air for a moment for this

25   discussion -- 30 years and therefore he was released when he was

1    in his early 60s, we don't even know what Haiti's going to look

2    like 30 years from now.

3            MS. SEIFERT:  I agree, Your Honor.

4            THE COURT:  And indeed -- and this is not in the

5    record of this case, but I believe there's been a substantial

6    change with respect to control of the territory that 400 Mawozo

7    previously controlled.

8            MS. SEIFERT:  I think that what I would note for the

9    Court and what is evidenced from both the defendant's statement

10   and the testimony the Court heard at trial is the defendant is a

11   person who is very much revered by the people around him and is

12   able to, through whatever it is, his charisma, his background,

13   really operate and control.  The fact that he's in prison and

14   has multiple cell phones in prison and is controlling people in

15   the United States and in Haiti --

16           THE COURT:  I want the audience to know that

17   Ms. Seifert is not referring to him being in prison in the

18   United States and doing that.  She's referring to him being

19   in prison in Haiti and doing that.

20           MS. SEIFERT:  Yes.  The fact that he's in prison in

21   Haiti and having the ability to control the gang I think really

22   goes to his ability to influence and his -- and why in terms of

23   deterrence a lengthy sentence is appropriate.  But I think with

24   respect to the nature and circumstances of the crime, there's

25   two crimes the Court is looking at, not only the gun violence

and the gun trafficking but also the effects of that, which is the kidnapping of U.S. persons.  And we can first talk about the kidnappings for which the Court just found he's responsible.

So D.R. and her husband and K.J., both offered very emotional testimony to Your Honor about the seriousness of their circumstances when they were kidnapped.  I mean, K.J. was quaking on the stand, so emotional in remembering what it was like to go through that and the fear of being taken at gunpoint and being -- and then having to go amongst her community and borrow and beg from everyone to get enough money to be released. I mean, these are very serious offenses for both -- these three victims.

But that doesn't even take into account all of the kidnapping conduct that Your Honor has heard about in the course of this gun-trafficking conspiracy and the proceeds being laundered.  Your Honor has heard of other relevant conduct that the government thinks the Court should consider and which also means that a guidelines compliant sentence is most appropriate, and that includes J.L.'s kidnapping, J.L. who noted all of the guns that were around him at the time and the various operations of the gang and how it was operating as a business and checked his wallet back out to him when he left and things of that nature but decided to keep his gun for themselves.

You heard from D.R., K.J., and J.L. about the scores of Haitian hostages who were being kept in custody by 400 Mawozo,

1    all of this involved in the series of kidnappings that the gang

2    was doing under defendant's direction and including the

3    kidnappings that were done in agreement with Vitel'Homme.

4        Defense, in their papers, said Mr. Germine genuinely tried

5    to help his countrymen, especially those who didn't have much.

6    And that just seems so contrary to what his countrymen must have

7    been feeling when they were being held in squalid conditions in

8    the gang's houses and various places where they were being

9    forced to pay what little money they had in order to get their

10   freedom.  And you heard about that from all three of those

11   witnesses.

12       There's also the case of the French nuns who were kidnapped,

13   which defendant himself says that he was in control of the gang

14   and was able to get them released.  And that is one in which

15   he's also communicating with Ms. Tunis about that in April of

16   2021.

17       And then of course the kidnapping of the missionaries on

18   October 16 of 2021, the missionaries who have five children with

19   them, one of whom is eight months old, still being nursed by her

20   mom at the time in which she is kidnapped, and another young

21   child is two.  They're held for 62 days.

22       And defendant is so proud of this that when he's discussing

23   it with Tunis, he's talking about the notoriety of the gang in

24   participating in this kidnapping.  And then, as Your Honor

25   noted, he's telling Ms. Tunis about where they're being held in

Mòn Kabrit, that Lanmo has told him.  And this is right after
this happened.

And you saw in the papers we submitted also that Mr. Pelice
heard from the defendant that and knew at the time that the
defendant had instructed Koleg, this other gang member who
Mr. St. Louis testified about, to kidnap the missionaries and
bring them to Lanmo Sanjou.  So all of that is consistent with
his own control of the gang and consistent with the conduct that
is just extremely serious here and does not warrant any sort of
departure.

And moreover, especially with the missionaries, he is using
them as a chip for himself, for his own release, for his own
political benefit.  He's not worried about the eight-month-old
child who's sitting there with her mother.  He wants his own
get-out-of-jail-free card.

And, in fact, I'll remind the Court of the video that the
government showed in opening statements of defendant, on his
birthday in jail, wearing Fendi that Ms. Tunis had purchased for
him, drinking and smoking in jail and partying and dancing.
That video, Your Honor, it was on his birthday, October 24 of
2021.  That is eight days after the missionaries were kidnapped.

And so his statements now about his concern for his
community I think are belied by the fact that the Court was
presented with about these series of kidnappings and the number
of people he has hurt over the course of his relatively young

life.

With respect to the facts and circumstances of the defendant, the government agrees that the defendant's letter does not show necessarily remorse but rather excuse.  In the government's view, the letter reads like the defendant is a victim in his own life, that really all of these things happened to him and he was victimized by other people and put into these various situations.

But again, the government submits that's just belied by the evidence the Court heard.  The evidence the Court heard from the people who knew defendant at the time he was in Haiti controlling the gang was that his life did not just happen to him.  He directed people.  He directed them to take people hostage, to hurt them and to use violence against them and to buy guns to further his gang's control.  He directed all of that while he was in jail maintaining multiple cell phones and multiple communications between himself and the gang leaders.

I would just reference for the Court the chart, for instance, of cell phone calls that occurred on the date the missionaries were kidnapped and all of the calls that he's having with Lanmo Sanjou and Gaspiyay that day, the very day the missionaries are taken into custody.  It just shows that he is in the middle of all of these decisions, criminal decisions, that he has made.

Now, I strongly commend, of course, Ms. Jus and the way in

her letter she described that she moved to the United States so
that she could work, so that she could send her children to
school, and that Mr. Germine was sent to school from the age of
five until the first year of college.  I can certainly imagine
that many children in Haiti would be so lucky to have a mom who
would be willing to do that for them, and I sympathize that that
means that she was away from her son.

But he was not placed into, you know, dire straits.  He
was placed into the care of family members and he was -- he did
receive an education.  But in the government's view, he
squandered that gift, squandered that gift from his mother by
engaging in this life with this gang that really worshipped him
and brought him something that he really wanted, right,
notoriety and wealth.

And you heard from Mr. Pelice the gang made him everything
he was.  And it really reflects in that behavior that the Court
saw in the video of being able to sort of have the run of the
jail and to do whatever you want even when you're in prison.  I
mean, that goes to his fame among the community and his power
and control.

I've already talked a little bit about the safety of the
community and the deterrence factor, but I would just note that
we don't know what Haiti's going to be like.  But even now, as
the defendant has been here in the United States for about two
years now, we still have this issue in Haiti.  Just last month

1    another set of missionaries was killed in May of 2023 by gang

2    violence.  And so this --

3              THE COURT:  2023 or 2024?

4              MS. SEIFERT:  Oh, sorry.  2024.  In May of 2024, a

5    young couple, 21 and 23, killed down in Haiti, there to do

6    missionary work.  And so the control of the gangs in Haiti

7    persists.  We'll have to see, of course, what happens with the

8    force coming over from Kenya.

9         But one of the things that's really important also is

10    general deterrence to other gang leaders, to tell them that the

11    Court here takes seriously what happens in Haiti, that these

12    crimes that are being fuelled by money coming to and from the

13    United States, by weapons coming to and from the United States,

14    will be taken seriously and that the Court will impose the full

15    letter of the law upon these crimes.

16         And defendant, you know, Vitel'Homme Innocent, who is

17    charged by the United States in the missionaries case, remains

18    at large and on the FBI's top 10 most wanted list, remains in

19    control down in Haiti.  There are other gang leaders in Haiti

20    also charged.  Mr. Sanjou, also charged in the missionaries

21    case, also at large.

22         These defendants have rewards out for their capture, and

23    the Court can sit here and send a message about what really is

24    waiting for individuals who continue to act in this violent way

25    that affects the United States and affects people in Haiti as

1    well.

2        And last I'll just talk a little bit about the comparators

3    to other defendants.  Ms. Amato said every defendant should be

4    treated differently even in the same case, and I agree,

5    certainly in this case.  The Court must treat these defendants

6    differently.  He is not like any other defendant in the case,

7    even Mr. Sanjou.  He is the king.  He is the one at the top of

8    the totem pole, according to everyone.

9        And so really, when the Court is looking for examples of

10   what an appropriate sentence is, of course the government, for

11   all of the reasons we've said, thinks the guidelines provide a

12   strong basis for the Court to sentence the equivalent of a life

13   sentence, but there are other cases where courts in D.C. have

14   looked at hostage taking cases that the government thinks are

15   very similar or similar enough to give the Court an idea of what

16   would be appropriate here.

17       So we cited in our papers *Palmera Pineda*, where Judge

18   Lamberth sentenced a senior member of the FARC to 60 years, and

19   of course that was actually the maximum sentence the government

20   could ask for because of the terms of the extradition agreement.

21       But the FARC leader, Mr. Palmera Pineda, had detained

22   several U.S. citizens and used them as a bargaining chip in

23   negotiations with the government of Colombia.  Now, that sounds

24   a lot like what we're talking about here, kidnapping people and

25   using them for other purposes, using them for political

1    purposes.

2        The Court in D.C. also imposed a very significant sentence

3    in *Yunis*, which of course the Court is well aware of, and there

4    30 years for hostage taking plus 20 years for the piracy offense

5    and five years for the conspiracy.  So, considering the hostage

6    taking there where all of the hostages were set free, the Court

7    gave 30 years, and then the separate piracy offense was given 20

8    years.

9        And then I would say, in contrast, the -- I think it's

10   *Tchibassa* case, which is the Angolan Front for the Liberation

11   for the Enclave of Cabinda, that's only a single hostage, no

12   political motive, right?  It's totally monetary.  There the

13   victim works for Chevron, and the Court gives 293 months.  So in

14   the government's view, that's more of a floor, because that also

15   was a senior, high-ranking member of a violent organization.

16       And so here the government thinks this case is more similar

17   to *Palmera Pineda* or to *Yunis* and that a sentence at the higher

18   end, in that 60-year range, would be -- which frankly, for the

19   defendant who is 30, would be likely an equivalent of a

20   guidelines range compliant sentence of life would be more

21   appropriate.  We think those are the comparators that we were

22   able to find to defendants in hostage takings.  Most of those

23   cases are in D.C. because, of course, that's where most of these

24   cases are brought.  But we weren't able to find any other case

25   with circumstances such as this when we're talking about a gang

leader, someone who's designing the plan, someone who's
politically connected, where a Court would impose a sentence of
210 months.  I just think that's unreasonably low given the
amount of conduct that defendant is accountable for.

So with that, Your Honor, we'll submit on the papers for
the remainder, just noting that he is the king and he deserves
the sentence that goes with that title.

THE COURT:  Thank you, Ms. Seifert.

Ms. Amato.

MS. AMATO:  So, Your Honor, again Mr. Orenberg and I
are going to share the podium.

THE COURT:  How are you going to share this?  I don't
want you repeating each other.

MS. AMATO:  We're not, actually.  I'm just going to
talk -- all I'm going to do, Your Honor, is talk about Mr. Germine's
upbringing, his youth, and personal characteristics.

THE COURT:  Okay.

MS. AMATO:  Those things.  So that's all I'm going to
talk about.  And Your Honor's already heard a good portion of
this during my opening statement which I provided at trial, but
I still thought it would be relevant to bring it up again and go
through it.

As Your Honor's aware, Mr. Germine is born, raised, and
grew up and lived his whole life in Haiti until of course he
was brought here for this case.

1           THE COURT:  Well, I heard it through your opening

2     statement, but nothing ever got into evidence with respect to

3     most of it.

4           MS. AMATO:  Right.

5           THE COURT:  So what you're going to be telling me is

6     in the record before me, or it's just coming from you?

7           MS. AMATO:  Coming from -- when I say my opening

8     statement, I guess what I'm just saying to Your Honor is the

9     Court has heard some of this already, that's all, and we also

10    included it in our sentencing memorandum.  But I just want to

11    put it orally on the record.

12          THE COURT:  All right.  Go ahead.

13          MS. AMATO:  Okay.  So again, Mr. Germine is not a U.S.

14    citizen.  He is not someone that has at any time lived in this

15    country except for now that he's here with this case.  As the

16    Court's very aware, living in Haiti is not an easy thing.

17    Circumstances there are very difficult for a good portion of

18    the society.  And he certainly as a child did not grow up in

19    a family of wealth, so he -- although he had the basics, he

20    certainly didn't lack food, but he was not someone that had a

21    very comfortable life growing up.

22      His mother, although she provided a letter in which she

23    talked about how she sent money, you could say in essence she

24    abandoned him to a degree because she left him in Haiti when he

25    was about 14 years old, and at that point we weren't living in

the kind of life of technology that we have now where a person can Facetime and just pick up their phone and Facetime and speak with someone no matter where they are in the world.

Mr. Germine did not have, in essence, a father that was there with him while he was growing up. His father also, in essence, abandoned him. He never really knew his father when he was a child. He met his father later. He has since been able to obtain good relationships with both parents, and he does have their support, and he has maintained regular contact with his mother.

But he was left on his own in Haiti from at least the age of 14, 15. He was left in the care of an uncle and an aunt. But certainly, not having parents that he could rely on who were there who could provide him with structure, security, the love, I would certainly submit must have had an effect on him growing up and certainly had an effect on probably the decisions that he made and the choices he made as a young teenager as well as the person he became.

His mother wrote a letter in which she -- and we didn't tell her to change it. We submitted it as it was. She thought that he had completed one year of college, and that's actually not accurate. He left school when he was in the ninth grade. And according to his letter, soon thereafter he started to see some of the violence that was being perpetrated against Haitians, and that affected him and he tried to assist with

other people to protect these people, especially the vulnerable who were being beaten up and for which other violent acts were committed.

And this was particularly in the area of La Plaine.  And he and other people grouped together and started to try to help these people to protect them against the violence.  So in essence, that's how he began his activity with a band of brothers that was the force that pushed him in that direction.

At some point he was in a position to retrieve and received lands --

THE COURT:  I'm not sure I like the use of the term "band of brothers" here, but go ahead.

MS. AMATO:  All right.  So at some point he was in a position where he received lands in Haiti and he -- with those lands, he permitted and helped farmers to farm the land so that they could have a living.  He also did try -- as some of the information that we had received from the government as well, although it did not come out at trial, but that he provided other resources to the people of Croix-des-Bouquets such -- and resources and services that the government was not providing, such as cleaning the streets, paying for children's school supplies, and food for some people.  And so he was someone that was giving back, and maybe that's why people liked him, because he was giving back to the community, at least in certain ways, and helping some of the people in Croix-des-Bouquets by

1    providing them services and other help that the government had

2    not.

3              THE COURT:  I guess, for my own purposes, other than

4    what he has said in his letter and what you are saying based on

5    conversations with him, what is it in the record before me that

6    would support the view that he was a protector and provider of

7    his community by forming the gang 400 Mawozo?

8              MS. AMATO:  So there was a -- I think it was a 302.

9    There was one government, I guess I'll say witness, who had

10   provided, when he was interviewed, information as to how the

11   gang was helping the community.  That was in their report.  And

12   I believe it was one of the reports that was part of under the

13   protective order.

14        So, I mean, I haven't introduced it.  We did not include it

15   in the sentencing pleading, but that definitely was something

16   that we saw.  And the government can say what they like about

17   it, but it was certainly in one of the reports that one of these

18   individuals who actually had been privy to the gang's actions

19   saw that this was something that they were doing.

20             THE COURT:  All right.  Go ahead.

21             MS. AMATO:  Well, that was it for me, Your Honor.

22   Thank you.  I think Mr. Orenberg is going to handle the rest.

23             THE COURT:  All right.  Mr. Orenberg.

24             MR. ORENBERG:  Yes, Your Honor.

25        Your Honor, we're not asking for a sentence, a short

1    sentence, a sentence of time served, a sentence of even 10

2    years.  We're asking the Court to consider a sentence of, in our

3    papers, 17 and a half years.  And the probation office has

4    recommended a sentence of 20 years in this case.

5        One thing that I did not -- or we did not refer the Court

6    to, but it's in the presentence report on page 37, paragraph 186,

7    is the judiciary sentencing information, the JSIN data.  I'm

8    sure the Court has reviewed that.  And even in that, the

9    information is such that the sentences recommended are in the

10   low 20-year range: 22 years, 23 years.

11       When they took a look at this particular -- you know, they

12   categorize the defendants, they put them in tables, level 43,

13   the primary guideline -- excuse me, the primary guideline as is

14   here is 2S1.1 with a final offense level of 43, criminal history

15   category I.

16       So even the JSIN information provided to the Court, which

17   has become, I would say, a reliable factor that the Court should

18   consider in all types of sentencings, which at least in my

19   experience the courts here and in Maryland have begun doing so,

20   is something that this Court should take into consideration when

21   fashioning the appropriate sentence for Mr. Germine.

22       Your Honor's correct when it observes we don't know what

23   state or what condition Haiti's going to be in 30 years from

24   now.  We don't know what condition Haiti's going to be in a year

25   from now, or five years from now, or 10 years from now.  But

that's not really the question here for this Court at this time. It's what is the best sentence -- or what is the best sentence that ascribes to all the sentencing factors that this Court is required to do.

Mr. Germine, as the Court has observed, is a relatively young man. He's, as far as we know, although it's unverified, he's already serving a lengthy sentence to the country of Haiti. We don't know what's going to happen with that.

THE COURT: We also have a little bit of information about the circumstances of that sentence from videos and other evidence showing how serious an incarceration that was.

MR. ORENBERG: But that was several years ago. We don't know when he completes --

THE COURT: But that's the time period you're talking about in terms of his serving that sentence.

MR. ORENBERG: Right. But what I'm saying is, if Mr. Germine serves out his sentence here and is returned to Haiti, we don't know if it's going to be like that or it's going to be a more organized, democratic --

THE COURT: I agree with you.

MR. ORENBERG: We hope it will be. By the way, Your Honor, if it's not clear, it is in our papers, we are -- because he is a deportable alien, we are asking for the *Smith* departure consideration. I want that on the record, and I want the Court to consider that.

1        But nevertheless, Your Honor -- and I did ask the Court --

2   Ms. Amato and I, we did ask the Court to take a look at the

3   other sentences that this Court has already imposed in this

4   case.  I know they're far, far less for Mr. Dor and for

5   Mr. St. Louis in this case.  Ms. Tunis, as the Court referred to

6   a few minutes ago when I was talking to the Court previously

7   about the guidelines, did receive somewhat of a lengthy

8   sentence, perhaps more than what she was expecting in this case.

9        And it's somewhat the same for Mr. Germine, but he needs to

10  be evaluated in comparison to the other defendants in this case,

11  okay?  The government says, well, he should be considered or

12  analogized to the *Yunis* case and the case before Judge Lamberth,

13  and I would say to the Court, well, that's not -- that's trying

14  to put a square peg into a round hole here.  I think what the

15  Court should do is take a look at the defendants in this case.

16       Okay, sure.  If the Court has already determined that he

17  gets the full role assessment for being organizer and leader,

18  then he's an organizer and leader.  But he should not be

19  categorized as someone who, as the government started out

20  blanketly saying, should get a life sentence.

21       Okay.  I think the Court has an obligation to take a look

22  at Mr. Germine and take a look at his upbringing, as Ms. Amato

23  so eloquently put forth to the Court and in the letter from his

24  mother, and yes, the letter from him shows the promise that

25  perhaps one day, if he is released from this -- from the United

States and goes back to Haiti -- and hopefully the country will

be a normal, beautiful country back what it was many, many years

ago -- that he'll be able to lead a normal and productive life.

But as the Court observed, he may not be released until he's a

much older man.  He may be in his 50s, he may be in his 60s, he

may be in his 70s.  And I can stand here and make all the

arguments for recidivism.  Rates go down as somebody gets older.

The Court is well aware of all those factors.

So we're not asking, as I said, for a very short sentence

or a sentence of time served or a sentence similar to Walder

St. Louis or Jocelyn Dor.  We're asking for a sentence that is

above what Ms. Tunis received but not a life sentence in this

case.  Thank you, Your Honor.

THE COURT:  Thank you, Mr. Orenberg.

MS. SEIFERT:  Your Honor, might I just briefly --

THE COURT:  On that one record issue only.

MR. ORENBERG:  I'm sorry?

THE COURT:  Ms. Seifert wanted to say something.

MS. SEIFERT:  I just wanted to address two points.

First, I am not familiar with the document referenced by defense

with respect to a witness for the government stating that Mawozo

was doing, you know, community work.  I did see if the agents

who are here in court recalled that, but no one seems to be able

to recall that at this time.  I'm not saying it doesn't exist.

I don't have it before me.  And I would ask the Court not to

1    consider evidence that has not been submitted for this

2    sentencing proceeding.

3        And then the other thing I would just ask the Court to

4    consider is obviously I understand the PSR writers now include

5    the sentence ranges for various like crimes, and the government

6    would submit that that's very hard to do in this case because,

7    of course, when you're looking at 2S, it would fight to end

8    money laundering offense regardless of what the underlying

9    offense is.  So it seems to us that that is not particularly

10    helpful to the Court, which is why we think the like cases of

11    hostage taking being the offense that the individual was

12    sentenced on is more similar to what the appropriate range

13    would be.

14              THE COURT:  All right.  Thank you.

15        All right.  Mr. Orenberg.

16              MR. ORENBERG:  May I have 30 seconds with --

17              THE COURT:  Absolutely.

18        (Defense conferring.)

19              MS. AMATO:  Your Honor, I will provide the name to the

20    government from whose report of interview I received the

21    information that I mentioned.

22        (Defense conferring with government.)

23              MS. AMATO:  Your Honor, it's one o'clock already.  If

24    the Court wanted to take a lunch break and we come back at that

25    point, we'd like to have a little bit more of an opportunity to

1    speak with our client before he makes a statement.

2              THE COURT:  I can't really take a lunch break and come

3    back in an hour given my other responsibilities.

4              MS. AMATO:  Okay.

5              THE COURT:  I can give you a couple of minutes.  If

6    you need a couple of minutes, we can take a couple-minute break.

7              MS. AMATO:  That's fine.  We'll take whatever Your

8    Honor will give us.

9              THE COURT:  All right.  Well, why don't we take a

10   break then.  Is this still a decision whether Mr. Germine wishes

11   to address the Court?

12             MS. AMATO:  Yes.

13             THE COURT:  So we'll go ahead and take 10 minutes.

14             MS. AMATO:  Thank you.

15             THE COURT:  And then we'll come back and see if we

16   can't finish this.  Thank you.

17        (Recess from 12:55 p.m. to 1:16 p.m.)

18             THE COURT:  Mr. Orenberg or Ms. Amato, does

19   Mr. Germine wish to say something at this point?

20             MR. ORENBERG:  Yes, Your Honor.

21             THE COURT:  All right.

22             MR. ORENBERG:  Would you like him to come forward or

23   remain at counsel table?

24             THE COURT:  I'd like him to come forward, but we need

25   the interpreters to do it the way they're most comfortable with.

1          All right.  Are we ready?

2                    THE INTERPRETER:  Yes, we are.

3                    THE COURT:  All right.  Mr. Germine, good afternoon.

4                    THE DEFENDANT:  I greet you, Honorable Judge Bates,

5     with a lot of respect.  I greet the government with a lot of

6     respect.  I greet everyone in the courtroom, both the lawyers.

7     I recognize that I am wrong.  I bow down and ask forgiveness to

8     everyone that I hurt.  Whatever the person living in the United

9     States, I ask forgiveness.

10         I am a young man.  I was living in Haiti.  I was born on

11    October 24, 1992.  In 2015 I was incarcerated in Haiti.  I went

12    to the prison.  I didn't have a title like a kidnapping person

13    or a thief.  My family made a lot, so I can be released.  I paid

14    in Haiti so I could be released.

15         I am not going to speak a lot because I don't want to be

16    too long.  What I know, if I was living in a good country, I

17    would not come here because the government of my country put me

18    in this situation.

19         I will be 32 years old soon.  I do not have a child yet.

20    I spent already 114 months in prison, 25 months here in the

21    United States.  I would like you, Your Honor, to release me --

22                    THE INTERPRETER:  I'm sorry.

23         (Interpreters conferring.)

24         I'm not asking Your Honor to release me, because I know you

25    are following the law.  What I know is because of the government

1    in my country, that's the reason why I'm here today.

2        I love my mother a lot.  My mother love me a lot.  Please,

3    Your Honor, I ask for forgiveness.  I know you cannot release

4    me, but because of the government of my country, that's why I'm

5    here today.

6        And I'm pretty sure you can understand the fact that I paid

7    a judge a lot of money so that he could release me.  He did not

8    release me.  I pretty much sold everything that I owned.  It is

9    as a result of all this that I found myself in this situation.

10   Anyone who is in a very difficult situation will have to react

11   one way or another.

12       In 2021, while I was in prison in Haiti, I received

13   multiple threats.  And if you would believe it, while I was in

14   prison, I was poisoned.  The police draw their weapons on me

15   while I was in prison.  I was in imminent danger.

16           THE INTERPRETER:  Court indulgence, Your Honor.

17       Could you please repeat what you just said?

18           THE DEFENDANT:  Meanwhile, while I was in prison, I

19   received multiple phone calls from people outside of the prison

20   telling me to be careful because there's a plan to kill me.  I

21   didn't have any choice.  This is the reason why I started this

22   activity of gun purchasing from the United States, so that I

23   could save myself.

24       Your Honor, we all love our life.  Thank you, Your Honor.

25   Thank you to the Court.

1          THE COURT:  All right.  Thank you, Mr. Germine.

2      Let me deal with a couple of things, and then I'm going to

3  ask Mr. Germine and his counsel to come back up to the lectern.

4  But first I'm going to cover a couple of things before I ask Mr.

5  Germine and his counsel to come back up to the lectern.

6      First, I've received the presentence investigation report,

7  reviewed it closely.  I've also received very helpful memoranda

8  from each side, the government and the defense, and reviewed

9  those closely, and they've been of great assistance to me as

10  well.  And I've received two letters on behalf of Mr. Germine.

11  One is his own statement, a letter from him, and the other is

12  from his mother.  And those have been reviewed and considered as

13  well.

14      There's no restitution issue here, so I need not address

15  that question.  With respect to a fine, I don't think that

16  Mr. Germine has readily identifiable liquid assets, and he's

17  been incarcerated for some time; and I conclude that he has an

18  inability to pay a fine, and I will not impose a fine.  But I'm

19  going to indicate the sentence to be imposed.  I'll only go

20  through this one time, but counsel will have an opportunity to

21  make any legal objections before I formally impose the sentence.

22  And I do so with the defendant standing before me at the lectern

23  with counsel, please.

24          (Defendant and counsel approach.)

25      We're here today on extremely serious offenses involving

gun smuggling -- I'll just use that term to capture the entirety of the 48-count second superseding indictment.  And the gun smuggling was to furnish weapons — high-powered, combat-ready weapons — to extremely dangerous people and a group in Haiti. It's an extremely serious offense.  It has national security impacts and, as I said, it is very dangerous to the people of Haiti and beyond.

These were destructive weapons, weapons that were meant for combat and have a real potential for violence and killing.  They were supplied to a very dangerous, violent gang of which the defendant was the leader.  He was called "the king" by himself as well as others.

The smuggling was done under the defendant's direction.  He led both the smuggling conspiracy that resulted in the 48-count indictment and as well the hostage taking efforts of 400 Mawozo that provided the proceeds to buy the guns involved in the counts of the second superseding indictment.

I'll just pause for a moment to say that the kidnapping activity by 400 Mawozo is astounding.  They just kidnapped after kidnapped after kidnapped U.S. citizen victims and others.  And the situation in Haiti today is even worse, but the situation back in 2021 when they were doing this, for purposes of the majority of the relevant conduct here, was terrible and appalling as well.

The defendant as an individual has no accountable prior

criminal history, although obviously he was imprisoned in Haiti,
and it's just that that does not wind up counting in the
circumstances of this case for the sentencing guideline
calculation.  He was a gang member of a violent, destructive
gang, and the leader of that violent, destructive gang.

I'm going to stop for a moment to talk about "the letter"
is what I call it that Mr. Germine has provided to the Court in
the context of the sentencing and as well to his comments here
today.  With respect to the letter, I have concluded that it is
unapologetic.  It's pretty much just excuses and explanations
and a review of Mr. Germine's life history.  And it casts the
gang, I believe without sufficient support, as a community
protector and provider.  Even if it were protecting the
community, doing so through kidnappings and other violent
activity, including killings, is simply not acceptable.

In his letter, Mr. Germine pretty much acknowledges guilt
on these charges, but he expresses no real remorse and provides
excuses rather than an acceptance of responsibility.  His
comments here today before me continue that approach, where the
blame is placed on the government of Haiti.

Now, the government of Haiti over the years is not
blameless for the circumstances in Haiti.  That's certainly
true.  But to cast the government as responsible for
Mr. Germine's conduct as the leader of a violent gang committing
criminal activity that has been reviewed both in the trial and

here today is, I conclude, both inaccurate and disturbing,

quite frankly.  He points to corruption by government officials

including judicial officials.  That may well be true, but it

doesn't provide a real excuse for his conduct as the leader of

400 Mawozo.

So I'm appalled by the violent criminal conduct of the gang

under the defendant's leadership and guidance and by the scope

of the gun-smuggling offenses that bring us here today.  The

purpose of the gun smuggling was to perpetuate violence in Haiti

and enable them, the gang, and Mr. Germine in particular, to

obtain funds and guns to continue the kidnappings and other

violent activity that they were engaged in.

So where does that bring us in terms of the sentencing

guidelines?  We've already gone over what we face here.  The

sentencing guidelines have a recommended range of life, life

imprisonment.  The probation office is recommending 240 months,

that's 20 years, and the defendant is recommending 210 months,

17 and a half years.

The government is recommending the life sentence, but

acknowledges that I can't really impose a life sentence.  It has

to be a number of years because of the statutory limits on each

count.  But it can be a lot of years.  It can be many hundreds

of years if I make all the counts statutory maximums and

consecutive.

And while I accept the sentencing guideline calculation of

1    life, I'm not going to impose a life sentence.  And ultimately,

2    I'm not going to impose a sentence that is so many years that

3    it is, beyond question, a life sentence.  As the sentencing

4    guidelines recommend, I conclude that the defendant is

5    accountable for the hostage taking specifically of U.S. citizens

6    for ransom that provided the proceeds to buy the guns that would

7    support the criminal conduct of 400 Mawozo under the defendant's

8    leadership.

9        The offenses here are voluminous and very serious on their

10   own, but adding the underlying kidnappings to the assessment of

11   a proper sentence brings the examination to another level and

12   another arena.

13       I conclude, taking all of that into account -- the nature

14   of the offenses, the relevant conduct here, the conduct that

15   leads to the guideline calculation, defendant's characteristics

16   and circumstances and everything else under 3553(a), I conclude

17   that the defendant should spend a very long period of time

18   incarcerated in the United States, several decades.

19       Referring to 3553(a), the sentence I am going to impose, I

20   have concluded, is sufficient but not greater than necessary to

21   comply with the purposes set forth in that statutory provision.

22   I've already discussed the nature and circumstances of the

23   offense and the history and characteristics of the defendant.

24   I've taken those into account.

25       The sentence needs to, in the words of 3553(a), reflect

1    both the seriousness of the offense conduct for these 48 counts,

2    but also the relevant conduct that includes hostage taking of

3    U.S. citizens, and needs to promote respect for the law and

4    provide not just punishment but adequate deterrence.

5        Deterrence is a hard thing to assess here.  With respect to

6    the individual, specific deterrence, the length of the sentence

7    to be imposed will do that.  It will take him out of the

8    criminal arena so he can't conduct any further crimes for a long

9    period.  But it will also, I think, dissuade him from anything

10   further in the later stages of his life if he serves out the

11   complete sentence.

12       But more generally in terms of deterrence, I think a

13   substantial, very substantial, sentence is needed here under

14   the circumstances in Haiti with respect to the kidnappings,

15   particularly of U.S. citizens, by 400 Mawozo and other gangs

16   in Haiti.  And the kind of activity that is taking place there,

17   deterrence is an important concept generally, but it's an

18   important concept here in particular because of the message to

19   others who would engage in not just the gun smuggling activities

20   to furnish high-powered combat-ready weapons to these gangs, but

21   also to commit the criminal conduct, including hostage taking of

22   U.S. citizens, that the gang, 400 Mawozo, and other gangs have

23   engaged in.

24       I have taken into account the *Smith* departure that the

25   defense asked for, but quite frankly, the kind of departure that

is normally applied under that D.C. Circuit case is only

measured usually in approximately six months, and the sentence

being imposed here is much, much, much longer than that.  But

I've taken the *Smith* departure into account.

So, with that, I'm going to read the sentence to be

imposed.  The sentence is, in effect, a sentence of 35 years.

We get there by basically a 20-year sentence on the counts

having a statutory maximum of 20 years, all concurrent, a

ten-year sentence on the counts having a statutory maximum of

10 years concurrent with each other but consecutive to the

counts that have 20-year maximum, and then the same thing for

the count having a five-year maximum, and that will be

consecutive to the other sentences.

So, pursuant to the Sentencing Reform Act of 1984, and in

consideration of the provisions of 18 U.S.C. § 3553, as well as

the advisory sentencing guidelines, it is the judgment of the

Court that you, Joly Germine, also known as Yonyon, are hereby

committed to the custody of the Bureau of Prisons for a term of

240 months.  That is 20 years as to each of Counts 1, 3 through

17 and 21 through 48, all counts to run concurrently; 60 months,

that is five years, as to Count 2 consecutive to Counts 1, 3

through 17 and 21 through 48; and 120 months, 10 years, on each

of Counts 18 through 20 with Counts 18 and 19 concurrent to

Counts 1, 3 through 17 and 21 through 48, and Count 20

consecutive to Counts 1, 2, 3 through 17 and 21 through 48, for

1    a total or aggregate sentence of 420 months of imprisonment.

2    Thirty-five years.

3        You are further sentenced to serve a concurrent 36-month,

4    three-year term, of supervised release on Counts 1 through 48.

5    That will be if you are not deported after you complete your

6    sentence.  In addition, you are ordered to pay special

7    assessments totaling $4,800 in accordance with 18 U.S.C. § 3013.

8        While on supervision, you are to abide by the following

9    mandatory conditions as well as all discretionary conditions

10   recommended by the probation office in Part D, the Sentencing

11   Options of the presentence report, which are imposed to

12   establish the basic expectations for your conduct while on

13   supervision.

14       The mandatory conditions include that you must not commit

15   another federal, state, or local crime.  You must not unlawfully

16   possess a controlled substance.  You must refrain from any

17   unlawful use of a controlled substance.  You must submit to one

18   drug test within 15 days of placement on supervision and at

19   least two periodic drug tests thereafter as determined by the

20   Court.  You must cooperate in the collection of DNA as directed

21   by the probation officer, and you must make restitution in

22   accordance with 18 U.S.C. Sections -- I'm sorry, there's no

23   restitution order here.

24       You shall comply with the following special conditions:

25   Contact restriction.  You must not associate, communicate, or

otherwise interact with any known or unknown member of a terrorist organization or any other known or unknown criminal extremist group or individual.

This includes persons who are or claim to be involved with violent acts or advocating for acts of violence and any persons who are located outside of the United States without the approval of the Court.  If you inadvertently associate, communicate, or otherwise interact with a known terrorist or extremist group or individual, you must immediately report this to the probation officer.

Social media.  You must seek the approval of the probation officer if you wish to access, view, or use any online social media.  You must not download any social media apps to your phone or computer.  You must not access social media on any other device not approved by the probation officer.  Social media includes social media sites, chat services, blogs, instant messages, SMS, MMS, digital photos, video sharing websites, emails or any other interactive online or electronic communication applications or sites.

You must submit your computers, as defined by statute, or other electronic communications or data storage devices or media to a search.  You must warn any other persons who use these computers or devices capable of accessing the internet that the devices may be subject to searches pursuant to this condition.  Probation officer may conduct a search pursuant to this

1  condition only when reasonable suspicion exists that there is a

2  violation of a condition of supervision and that the computer or

3  device contains evidence of this violation.  Any search will be

4  conducted at a reasonable time and in a reasonable manner.

5      You must allow the probation officer to install

6  computer-monitoring software on any computer that you use, again

7  as defined by statute.  To ensure compliance with the computer

8  monitoring condition, you must allow the probation officer to

9  conduct initial and periodic unannounced searches of any

10 computers, again as defined by statute, subject to computer

11 monitoring.

12     These searches shall be conducted to determine whether the

13 computer contains any prohibited data prior to installation of

14 the monitoring software, whether the monitoring software is

15 functioning effectively after its installation, and whether

16 there have been attempts to circumvent the monitoring software

17 after its installation.  You must warn any other people who use

18 these computers that the computers may be subject to searches

19 pursuant to this condition.

20     You must submit your person, house, residence, vehicle,

21 papers, computer devices, other electronic communications,

22 network or cloud storage, data storage devices or media or

23 office to a search conducted by a United States probation

24 officer.  The probation officer may conduct the search under

25 this condition only when reasonable suspicion exists that you

1    have violated a condition of supervision and that the areas to

2    be searched contain evidence of this violation.  Any search must

3    be conducted at a reasonable time and in a reasonable manner.

4    Failure to submit to a search may be grounds for revocation of

5    release.  You must warn any other occupants that the premises

6    may be subject to searches pursuant to this condition.

7       You must report to U.S. Immigration and Customs Enforcement

8    and follow all their instructions and reporting requirements

9    until any deportation proceedings are completed.  If you are

10   ordered deported from the United States, that is after service

11   of your sentence, you must remain outside the United States

12   unless legally authorized to reenter.  If you do reenter the

13   United States, you must report to the nearest probation office

14   within 72 hours after you return.

15      The Court finds that you do not have the ability to pay a

16   fine and therefore waives imposition of a fine in this case.

17   The financial obligations are immediately payable to the Clerk

18   of the Court for the U.S. District Court at the address here in

19   Washington.  Within 30 days of any change of address, you shall

20   notify the Clerk of the Court of the change until such time as

21   the financial obligation is paid in full.  The probation office

22   shall release the presentence investigation report and/or the

23   judgment and commitment order to the Bureau of Immigration and

24   Customs Enforcement, that is ICE, to facilitate any deportation

25   proceedings.

1    The probation office shall release the presentence

2    investigation report to all appropriate agencies, which includes

3    the United States Probation Office in the approved district of

4    residence, in order to execute the sentence of the Court.

5    Treatment agencies shall return the presentence report to the

6    probation office upon the defendant's completion or termination

7    from treatment.

8    Now, Mr. Germine, you were convicted by a plea of guilty.

9    You can appeal your conviction if you believe that your guilty

10   plea was somehow unlawful or involuntary or if there is some

11   other fundamental defect in the proceedings that was not waived

12   by your guilty plea.  You also have a statutory right to appeal

13   your sentence under certain circumstances, particularly if you

14   think the sentence is contrary to law.

15   You have the right to apply for leave to appeal in forma

16   pauperis, and if you were to so request and qualify, then the

17   Clerk of the Court would prepare and file a notice of appeal on

18   your behalf.  But I note that you are represented by very able

19   counsel here today who presumably would assist you in this

20   process if you wish to follow it.  With few exceptions, any

21   notice of appeal must be filed within 14 days of the entry of

22   judgment, and I expect the judgment will be entered in the next

23   couple of days.  I'm not sure we'll get it out today.

24   So, with that, let me ask counsel if they know of any

25   reason, other than the reasons already stated and argued, why

1    the sentence should not be imposed as I have just indicated.

2    Ms. Amato and Mr. Orenberg?

3                MR. ORENBERG:  No, Your Honor.

4                THE COURT:  Ms. Seifert.

5                MS. SEIFERT:  Not for the government.

6                THE COURT:  Is there anything else that we need to

7    cover before I impose the sentence, Mr. Orenberg?

8                MR. ORENBERG:  Judicial recommendation to the Bureau

9    of Prisons for the Florida region?

10               THE COURT:  And I will make that recommendation for

11   the Florida region or in South Florida.  Anything else?

12               MR. ORENBERG:  No, Your Honor.

13               THE COURT:  Anything else from the government?

14               MS. SEIFERT:  No, Your Honor.

15               THE COURT:  I order that the sentence is imposed as

16   I have just indicated, but I do need to do something for the

17   government.  I think we have to -- technically, we have to

18   dismiss the counts of the original indictment and the first

19   superseding indictment.

20               MR. ORENBERG:  Right.

21               MS. SEIFERT:  Yes, Your Honor.  The government so

22   moves.

23               THE COURT:  And those will be dismissed.

24        And, with that, is there anything further from the

25   government?

1      MS. SEIFERT:  Not before sentence, but I did want to

2  address our status after the sentence is imposed.

3      THE COURT:  All right.  And anything else from the

4  defense?

5      MR. ORENBERG:  No.  Thank you, Your Honor.

6      THE COURT:  All right.  Please have a seat.

7    That completes the sentencing proceeding, but the

8  government wants to address our status.

9      MS. SEIFERT:  Your Honor, in Mr. Germine's other case,

10  we had a status hearing set for this Friday, though in truth I

11  believe when we set that the sentencing hearing was supposed to

12  be earlier in the month.  I think defense shares my agreement

13  that it's probably not productive to have a status in that case

14  at this time, and so if we can push that to later in July, that

15  will give us time to confer with defense counsel about the other

16  case.

17      THE COURT:  All right.  Let's do that, and why don't

18  I just continue that date, and confer among yourselves and then

19  with Ms. Duncan to set a new date.

20      MS. SEIFERT:  That's fine, Your Honor.

21      THE COURT:  All right.  And I believe that completes

22  these proceedings altogether, and whenever we set another status

23  in the other case, I will see you then.  Until then, we're done

24  for today.

25    (Proceedings adjourned at 1:50 p.m.)

\* \* \* \* \* \*

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.

*/s/ Bryan A. Wayne*
Bryan A. Wayne